Jason S. Mills (SBN 225126)
jason.mills@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
300 S. Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 612 7387
Facsimile: +1 213 612 2501

Justin A. Savage (*pro hac vice*
forthcoming)
jsavage@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711

Brooklyn Hildebrandt (SBN 350707)
bhildebrandt@sidley.com
SIDLEY AUSTIN LLP
350 S. Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

Nima H. Mohebbi (SBN 275453)
Nima.mohebbi@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: +1 310 595 9500
Facsimile: +1 310 595 9501

*Attorneys for Western States Petroleum
Association*

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLEAN AIR COUNCIL; COMMUNITIES FOR A BETTER ENVIRONMENT; and NATURAL RESOURCES DEFENSE COUNCIL, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator; and NANCY | Case No. 8:25-cv-01473-MWF-DFMx <br> Assigned to Hon. Michael W. Fitzgerald <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF WESTERN STATES PETROLEUM ASSOCIATION'S MOTION TO DISMISS** |

1   BECK, in her official capacity as Principal
2   Deputy Assistant Administrator for the
    Office of Chemical Safety and Pollution
3   Prevention,

4                Defendants.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| Hearing Time: | 10:00 a.m. |
| Hearing Date: | March 16, 2025 |
| Courtroom: | 5A |
| | |
| Action Filed: | July 8, 2025 |
| Trial Date: | Not set |

MEM. OF POINTS AND AUTHORITIES IN SUPP. OF MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iv

I.    INTRODUCTION ....................................................................................... 1

II.   BACKGROUND ......................................................................................... 3

      A.    HF Use in Oil Refining Is Heavily Regulated by Existing Federal and State Law. ............................................................................... 4

      B.    EPA's Authority under Section 6 of TSCA Is Limited to Addressing a Chemical Substance's Foreseeable Conditions of Use. ......................................................................................................... 8

      C.    EPA Denied Plaintiffs' Attempt to Ban HF Because Their Reasoning Rested on Unprecedented, Catastrophic Accidents. .... 12

      D.    Plaintiffs' Faulty Reasoning Has Not Changed Since EPA Denied Their Petition. ............................................................................. 14

III.  Plaintiffs' Hypothetical, Worst-Case-Scenario Allegations Do Not Confer Standing Under Rule 12(b)(1). ...................................................... 14

      A.    Legal Standard ................................................................................ 15

      B.    Plaintiffs Have Not Come Close to Alleging an Actual or Imminent Injury. .............................................................................. 16

IV.   Alternatively, the Complaint Should Be Dismissed Under Rule 12(b)(6) Because Plaintiffs' Requested Relief is Not Available Under TSCA. .... 19

      A.    Legal Standard ................................................................................ 19

      B.    Plaintiffs' Claims Fail Because TSCA Does Not Apply to Accidental Releases of an Already-Regulated Chemical Substance. .......................................................................................................... 20

            1.    TSCA Does Not Apply to Accidental Chemical Releases. .. 20

            2.    Congress Did Not Intend TSCA to Regulate the Same Chemical Risk Multiple Times. ........................................... 23

V.    CONCLUSION .......................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)......................................................................................19

*City of San Francisco v. EPA,*
  604 U.S. 334 (2025)......................................................................................22

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013)..............................................................15, 16, 17, 18

*Ctr. for Cmty. Action & Env't Just. v. BNSF Ry.,*
  764 F.3d 1019 (9th Cir. 2014) ..............................................................24, 26

*Murthy v. Missouri,*
  603 U.S. 43 (2024) .................................................................15, 16, 18

*Safer Chems., Healthy Fams. v. EPA,*
  943 F.3d 397 (9th Cir. 2019) ........................................................20, 24

*SEC v. Chenery Corp.,*
  332 U.S. 194 (1947)......................................................................................20

*Shulman v. Kaplan,*
  58 F.4th 404 (9th Cir. 2023) ........................................................14, 15

*Somers v. Apple, Inc.,*
  729 F.3d 953 (9th Cir. 2013) ........................................................................19

**Statutes**

Pub. L. No. 114-182, 130 Stat. 448....................................................8, 21

15 U.S.C. § 2601 *et seq.*..................................................................................22

15 U.S.C. § 2601 ..........................................................................................23

15 U.S.C. § 2602 ............................................................................2, 9, 21

15 U.S.C. § 2605 ............................................................................8, 9, 10, 21

15 U.S.C. § 2608 ................................................................................................27

15 U.S.C. § 2620 ..........................................................................................11, 19

33 U.S.C. § 1321 ................................................................................................22

33 U.S.C. § 2701 *et seq.* .....................................................................................22

42 U.S.C. § 7412 ............................................................................................5, 22

42 U.S.C. § 7413 ..................................................................................................7

**Other Authorities**

40 C.F.R. pt. 68 ................................................................................................4, 7

40 C.F.R. pt. 702 ................................................................................................10

40 C.F.R. § 702.39 .............................................................................................10

40 C.F.R. § 702.43 .............................................................................................10

49 C.F.R. § 172.200 .............................................................................................7

57 Fed. Reg. 6,356 (Feb. 24, 1992)......................................................................5

61 Fed. Reg. 31,668 (June 20, 1996) ...................................................................6

82 Fed. Reg. 33,726 (July 20, 2017) ..................................................................24

90 Fed. Reg. 1,375 (Jan. 8, 2025) ........................................................................7

90 Fed. Reg. 20,575 (May 15, 2025) .......................................................13, 21, 22

Fed. R. Civ. P. 12 ......................................................................................*passim*

S. Rep. No. 94-698 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 4491 .................20

S. Rep. No. 101-228 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 3385 .................4

EPA, *Hydrogen Fluoride Study, Final Report: Report to Congress, Section 112(n)(6), Clean Air Act as Amended* (1993)........................................................6

## I.    INTRODUCTION

Proposed Intervenor-Defendant Western States Petroleum Association ("WSPA") respectfully requests that this Court dismiss Plaintiffs' case for lack of subject matter jurisdiction, or in the alternative, for failure to state a claim upon which relief can be granted.

What Plaintiffs seek here is nothing short of extraordinary.  They ask this Court to wield an obscure and inapplicable statutory provision as a weapon to force the U.S. Environmental Protection Agency ("EPA" or the "Agency") to ban a chemical substance that is critically important to the nation's fuel supply.  Hydrofluoric acid ("HF")—a substance whose properties and risks have been studied, regulated, and safely managed for decades—is used by roughly a third of America's refineries to produce alkylate, a high-octane, low-sulfur gasoline blendstock that is essential for producing the gasoline that keeps the economy running.  Over the last four decades, federal and state lawmakers, together with industry experts, have constructed an extensive web of regulations and safety standards governing every facet of HF's transportation and use at refineries.  The industry has invested heavily in risk mitigation measures, which have protected workers, communities, and the environment.

Yet Plaintiffs now urge the Court to sweep all of that aside.  Their theory would convert the Toxic Substances Control Act ("TSCA") into a roving mandate to ban any chemical substance simply because, in their view, no matter what precautions a

MEM. OF POINTS AND AUTHORITIES IN SUPP. OF MOTION TO DISMISS

refinery takes, the world is a dangerous place and bad things *might* happen.  But Article III does not permit the federal courts to entertain generalized anxieties.  Not one Plaintiff alleges that any member faces a concrete, imminent injury traceable to HF's foreseeable conditions of use at refineries.  Instead, they point to isolated, accidental HF releases in the United States—separated by decades and hundreds of miles of geography—and extrapolate from them a parade of horribles that is beyond the realm of reasonable foreseeability.  That is not standing.  It is precisely the kind of speculative fear the Constitution forbids from supporting a lawsuit.  The complaint should be dismissed under Rule 12(b)(1).

Plaintiffs' claims equally fail on their own terms under Section 6 of TSCA. Section 6 is not a blank check for EPA to regulate every theoretical calamity (like refinery explosions and train derailments) that an inventive mind can conjure. Congress directed EPA to evaluate risks arising from a chemical substance's foreseeable "conditions of use"—meaning how a chemical is foreseeably used in everyday scenarios—not from a chain of hypotheticals, worst-case disasters, or third-party failures piled on top of each other.  *See* 15 U.S.C. § 2602(4).  And Congress was aware of the myriad of laws and regulations when it enacted the "conditions of use" language. Plaintiffs' attempt to recast TSCA as a national-disaster prevention statute disregards that Congress has already assigned oversight of refinery safety and chemical transportation to other, more tailored regulatory

MEM. OF POINTS AND AUTHORITIES IN SUPP. OF MOTION TO DISMISS

regimes.  TSCA Section 6 simply does not grant EPA authority to do what Plaintiffs ask.

Unable to ground and support their claims in the statutory text, Plaintiffs fall back on sweeping and conclusory pronouncements, such as "[r]efinery use of HF presents an unreasonable risk of injury to human health."  *See* Compl. ¶ 109.  But saying so does not make it so.  Their underlying petition to EPA, which the complaint often (but not always) mirrors verbatim, relied on conjecture, and Plaintiffs rely on the same conjecture now.  TSCA Section 6 is not a mandate for EPA to regulate on such a basis.  EPA was right to deny the petition, and this Court should be equally unwilling to indulge in Plaintiffs' efforts to transform TSCA into a tool that selectively targets a crucial component of the refining industry.

For these reasons, and those explained more fully below, WSPA respectfully requests that this Court dismiss the complaint.

## II.    BACKGROUND

To see why Plaintiffs' claims fail on the pleadings, the regulatory backdrop matters.  WSPA therefore begins with a brief overview of HF regulation, the TSCA Section 6 process, EPA's review and denial of Plaintiffs' petition, and how this dispute arrived before this Court.

MEM. OF POINTS AND AUTHORITIES IN SUPP. OF MOTION TO DISMISS

### A.    HF Use in Oil Refining Is Heavily Regulated by Existing Federal and State Law.

Contrary to Plaintiffs' hyperbolic claims, HF at refineries is a highly regulated substance.  Multiple federal regulatory programs already address the potential risks associated with the domestic refining industry's use and transport of HF.  *See, e.g.*, 40 C.F.R. Part 68 (establishing a broad series of requirements for owners and operators of facilities, including refineries, to prevent and mitigate the impacts of accidental releases of regulated substances such as HF).  And these federal regulatory programs were adopted—over the course of multiple presidential administrations—to prevent the exact (albeit speculative and statistically anomalous) concerns Plaintiffs now raise.  Although Plaintiffs ignore the regulatory and industry shifts that transpired after the 1987 Texas City Refinery fire in their quest to creatively expand the scope of TSCA, the existing regulatory scheme provides necessary context.

More than three decades ago, through the Clean Air Act ("CAA") Amendments of 1990, Congress responded to a series of catastrophic chemical releases and recognized that the previously existing regulatory framework lacked an integrated approach to prevent high-consequence chemical releases and accidents. *See* S. Rep. No. 101-228, at 204, 208 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 3385 (noting that the 1990 Amendments created multiple programs to address the risks associated with chemical releases following a string of chemical accidents).

Through the 1990 Amendments, Congress has, among other steps, directed EPA to promulgate regulations—later known as the Risk Management Program ("RMP")—to prevent accidental releases of extremely hazardous substances, and called for the U.S. Occupational Safety and Health Administration ("OSHA") to promulgate chemical process safety standards also designed to reduce employee exposure to chemical accidents pursuant to its authority under the Occupational Safety and Health Act of 1970.  42 U.S.C. § 7412(r)(7).  Congress also directed EPA to conduct a CAA Section 112(n) study and to make recommendations about whether Congress should further act.  Congress made clear that it was the responsibility of EPA, OSHA, and the Department of Transportation ("DOT") to coordinate within the statutory confines of the CAA and related OSHA and DOT authorities to address risks associated with the use and transport of regulated substances like HF.  *Id.* § 7412(r)(7)(D).

Two years after the 1990 Amendments, OSHA promulgated its first Process Safety Management ("PSM") regulations.  *See* OSHA, *Process Safety Management of Highly Hazardous Chemicals; Explosives and Blasting Agents*, 57 Fed. Reg. 6,356, 6,356 (Feb. 24, 1992).  And one year later, EPA concluded its mandated 112(n) study, recommending no "legislative action from the Congress . . . to reduce the hazards associated with HF" as EPA found the "legislative authorities already in place," which did not include TSCA Section 6, provided "a solid framework for the prevention of accidental chemical releases and preparedness in the event that they

occur." *See* EPA, *Hydrogen Fluoride Study, Final Report: Report to Congress, Section 112(n)(6), Clean Air Act as Amended*, at xiii (1993). Instead, EPA concluded there was a "need for process safety management for HF and other hazardous chemicals, as well as the need to communicate crucial information to stakeholders and the public on how to prevent, mitigate and respond to HF releases." *Id.* at 2. EPA, OSHA, and the industry went on to take these exact measures.

Three years later, after significant coordination with stakeholders, EPA promulgated its RMP regulations. EPA, *Accidental Release Prevention Requirements: Risk Management Programs Under Clean Air Act Section 112(r)(7)*, 61 Fed. Reg. 31,668, 31,688 (June 20, 1996). The RMP requirements generally run parallel with and are nearly identical to PSM requirements; EPA explained that covered sources should not be subject to inconsistent requirements for chemical accident prevention and that it specifically adopted requirements identical to the PSM standards. *See id.* at 31,668–70.

PSM and RMP impose significant requirements designed by process safety experts for refiners using HF. These include, but are not limited to:

- hazard analyses of processes using HF;
- training for personnel involved in processes that use HF;
- mechanical integrity inspection and testing requirements for equipment used in HF-service;
- compliance and consistency with industry-wide standards and recognized and generally accepted good engineering practices; and

6

- RMP and process safety triennial compliance audits.

*See* 40 C.F.R. Part 68, Subpart D (establishing requirements for Program Level 3 processes which include HF alkylation units).

All of these requirements directly address and manage the risks associated with using HF in domestic refining in ways that Congress clearly authorized under CAA Section 112(r). And enforcement of these requirements is substantial. CAA Section 113 allows for both civil and criminal liability for violations of RMP requirements, with civil penalties currently authorized for $124,426 per violation per day. 42 U.S.C. § 7413(b)–(c); EPA, *Civil Monetary Penalty Inflation Adjustment*, 90 Fed. Reg. 1,375, 1,378 (Jan. 8, 2025).

The regulation of HF does not end at a refinery's border. DOT's Pipeline and Hazardous Materials Safety Administration ("PHMSA") separately regulates the transport, packaging, transfer (i.e., loading and unloading), and incident reporting of HF as hazardous and corrosive material consistent with its Hazardous Materials Regulations ("HMR"). The HMR also require training for certain hazardous materials handlers to ensure knowledge of emergency response information, self-protection measures, and accident prevention methods and procedures. *See* 49 C.F.R. § 172.200.

Beyond the federal scheme, various state and local governments separately regulate the hazards associated with HF use through programs aimed to prevent accidental chemical releases. These programs often mirror or exceed their federal

7

counterparts in regulating entities like refineries to address localized risks and to reduce risk in the event of an accident, including inherent safety analysis specific to HF. California provides an example of these additional safeguards.

California EPA manages its own RMP program in the form of its Accidental Release Prevention program. The Department of Toxic Substances Control oversees statewide hazardous material regulations, and that Department's Emergency Response Unit provides statewide response to actual and potential releases of hazardous substances. California OSHA, through the state's PSM program, requires refineries to maintain written emergency action plans covering alarms, evacuation, shutdown, training, reporting, and more.

California's extensive RMP, accident prevention, and PSM programs are supplemented by regional and local programs, including those of local Air Quality Management Districts and Air Pollution Control Districts that oversee permitting, inspections, releases, and emissions for refining facilities, and Certified Unified Program Agencies, which manage environmental and hazardous material programs at the local level.

**B.    EPA's Authority under Section 6 of TSCA Is Limited to Addressing a Chemical Substance's Foreseeable Conditions of Use.**

The above-described, cross-jurisdictional regulatory framework existed when, in 2016, Congress amended TSCA to add the provision that Plaintiffs rely upon in this case. *See Frank R. Lautenberg Chemical Safety for the 21st Century Act*, Pub.

8

L. No. 114-182, 130 Stat. 448 (codified at 15 U.S.C. § 2605). And Congress made clear that TSCA is not a blank check. Rather, the statute carefully delineates EPA's authority. The provision at issue here, Section 6, does not permit EPA to regulate a chemical solely because an accident "could" occur, and TSCA is therefore ill-equipped to do so. Instead, Congress created a three-step process for the Agency to evaluate and address "unreasonable risk of injury" that "the manufacture, processing, distribution in commerce, use, or disposal" of chemicals poses to human health and the environment. *See* 15 U.S.C. § 2605. The contours of these three steps show why Plaintiffs' legal claim is defective and must be dismissed.

*First*, Section 6 requires EPA to periodically prioritize chemical substances for evaluation and classify them as either high or low priority. 15 U.S.C. § 2605(b). That analysis does not occur in a vacuum. EPA has the authority to designate a chemical substance as a high priority where the Agency concludes the chemical "*may* present an unreasonable risk of injury to health or the environment" were an exposure to occur "under the conditions of use" for the chemical. *Id.* (emphasis added). Congress narrowly defined the phrase "conditions of use" as "the circumstances … under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." 15 U.S.C. § 2602(4). Section 6 does not permit EPA to designate every chemical substance that *could* possibly present a risk, especially based on unlikely accident scenarios, as high-priority for risk evaluation.

9

*Second*, only if EPA determines at step one that a chemical substance is high priority within the boundaries of its conditions of use, paragraphs (3) and (4) of Section 6(b) require the Agency to conduct a risk evaluation to determine whether the chemical substance *actually* poses an "unreasonable risk of injury" to human health or the environment under its conditions of use. 15 U.S.C. § 2605(b)(3)(A), (b)(4)(A). Again, Section 6 does not open the door to unfettered regulation of chemical substances that could conceivably pose a risk. Instead, the "conditions of use" remain an important check on the Agency's analysis at step two, in addition to helping EPA determine which chemicals it intends to evaluate at step one. EPA has correctly embraced that limitation through its regulatory process for conducting risk evaluations. *See* 40 C.F.R. Part 702, Subpart B. Consistent with TSCA Section 6, the regulatory process repeats that EPA's evaluation is limited to reviewing the chemical substance under its conditions of use. *See, e.g.*, 40 C.F.R. §§ 702.39(c)(1), 702.39(c)(4), 702.39(d)(1), 702.39(d)(9), 702.39(f)(1), 702.39(f)(3), 702.43(d)(1) (all limiting review to a chemical substance's conditions of use).

*Third*, only if EPA finds that within its conditions of use, (1) a high priority chemical substance (2) "presents" an unreasonable risk of injury, "may" the Agency (3) promulgate a regulation "to the extent necessary so that the chemical substance or mixture no longer presents such [unreasonable] risk." *See* 15 U.S.C. § 2605(a); 40 C.F.R. § 702.43(e).

TSCA Section 21(a) allows parties to "petition [EPA] to initiate a proceeding for the issuance, amendment, or repeal of a rule under [TSCA Section 6]," *see* 15 U.S.C. § 2620(a), but that Section does not provide an escape hatch from the limitations of Section 6 nor the process requirements placed upon EPA thereunder. Instead, a petitioner must "set forth the facts which it is claimed establish that it is necessary to issue . . . a rule" under Section 6(a), including that the chemical poses an unreasonable risk within the confines of its conditions of use. *Id.* § 2620(b)(1). Here, as EPA determined, Plaintiffs did not make a case for needing HF risk management—nor did they make the case that HF may present an unreasonable risk under its foreseeable conditions of use.

If EPA denies a Section 21(a) petition, "the petitioner may commence a civil action in a district court of the United States to compel [EPA] to initiate a rulemaking proceeding as requested in the petition." 15 U.S.C. § 2620(b)(4)(A). A TSCA Section 21 proceeding in federal court is conducted *de novo*, *id.* § 2620(b)(4)(B), but the opportunity for a judicial proceeding does not alleviate the limitations Congress imposed on EPA in Section 6. TSCA still requires that a plaintiff prove by a preponderance of the evidence that "the chemical substance … presents an unreasonable risk of injury to health or the environment … under the conditions of use." *Id.* § 2620(b)(4)(B)(ii). A civil action effectively asks the court to reassess step two of the Section 6 process by subjecting the risk evaluation

MEM. OF POINTS AND AUTHORITIES IN SUPP. OF MOTION TO DISMISS

process to judicial consideration, and then require EPA to undertake regulatory

action.

**C.    EPA Denied Plaintiffs' Attempt to Ban HF Because Their
        Reasoning Rested on Unprecedented, Catastrophic Accidents.**

On February 11, 2025, Plaintiffs petitioned EPA to initiate a rulemaking

under TSCA Section 6 to "prohibit the use of [HF] in domestic oil refining" (the

"Petition").  *Petition to Prohibit the Use of Hydrogen Fluoride in Domestic Oil*

*Refining Under §§ 21, 6(a) of the Toxic Substances Control Act*, Petition to EPA,

Docket No. EPA-HQ-OPPT-2025-0102-0002 (Feb. 11, 2025).  There, Plaintiffs

asserted that HF presents "an unreasonable risk to human health and the

environment" not under its conditions of use, but solely in the event of an accidental

release in a refinery setting or during transportation to a refinery.  *Id.* at 2.  The

Petition rested on hypothetical "worst-case" chemical-release modeling, including

catastrophic refinery failures, derailments, truck crashes, and extreme-weather

scenarios that could result in HF releases.  *Id.* at 18–37.  Plaintiffs provided maps of

potential "threat zones" were a worst-case scenario to occur at a number of

refineries throughout the country, *id.*, and summarized past HF release events, as

well as a "near-miss event[]," examples of refineries allegedly leaking *other*

chemicals, and an attachment (Appendix B to the Petition) with instances of HF

incidents, including, for example, when "[a] drop of hydrofluoric acid splashed onto

a construction worker" in 1987.  *Id.* at 38–44; Appendix B to the Petition at 2–6.

12

On May 9, 2025, EPA denied the Petition.  *See* EPA, *Reasons for Agency Response*, 90 Fed. Reg. 20,575, 20,575 (May 15, 2025).  In its statement of reasons for denying the Petition, EPA concluded that Plaintiffs had not satisfied TSCA's statutory criteria for requiring a Section 6 rulemaking precisely because Plaintiffs' "catastrophic release" scenarios are not "conditions of use" regulated by TSCA Section 6.

As EPA correctly explained, TSCA regulates only "the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture, or . . . any combination of such activities."  *Id.* (quoting 15 U.S.C. § 2605(a) (TSCA Section 6)).  When EPA conducts a risk evaluation under Section 6(b)(4)(A), it must do so with respect only to the chemical's "conditions of use," defined as the "circumstances, as determined by the Administrator, under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of."  *Id.* at 20,577 (quoting 15 U.S.C. § 2602(4)).  EPA concluded that Plaintiffs' reliance on catastrophic accidental releases evaded TSCA's "conditions of use" limitation.  In other words, the Petition rested on hypothetical catastrophic accidents—refinery explosions and similar disasters—that are not "conditions of use" because they are not ways in which HF is manufactured, processed, used, distributed, or disposed of.  They therefore fall outside EPA's regulatory authority under Section 6(a).  Thus, EPA concluded that the Petition "did not establish unreasonable risk under the

conditions of use of *using* and *distributing* in commerce HF for domestic refining." *Id.* at 20,578 (emphasis added).

### D. Plaintiffs' Faulty Reasoning Has Not Changed Since EPA Denied Their Petition.

Plaintiffs now challenge EPA's denial of their Petition to ban refinery use of HF, and their TSCA Section 21 complaint tracks their Petition to EPA (often verbatim). Plaintiffs repeatedly frame the case around "worst-case" releases, *see* Compl. ¶¶ 4, 64–67, for example, predicting HF clouds that "could" spread to "danger zones," *id.* ¶¶ 4, 6, 13, 16, 64. They allege only two instances of specific HF refinery events in the United States that appear to be central to their allegations, *id.* ¶¶ 87, 89, and, in passing, two rail instances, *id.* ¶ 77; otherwise, Plaintiffs provide an allegation that an HF incident occurred in South Korea over a decade ago, *id.* ¶¶ 83–84, and, without *any* detail, an unsupported statement that other HF incidents have occurred in the U.S., *id.* ¶ 91.

## III. Plaintiffs' Hypothetical, Worst-Case-Scenario Allegations Do Not Confer Standing Under Rule 12(b)(1).

Article III is a jurisdictional prerequisite—a "threshold issue that must be addressed before turning to the merits of a case." *See Shulman v. Kaplan*, 58 F.4th 404, 407–08 (9th Cir. 2023) (citing *Horne v. Flores*, 557 U.S. 433, 445 (2009)). If standing is lacking, the case ends, and plaintiffs' own allegations establish that it is. Their claimed "harms" rest on conjecture, not fact. The complaint repeatedly invokes "worst-case" scenarios and future accidents. *See, e.g.*,

Compl. ¶¶ 4, 64–67.  That is not injury.  It is guesswork.  Article III does not permit jurisdiction based on the possibility that a chemical release might occur someday, through the independent actions of third parties, at some unknown time, in circumstances unrelated to EPA's conduct.  Such hypotheticals do not constitute a concrete, particularized, or imminent injury under Article III.

## A.    Legal Standard

Plaintiffs bear the sole burden of "establishing standing pursuant to Article III."  *Shulman*, 58 F.4th at 408 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  When assessing a party's standing at the pleading stage, courts "accept all facts alleged in the complaint as true."  *Id.*  Plaintiffs must allege "(1) that they 'suffered an injury in fact that is concrete, particularized, and actual or imminent'; (2) 'that the injury was likely caused by the defendants;' and (3) 'that the injury would likely be redressed by judicial relief.'"  *Id.*  (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

As to the first element, the Supreme Court has "repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).

Further, where a plaintiff sues the government for not regulating a third party, "[t]he one-step-removed, anticipatory nature of their alleged injuries" presents the plaintiffs with particular challenges.  *Murthy v. Missouri*, 603 U.S. 43, 57 (2024).

15

Because "a federal court cannot redress injury that results from the independent action of some third party not before the court," a plaintiff must offer facts showing that the third party not before the court will respond to the government's action—or here, the government's inaction—such that injury is "certainly impending." *Id.* (internal quotation marks omitted); *Clapper*, 568 U.S. at 409. In other words, Plaintiffs must satisfactorily allege that EPA's decision not to ban HF in refineries will lead to those refineries experiencing an HF release that affects Plaintiffs' members.

### B. Plaintiffs Have Not Come Close to Alleging an Actual or Imminent Injury.

Plaintiffs allege no injury that has occurred or is about to occur. Instead, they posit a chain of hypotheticals: *if* EPA does not ban HF, then a third party *might* accidentally release HF in a refinery or transportation incident; *if* that release occurs under certain conditions; and then *if* enough HF is released; then Plaintiffs *could* be exposed. That is not standing. It is speculation.

Injury in fact must be "certainly impending." *Clapper*, 568 U.S. at 409. Plaintiffs' theory, instead, depends on "a highly attenuated chain of possibilities," which Article III does not tolerate. *Id.* at 410. The complaint illustrates the point. Plaintiffs allege that some of their members live near refineries or transportation routes. *See, e.g.*, Compl. ¶¶ 10–21 (alleging that some of Plaintiffs' members live near refineries and transportation routes, but not that there have been HF releases

near their residences).  But they do not clearly allege that HF has been released near those residences.  Instead, they rely on hypothetical  "worst-case" scenarios involving refinery explosions or transportation accidents occurring under extremely unlikely meteorological conditions.  *Id.* ¶¶ 67–81 (highlighting fictional "worst-case" scenarios of HF releases).  Conjecture piled on conjecture, in other words.

Plaintiffs attempt to dress this speculation with stronger language, asserting that risk of HF release is "substantial, foreseeable, and growing."  *Id.* at pp. 22–23.  But three additional adjectives do not meet the exacting constitutional standard.  Article III demands more than foreseeability.  It requires imminence.  A risk that is merely possible does not establish standing unless the alleged "threatened injury [is] certainly impending."  *Clapper*, 568 U.S. at 401 (cleaned up).

Plaintiffs' own factual allegations confirm how remote their alleged injury is.  They identify only two major HF releases from U.S. refineries over several decades that might remotely resemble the harms they posit: a 1987 accident in Texas involving a crane striking a tank, *see id.* ¶ 87, and a 2019 pipe rupture at a facility in Philadelphia, *see id.* ¶ 89—both examples tied to site-specific circumstances.  They also reference two rail incidents involving HF in 1997 and 2012, neither of which resulted in the mass casualties that Plaintiffs now speculate.  *Id.* ¶ 77.  Beyond that, Plaintiffs cite only "near misses" of HF releases, releases of entirely different chemicals, unrelated refinery accidents (e.g., fires), and unspecified HF "leak[s]."  *See id.* ¶¶ 85–94.

MEM. OF POINTS AND AUTHORITIES IN SUPP. OF MOTION TO DISMISS

Plaintiffs' effort to bolster standing by invoking individual members only compounds the problem. They identify members who live at varying distances from refineries and express generalized concerns about hypothetical HF releases—concerns such as potential traffic congestion during a possible future evacuation, *id.* ¶ 21, or the distance from their home to the nearest hospital, *id.* ¶ 13. None of this conjecture alleges injury. It describes apprehension about contingencies that may never occur. Worse still, Plaintiffs' theory depends on a cascading failure of safeguards. Their hypothesized catastrophe assumes that the numerous federal, state, local, and industry safety regimes governing HF storage, transport, and use would all fail at once, as well as the robust mitigation measures employed. *See supra* Section II.A. Article III does not permit standing based on the assumption that every protective system will simultaneously collapse.

This is precisely the kind of speculation and "guesswork" the Supreme Court has held insufficient to confer standing. *Murthy*, 603 U.S. at 72. There is no standing where a plaintiff cannot allege "the predictable effect of Government action on the decisions of third parties" and instead "speculat[es] about the decisions of third parties." *Id.* Here, Plaintiffs do not allege an actual injury traceable to EPA's conduct without resorting to conjecture at every step. The Constitution demands more. Plaintiffs' allegations fall far short of showing an injury that is "certainly impending." *Clapper*, 568 U.S. at 401. This Court should dismiss Plaintiffs' action for lack of standing.

18

### IV. Alternatively, the Complaint Should Be Dismissed Under Rule 12(b)(6) Because Plaintiffs' Requested Relief is Not Available Under TSCA.

Plaintiffs also fail to state "a cognizable … theory" and "to allege sufficient facts" to support that theory. *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013). Plaintiffs invite the court to stretch TSCA to regulate extreme, accidental events—i.e., catastrophic releases arising from refinery explosions or transportation accidents. Congress did not authorize that. This Court should thus reject Plaintiffs' invitation and dismiss the complaint.

#### A.    Legal Standard

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[L]abels and conclusions" disguised as facts and "formulaic recitation[s] of the elements of a cause of action" cannot support a complaint, and a court must disregard them. *See id.* at 678, 681.

Judicial review of a TSCA Section 21 petition is *de novo*. Plaintiffs bear the burden to prove, "by a preponderance of the evidence," that the chemical substance at issue "presents an unreasonable risk of injury . . . under the conditions of use." 15 U.S.C. § 2620(b)(4)(B)(ii). A court's *de novo* review of EPA's decision on the Section 21 petition is properly confined to the administrative record before EPA at

MEM. OF POINTS AND AUTHORITIES IN SUPP. OF MOTION TO DISMISS

the time of its decision.  *See generally SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

## B. Plaintiffs' Claims Fail Because TSCA Does Not Apply to Accidental Releases of an Already-Regulated Chemical Substance.

Plaintiffs' demand for an HF ban rests on "worst-case" scenarios involving accidental releases of a chemical that is already subject to extensive regulation. That theory as alleged does not fit within the structure of TSCA Section 6.

Congress intended TSCA to be a "regulatory gap[]" filler to manage the unreasonable risks of injury from chemicals which threaten human health and the environment under their *conditions of use*—that is, during typical and foreseeable use.  *Safer Chems., Healthy Fams. v. EPA*, 943 F.3d 397, 406 (9th Cir. 2019); S. Rep. No. 94-698, at 1 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 4491, 4491. Refinery explosions, truck collisions, and other similar disasters fall outside that statutory description.  They are not uses of a chemical.  They are failures of equipment, vehicles, human conduct, etc., and risks that Congress already addressed through other regulatory regimes governing industrial safety and transportation. This Court should dismiss Plaintiffs' claims.

### 1. *TSCA Does Not Apply to Accidental Chemical Releases.*

Plaintiffs' attempt to compel a TSCA Section 6(a) rulemaking to ban HF fails at the threshold because the statute does not apply to catastrophic chemical releases. Congress made that clear in 2016, when it amended the statute to restrain Section 6

risk evaluations to a chemical substance's "conditions of use." *Frank R. Lautenberg Chemical Safety for the 21st Century Act*, Pub. L. No.114-182, 130 Stat. 448 (codified at 15 U.S.C. § 2605). As discussed, the statute defines "conditions of use" narrowly: "the circumstances, as determined by [EPA], under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." 15 U.S.C. § 2602(4). And in conducting a risk evaluation, EPA considers, "where relevant, the likely duration, intensity, frequency, and number of exposures *under the conditions of use* of the chemical substance." *Id.* § 2605(b)(4)(F)(iv) (emphasis added). These provisions underscore Congress's intent that TSCA's scope be limited to the typical, recurring, and foreseeable use of a chemical substance that poses a threat to human health or the environment.

The amendments also confirm EPA's central role in defining what qualifies as a "condition of use." *See id.* § 2602(4) (conditions of use "determined by [EPA]"). Exercising that authority, EPA has explained "that it does not consider exposures from [catastrophic, etc.] circumstances to be reasonably foreseen and, therefore, generally would not assess them as part of a risk evaluation." 90 Fed. Reg. at 20,576. Plaintiffs ask this Court to force EPA to do exactly what TSCA says the Agency cannot, that is, ban an important chemical substance based on worst-case scenarios that are unlikely and unforeseeable based on the limited allegations in Plaintiffs' complaint.

EPA's interpretation of TSCA follows directly from the statutory text. Congress did not include "accidents," "catastrophes," "spills," or other similar situations in TSCA's definition of "conditions of use." 15 U.S.C. § 2601 *et seq.* In fact, those words do not appear *anywhere* in TSCA. *Id.* That omission matters. When Congress intends to regulate accidental releases, it knows how to say so—and it has done so elsewhere. *See, e.g.* Clean Water Act ("CWA"), 33 U.S.C. § 1321 (regulating "discharges" and "spills"); Oil Pollution Act, 33 U.S.C. § 2701 *et seq.* (regulating "incidences" including "discharges"); the CAA, 42 U.S.C. § 7412 (specifically addressing "accidental releases" of hydrofluoric acid). Courts presume that "Congress acts intentionally and purposely in the disparate inclusion or exclusion of language in a statute." *City of San Francisco v. EPA*, 604 U.S. 334, 335 (2025).

As discussed, Plaintiffs focus on the possibility of "worst-case" releases of HF that are rare, even on the face of the complaint. Compl. ¶¶ 4, 77, 86, 88. However, as EPA explained in its denial of Plaintiffs' Section 21 Petition, "catastrophic accidents, extreme weather events, and other natural disasters" are not foreseeable conditions of use under TSCA if such events "do not lead to *regular and predictable* exposures associated with a given condition of use." 90 Fed. Reg. at 20,577 (emphasis added). "A future one-time accident caused by an atypical one-time set of circumstances" is not "reasonably foreseen." *Id.* (quoting 15 U.S.C. § 2602(4)). That ends the matter. Plaintiffs' reliance on a handful of isolated

incidents spread over four decades, none of which rose to the level of Plaintiffs' speculative concerns, cannot transform extraordinary accidents into ordinary conditions of use.

In essence, even under Plaintiffs' theory, an HF release from refinery operations would be an outlier—an extraordinary event from a catastrophic accident, compounded by a failure of installed mitigation technologies and highly unlikely weather conditions.  EPA rightly declined to treat the risk of such event as a "reasonably foreseen" condition of use.

> ### 2. *Congress Did Not Intend TSCA to Regulate the Same Chemical Risk Multiple Times.*

Plaintiffs' complaint fails for an additional reason: Congress did not design TSCA to impose duplicative regulation on chemical releases already governed by other federal statutes.

As noted, TSCA is a *gap-filling* statute, enacted to address risks posed by "chemical substances and mixtures"—particularly new and emerging chemicals— "which are constantly being developed and produced."  15 U.S.C. § 2601(a)(1), (2). It was not intended to displace or duplicate existing statutes that already regulate emissions, discharges, spills, and industrial accidents.  Specifically, unlike other statutes such as the CAA, EPCRA, the CWA, and Comprehensive Environmental Response, Compensation Act ("CERCLA"), TSCA regulates the "chemicals themselves (rather than regulation of discharges, emissions, ambient air, or

consumer products)." *Safer Chems., Healthy Fams.*, 943 F.3d at 406 (quoting

S. Rep. No. 94-698, at 1 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 4491, 4491).

Thus, TSCA serves a distinct purpose from other federal statutes—one that cannot

be stretched into a mandate for EPA to outright ban HF in order to prevent

speculative discharges at refineries and in transit when (1) HF release prevention is

already extensively regulated, and (2) TSCA is not designed to police accidental

releases.

To effectuate Congress's design, EPA has determined that it "may, on a case-

by-case basis, exclude certain activities that [it] has determined to be conditions of

use," including activities "that ha[ve] been adequately assessed by another

regulatory agency, particularly where the other agency has effectively managed the

risks." 82 Fed. Reg. 33,726, 33,729 (July 20, 2017). In *Safer Chemicals, Healthy*

*Families v. EPA*, the Ninth Circuit rejected the suggestion that EPA's rulemaking

process violates TSCA and allowed EPA to continue exercising discretion in

enforcing TSCA's mandates. 943 F.3d at 406.

EPA's interpretation is correct. TSCA does not authorize regulation of

activities already directly governed by other statutory schemes, *especially where*

*EPA has expressly declined to regulate because another agency is already doing so*.

*See Ctr. for Cmty. Action & Env't Just. v. BNSF Ry.*, 764 F.3d 1019, 1030 (9th Cir.

2014) ("The statutory and legislative histories make clear that Congress, having

identified specific reasons for its decision, intended to exclude indirect sources from federal regulation.").

Again, the transportation, storage, and use of HF at refineries are already subject to extensive regulatory programs designed to prevent and mitigate accidental chemical releases, including HF. Those regimes did not arise by happenstance. Specifically, in response to past chemical accidents, Congress and the refining industry acted—Congress by enacting targeted statutes and regulatory programs, and the industry by adopting rigorous safety standards—to address chemical safety directly.

Those programs include EPA's CAA RMP and OSHA's PSM requirements, which obligate refinery owners and operators to implement a variety of mitigation measures and safeguards—including onsite and process-specific training, leak detection systems, and incident response measures—that address the accidental releases of HF. DOT regulates HF through its HMR, which requires specific labeling, placarding, handling, and packaging of HF to protect the public and reduce the risk of a transportation-related HF incident, as feared in Plaintiffs' complaint. *See* Compl. ¶ 5 ("Trains and trucks carry HF thousands of miles across our country, jeopardizing people along the way."). And the American Petroleum Institute ("API") also designed Recommended Practice ("RP") 751 for the Safe Operation of HF Alkylation Units. According to API, the RP is designed to "assist[] refinery

MEM. OF POINTS AND AUTHORITIES IN SUPP. OF MOTION TO DISMISS

operators in implementing maintenance, integrity management and other safety programs for [HF] acid alkylation units."[1]

Plaintiffs' attempt to contort TSCA into an all-purpose accident-prevention statute mirrors the failed effort of the plaintiff in *Center for Community Action*. There, the plaintiff filed a citizen suit under the Resource Conservation and Recovery Act ("RCRA") that sought to enjoin railway companies from using heavy-vehicle engines at their railyards, under the theory that particulate matter air emissions found in diesel exhaust constituted the "disposal" of solid waste. *Ctr. for Cmty. Action & Env't Just.*, 764 F.3d at 1021. The district court dismissed, and the Ninth Circuit affirmed. In doing so, the Ninth Circuit held, in part, that particulate matter air emissions were already subject to complex regulations under the CAA and the attempt by the plaintiffs to regulate those emissions via a different statute would be contrary to Congress' "careful and reasoned decision" to regulate air emissions under the CAA. *Id.* at 1030.

The same logic applies here. Plaintiffs attempt to have this Court regulate speculative accidental releases of HF from refineries through the TSCA program even though Congress, through various agencies like EPA and OSHA, has already done so through "careful and reasoned decision." *Id.* Plaintiffs make the same argument towards releases of HF through transportation incidents, even though

---

[1] American Petroleum Institute, API Recommended Practice 751, 5th Edition, https://www.api.org/products-and-services/standards/important-standards-announcements/751.

Congress and DOT have crafted regulations designed at eliminating those risks. Put differently, DOT, EPA, and OSHA have "adequately assessed" the risks posed by HF transportation, storage, and use in refineries and have "effectively managed th[ose] risks."

Section 9 of TSCA, titled "Relationship to other Federal laws," further confirms that Congress did not intend for TSCA to regulate chemicals already addressed by other federal statutes. Under this provision, if the EPA Administrator finds a chemical to present unreasonable risk under the conditions of use, and also finds that another federal law administered by a different agency can prevent or reduce that risk, Section 9 requires the Administrator to submit a report to that agency. 15 U.S.C. § 2608(a)(1). Once EPA has handed off the matter to the other agency, the question now lies with that agency—if that agency either finds that the activity does not pose a risk or the agency takes an action to protect against that risk, EPA is *barred* from taking action under Section 6. 15 U.S.C. § 2608(a)(2). Indeed, plaintiffs are free to petition EPA to revise the CAA RMP regulations or PHMSA to revise the transportation regulations already applicable to HF.

Section 9 in essence reflects a deliberate legislative choice. Congress anticipated overlap among federal regulatory schemes and resolved it by assigning TSCA a limited, gap-filling role, not a mandate to regulate the same chemical risks multiple times over. Because TSCA cannot wade into the territory of other agencies, and HF is heavily regulated by other regulations and agencies, TSCA can

offer no relief to Plaintiffs and this Court should dismiss their motion under Rule 12(b)(6).

## V.    CONCLUSION

For the foregoing reasons, WSPA respectfully requests that the Court grant this motion to dismiss Plaintiffs' claims.

DATED: December 19, 2025                    Respectfully Submitted

By:  */s/ Jason S. Mills*

Jason S. Mills (SBN 225126)
jason.mills@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
300 S. Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 612 7387
Facsimile: +1 213 612 2501

Justin A. Savage (*pro hac vice* forthcoming)
jsavage@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711

Nima H. Mohebbi (SBN 275453)
nima.mohebbi@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: +1 310 595 9500
Facsimile: +1 310 595 9501

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Brooklyn Hildebrandt (SBN 350707)
bhildebrandt@sidley.com
SIDLEY AUSTIN LLP
350 S. Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

MEM. OF POINTS AND AUTHORITIES IN SUPP. OF MOTION TO DISMISS

# <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Proposed Intervenor, certifies that this brief contains 6,380 words, which complies with the word limit of L.R. 11-6.1.

DATED: December 19, 2025

<u>/s/ *Jason S. Mills*</u>
Jason S. Mills

MEM. OF POINTS AND AUTHORITIES IN SUPP. OF MOTION TO DISMISS

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 19th day of December, 2025, a true and complete copy of the foregoing has been filed with the Clerk of the Court pursuant to the Court's electronic filing procedures, and served on counsel of record via the Court's electronic filing system.

*/s/ Jason S. Mills*
Jason S. Mills

MEM. OF POINTS AND AUTHORITIES IN SUPP. OF MOTION TO DISMISS