ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
Deputy Assistant Attorney General
Environment & Natural Resources Division
SANYA SHAHRASBI (DC Bar #1671001)
sanya.shahrasbi@usdoj.gov
United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-5810
Fax: (202) 514-8865

*Attorney for Defendants*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CLEAN AIR COUNCIL; COMMUNITIES FOR A BETTER ENVIRONMENT; and NATURAL RESOURCES DEFENSE COUNCIL, INC., <br><br>    Plaintiffs, <br><br> v. <br><br> U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator; and NANCY BECK, in her official capacity as Principal Deputy Assistant Administrator for the Office of Chemical Safety and Pollution Prevention, <br><br>    Defendants. | Case No. 8:25-cv-1473-MWF (DFMx) <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT (DKT. NO. 50)** <br><br> Date: June 8, 2026 <br> Time: 10:00 a.m. <br> Judge: Hon. Michael W. Fitzgerald <br> Courtroom: 5A |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................iii

INTRODUCTION ........................................................................................................1

BACKGROUND ..........................................................................................................2

I.       The Toxic Substances Control Act..........................................................3

II.      Plaintiffs' Petition to EPA .......................................................................6

LEGAL STANDARD....................................................................................................7

ARGUMENT ...............................................................................................................9

I.       The Court should dismiss the amended complaint under Rule
         12(b)(1) for lack of subject-matter jurisdiction...................................9

         A.       Plaintiffs have not alleged an injury-in-fact that is actual
                  or imminent .......................................................................10

                  1.       Plaintiffs' alleged injury relies on a speculative
                           chain of events and is not "imminent" or "certainly
                           impending." .........................................................10

                  2.       Plaintiffs cannot show imminent harm to their
                           members by relying on the potential effects of
                           "worst-case" scenarios ...........................................14

                  3.       Plaintiffs alleged "near miss" events also do not
                           show "certainly impending" harm or a "credible
                           threat that a probabilistic harm will materialize" ....................15

                  4.       Plaintiffs have not alleged harm founded on EPA
                           action.................................................................18

II.      The Court should dismiss the complaint under Rule 12(b)(6)
         because it fails to state a claim upon which relief can be granted ...............19

III.    Plaintiffs seek relief that is not available under Section 21 ..........................21

CONCLUSION ....................................................................................................22

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................9

*Blanz v. Cal. Dep't of Corr., & Rehab.*,
  727 F.3d 917 (9th Cir. 2013) ...............................................11

*Cal. Rest. Ass'n v. City of Berkeley*,
  89 F.4th 1094 (9th Cir. 2023) ...............................8, 10, 16

*Christopher v. Harbury*,
  536 U.S. 403 (2002)..................................................................9

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ........................1, 8, 9, 11, 12, 13, 18, 19

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
  563 F.3d 466 (D.C. Cir. 2009) ...............................................12

*Ctr. for Env't Health v. Regan*,
  103 F.4th 1027 (4th Cir. 2024)...............................................21

*D'Lil v. Best W. Encina Lodge & Suites*,
  538 F.3d 1031 (9th Cir. 2008) ...............................................7

*Ecological Rts. Found. v. Pac. Lumber Co.*,
  230 F.3d 1141 (9th Cir. 2000) ...............................................19

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024)..................................1, 7, 8, 10, 13

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. Inc.*,
  528 U.S. 167 (2000)..................................................7, 8

*Holden v. Hagopian*,
  978 F.2d 1115 (9th Cir. 1992) ...............................................7

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977).................................................................................8

*In re Baroni*,
    No. CV 23-1818-MWF, 2023 U.S. Dist. LEXIS 112934 (C.D. Cal. June 28,
    2023) .......................................................................................................9

*Int'l Partners for Ethical Care Inc. v. Ferguson*,
    146 F.4th 841 (9th Cir. 2025) ..........................1, 8, 9, 10, 13, 14, 15

*Jones v. L.A. Cent. Plaza LLC*,
    74 F.4th 1053 (9th Cir. 2023) ...........................................................7, 8

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).........................................................................7, 8, 9

*Metro. Edison Co. v. People Against Nuclear Energy*,
    460 U.S. 766 (1983) .............................................................................11

*Munns v. Kerry*,
    782 F.3d 402 (9th Cir. 2015) ...............................................................9

*Neitzke v. Williams*,
    490 U.S. 319 (1989)...............................................................................9

*NRDC v. EPA*,
    735 F.3d 873 (9th Cir. 2013) .............................................................16

*Nw. Requirements Utils. v. FERC*,
    798 F.3d 796 (9th Cir. 2015) .............................................................12

*Or. Advoc. Ctr. v. Mink*,
    322 F.3d 1101 (9th Cir. 2003) .............................................................8

*Phillips v. U.S. Customs & Border Prot.*,
    74 F.4th 986 (9th Cir. 2023) ................................................................8

*San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*,
    100 F.4th 1039 (9th Cir. 2024) ...................................................12, 18

*SDI Labs, Inc. v. Sameday Techs., Inc.*,
   No. CV-23-05619-MWF (MRWx), 2024 U.S. Dist. LEXIS 44386  (C.D. Cal.
   Jan. 25, 2024) ..................................................................................................11
*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)......................................................................................8, 9
*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ..........................................................................................7
*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ..........................................................................................7

**Statutes**

15 U.S.C. § 2602(4) .................................................................................2, 5, 20
15 U.S.C. § 2605(a) ....................................................................................3, 21
15 U.S.C. § 2605(b)(4)(B) ...............................................................................4
15 U.S.C. § 2605(b)(4)(F)(i) .............................................................................5
15 U.S.C. § 2605(b)(4)(F)(iv)..........................................................2, 5, 20, 21
15 U.S.C. § 2605(c)(1)......................................................................................22
15 U.S.C. § 2620(a) ...................................................................................3, 19
15 U.S.C. § 2620(b)(1) ...............................................................................4, 19
15 U.S.C. § 2620(b)(3) ......................................................................................4
15 U.S.C. § 2620(b)(4) ......................................................................................4
15 U.S.C. § 2620(b)(4)(B) ..........................................................2, 4, 19, 21
15 U.S.C. § 2620(b)(4)(B)(ii) ....................................................................4, 19
Pub. L. No. 94-469, 90 Stat. 2003 (1976) ................................................3

**Rules**

Fed. R. Civ. P. 12(b)(1) ....................................................................................7
Fed. R. Civ. P. 12(b)(6) ....................................................................................9

**Federal Register**

82 Fed. Reg. 33765 (July 20, 2017)...............................................................4

89 Fed. Reg. 37028 (May 3, 2024) .......................................................................... 4, 21

90 Fed. Reg. 20575 (May 15, 2025) ............................................................. 6, 7, 20, 21

**Legislative History**

161 Cong. Rec. 10255 (2015) ............................................................................... 5, 21

162 Cong. Rec. 7987 (2016) ..................................................................................... 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# INTRODUCTION

Plaintiffs—environmental groups—challenge the United States Environmental Protection Agency's ("EPA's") denial of their petition for rulemaking to ban the use of hydrogen fluoride ("HF") in oil refineries. Plaintiffs' amended complaint should be dismissed for two independent reasons: Plaintiffs lack standing and have failed to state a claim upon which relief can be granted.

First, constitutional standing principles limit the jurisdiction of federal courts to cases or controversies. Review is limited to disputes involving alleged injuries that are actual or imminent and not speculative. Here, Plaintiffs have alleged no such injury. Instead, Plaintiffs allege that their members live near refineries that use HF and "worry" that they will be harmed by being exposed to HF. But this "fear" is largely premised on the mere possibility of a "worst-case" scenario: that a disaster could happen at some future time; that HF could be released in massive quantities; and that Plaintiffs' members would somehow be injured by the release. There are many steps that need to occur before this speculative chain could become a reality. Plaintiffs' alleged injury is purely hypothetical and does not meet the constitutional requirement that such harm be imminent, that is, "likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (injury must be "certainly impending" to satisfy "imminen[ce]" requirement).

Recognizing this, Plaintiffs cite the age of the refineries, localized releases of HF within some refineries, so-called "near-miss[]" events, and wholly unrelated incidents. But none of these allegations show "imminence" or a "credible threat" of the harm Plaintiffs fear will materialize. *Int'l Partners for Ethical Care Inc. v. Ferguson*, 146 F.4th 841, 853 (9th Cir. 2025) (citation omitted). Instead, Plaintiffs' allegations only show that the sole HF release that resulted in anything remotely near the harm that Plaintiffs fear will happen to them occurred once, nearly four decades ago, at a refinery nowhere near where Plaintiffs' members live.

1    Second, Plaintiffs have not stated a claim upon which relief can be granted.

2  Under Section 21 of the Toxic Substances Control Act ("TSCA"), when EPA

3  denies a petition for rulemaking under Section 6, as it has done here, the petitioner

4  has the opportunity to have "such petition" considered by the court in a de novo

5  proceeding. 15 U.S.C. § 2620(b)(4)(B). Petitioners must then demonstrate by a

6  "preponderance of the evidence" that the chemical substance "presents an

7  unreasonable risk" of injury to health or the environment under "the conditions of

8  use." *Id*. TSCA defines the circumstances of conditions of use as being "intended,

9  known, or reasonably foreseen," *id.* § 2602(4), and requires consideration of the

10  "likely" exposures under such circumstances, *id.* § 2605(b)(4)(F)(iv). Here,

11  Plaintiffs' theory of exposure relies on unpredictable catastrophic events that are

12  not—and have never been—regulated under TSCA. Thus, even assuming the

13  alleged facts are true, Plaintiffs fail as a matter of law to show that the risk of

14  accidental exposures from unexpected, worst-case events presents an unreasonable

15  risk of injury under the statute.

16    Further, Plaintiffs request relief that is beyond the authority of a district

17  court to grant. Plaintiffs request that this Court impose specific deadlines for EPA

18  to publish a proposed rule and a final rule by dates certain. But Section 21 of

19  TSCA does not authorize such deadlines.

20    For these reasons, Plaintiffs' amended complaint should be dismissed.

21                                **BACKGROUND**

22    HF is an industrial chemical used in many different facets of manufacturing

23  across the United States. It is used in the production of refrigerants, herbicides,

24  pharmaceuticals, aluminum, plastics, electrical components, fluorescent light

25

26

27

28

bulbs, and oil refining—to name a few.[1] HF use in oil refining—the subject of this litigation—allows for the creation of high-octane gas that allows for the proper performance of high-powered engines.[2] American refineries use HF or "modified HF,"[3] to create high-octane gas.[4]

## I.     The Toxic Substances Control Act

Congress enacted TSCA as a national program for assessing and managing unreasonable risks of chemicals to human health and the environment. Pub. L. No. 94-469, 90 Stat. 2003 (1976). Among its many provisions, TSCA includes a unique petition provision.

TSCA Section 21 allows "[a]ny person" to petition EPA to initiate a proceeding for the issuance, amendment, or repeal of a rule or order under Section 6[5] and other specified sections. 15 U.S.C. § 2620(a). A Section 21 petition must

---

[1] Hydrogen Fluoride (Hydrofluoric Acid) (updated 2016), https://www.epa.gov/sites/default/files/2016-10/documents/hydrogen-fluoride.pdf [https://perma.cc/799T-4Q58].

[2] U.S. Energy Information Administration, Gasoline explained (2022), https://www.eia.gov/energyexplained/gasoline/octane-in-depth.php [https://perma.cc/43HP-6D9N].

[3] Modified HF includes an additive to reduce the volatility of the chemical if released.

[4] AFPM-API Letter Re: Citizen Petition under TSCA Section 21 to Prohibit Hydrogen Fluoride in Domestic Oil Refining (American Fuel & Petrochemical Manufacturers and American Petroleum Institute Mar. 17, 2025), https://www.regulations.gov/document/EPA-HQ-OPPT-2025-0102-0004.

[5] "If the Administrator determines in accordance with subsection (b)(4)(A) that the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture, or that any combination of such activities, presents an unreasonable risk of injury to health or the environment," then the Administrator must regulate the "substance or mixture to the extent necessary so that the chemical substance or mixture no longer presents such risk." 15 U.S.C. § 2605(a).

"set forth the facts which it is claimed establish that it is necessary" to initiate the
action requested. *Id.* § 2620(b)(1).[6]

EPA must grant or deny the petition within ninety days of filing. *Id.* §
2620(b)(3). If EPA grants the petition, it must "promptly commence an appropriate
proceeding" in accordance with certain provisions of the Act. *Id.* If EPA denies the
petition, it must publish its reasons in the Federal Register. *Id.*

TSCA affords the petitioner a right to judicial review in a federal district
court if EPA denies the petition. *Id.* § 2620(b)(4). In seeking judicial review for a
petition to initiate a proceeding to issue a rule (rather than amend or repeal one),
the petitioner "shall be provided an opportunity to have such petition considered by
the court in a de novo proceeding." *Id.* § 2620(b)(4)(B). In reviewing "such
petition," if the court finds to its satisfaction "by a preponderance of the evidence"
that the required statutory elements were met, then "the court shall order [EPA] to
initiate the action requested by the petitioner." *Id.* That is, the petitioner must
demonstrate that the chemical presents an "unreasonable risk" of injury to health or
the environment, without consideration of costs or other non-risk factors, "under
the conditions of use." *Id.* § 2620(b)(4)(B)(ii).

TSCA does not define "unreasonable risk," but Section 6 provides the
analyses that EPA—and here the Court—must undertake when determining
whether a chemical substance presents an unreasonable risk. Specifically, since

---

[6] In 2017, EPA issued "Guidance to Assist Interested Persons in Developing and
Submitting Draft Risk Evaluations Under the Toxic Substances Control Act"
pursuant to the 2016 TSCA amendments. 82 Fed. Reg. 33765 (July 20, 2017)
(Notice). EPA has also issued a rule on the risk evaluation process. 15 U.S.C. §
2605(b)(4)(B); *see* 89 Fed. Reg. 37028, 37033 ("Procedures for Chemical Risk
Evaluation Under the Toxic Substances Control Act (TSCA)" (May 3, 2024)).

risk is a function of hazard and exposure,[7] Section 6 requires consideration of, among other things, the available information on "hazards and exposures for the conditions of use" and the "likely duration, intensity, frequency, and number of exposures under the conditions of use of the chemical substance." *Id.* § 2605(b)(4)(F)(i), (iv).

Central to the unreasonable risk analysis are "conditions of use." The conditions of use of a chemical substances are "the circumstances . . . under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." *Id.* § 2602(4). TSCA defines the circumstances as those that are "intended, known, or reasonably foreseen," *id.*, and consideration of the likelihood of exposures under such circumstances, *id.* § 2605(b)(4)(F)(iv). In other words, for a chemical to pose any risk at all—let alone an unreasonable one—there must be actual exposures that are likely to occur under the conditions of use. Congress intended for chemical substances to be analyzed not in the abstract but under the ordinary, real-world circumstances in which they could be encountered by exposed persons. *See* 162 Cong. Rec. 7987 (2016) (explaining that "the conditions of use of a chemical substance drive the potential for exposure," and that "exposure potential, when integrated with the hazard potential of a chemical, determines a chemical's potential for risk"); *see also* 161 Cong. Rec. 10255 (2015) (noting that unreasonable risk is "based on a combination of hazard and *actual* exposure") (emphasis added).

---

[7] Plaintiffs agree that risk is a function of hazard and exposure. First Am. Compl. ("FAC") ¶ 39, Dkt. No. 50. Moreover, they acknowledge that exposure describes the "potential human or environmental contact with a chemical." *Id.*

## II.        Plaintiffs' Petition to EPA

In February 2025, Plaintiffs submitted a Section 21 administrative petition to EPA requesting a ban on the use of HF in oil refineries under Section 6 of TSCA.[8] Plaintiffs' petition, along with three attached appendices, included information about HF as a chemical, diagrams and descriptions of "worst-case" scenario releases, a list and discussion of what the petition described as past accidents and "near misses" at refineries, and hypothetical maps, charts, and other analysis on the scope of harm if there were to be an HF release while it is being transported to or used at the oil refineries. Notably, Plaintiffs' petition did not include information on the likely frequency, duration, or intensity of exposures to HF during the transportation of HF or the use of HF at oil refineries.

EPA denied the petition and published its reasoning in the Federal Register as well as in a letter to Plaintiffs' counsel. 90 Fed. Reg. 20575 (May 15, 2025). EPA explained that "the facts presented in the petition did not establish unreasonable risk under the conditions of use of using and distributing in commerce HF for domestic refining."[9] This was because the petition did not establish the likely duration, intensity, frequency, and number of exposures of HF involving releases at refineries. *Id.* EPA reiterated, consistent with its past statements, that it does not consider catastrophic or accidental releases, extreme weather events, and natural disasters that do not lead to regular and predictable exposures, as part of its analysis of unreasonable risk under Section 6. *Id.* EPA

---

[8] Petition for Rulemaking, Petition to Prohibit the Use of Hydrogen Fluoride In Domestic Oil Refining Under Section 21 and 6(a) of the Toxic Substances Control Act (U.S. EPA Feb. 11, 2025), https://downloads.regulations.gov/EPA-HQ-OPPT-2025-0102-0002/content.pdf.

[9] Letter from Nancy Beck, Principal Deputy Assistant Administrator, to Petitioners at 2 (May 12, 2025), https://www.epa.gov/system/files/documents/2025-05/12651-01_letter_petition_response_for_pdaa_esignature-signed_5.12.2025.pdf [https://perma.cc/D65P-8WBK].).

further explained that such catastrophic and accidental releases are not exposures from circumstances that are intended, known, or reasonably foreseen under the conditions of use. 90 Fed. Reg. at 20576.

Plaintiffs thereafter commenced this action by filing their complaint. Dkt. No. 1. After EPA moved to dismiss the complaint, on January 16, 2026, Plaintiffs amended their complaint. Dkt. No. 50.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) requires dismissal of any claim over which the court lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Plaintiff shoulders the burden to establish the predicates to federal jurisdiction, including standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In the absence of standing, a matter is not justiciable. *Id.* A plaintiff must demonstrate standing at the "outset" of a case. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. Inc.*, 528 U.S. 167, 180 (2000); *see also Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1056–57 (9th Cir. 2023) ("[A]t the pleadings stage, the plaintiff must allege sufficient facts that, taken as true, demonstrate each element of Article III standing . . . . If the plaintiff fails to do so, the complaint is subject to dismissal at the outset. . . .") (citation modified). Standing is assessed based on "the facts as they existed at the time the plaintiff filed the complaint." *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008). Although a reviewing court accepts the complaint's factual allegations as true, it does not accept "conclusory allegations" or "conclusory legal assertions." *Holden v. Hagopian*, 978 F.2d 1115, 1121 (9th Cir. 1992) (quotation marks omitted).

To establish standing under Article III, a plaintiff must demonstrate a "personal stake" in the dispute, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021), which is supported by "specific allegations" of "imminent harm" to a "concrete interest." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494–98 (2009). Organizational plaintiffs like those here can demonstrate injury either by showing

that the challenged action harms its organizational interests, *see All. for Hippocratic Med.*, 602 U.S. at 394–95, or under an associational standing theory by showing, among other things, that at least one of its members can demonstrate individual standing—meaning "its members would otherwise have standing to sue in their own right," *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1109 (9th Cir. 2003) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). For the latter, Plaintiffs must allege: "(1) [that their member] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Jones*, 74 F.4th at 1057 (quoting *Friends of the Earth*, 528 U.S. at 180–81). When a plaintiff challenges the government's purported "unlawful regulation (or lack of regulation) of *someone else*," "standing is not precluded, but it is ordinarily substantially more difficult to establish." *All. for Hippocratic Med.*, 602 U.S. at 382 (citing *Lujan*, 504 U.S. at 562).

For a harm to be concrete and particularized it must "actually exist[]." *Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 991 (9th Cir. 2023) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)). The harm must also be "actual or imminent," meaning "likely to occur soon." *All. for Hippocratic Med.*, 602 U.S. at 381 (citing *Clapper*, 568 U.S. at 409). The Ninth Circuit has further held that "[t]o establish 'actual or imminent' injury, the [plaintiff] must show a credible threat that a probabilistic harm will materialize." *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1100 (9th Cir. 2023) (citation modified); *see also Int'l Partners*, 146 F.4th at 852 (holding that probabilistic harm "merely recognizes" that a plaintiff may show injury-in-fact by showing the likelihood of harm has "significantly increased, bringing his potential for injury from certainly imaginable to 'certainly impending'"). The court has made clear that "although probabilistic

harm can create standing, it does not replace the foundational rule that a future injury must be imminent in order to satisfy the injury-in-fact requirement." *Int'l Partners*, 146 F.4th at 852 (citing *Lujan*, 504 U.S. at 564 n.2). Thus, allegations that rest on a "highly attenuated chain of possibilities" are not sufficient to show a harm is imminent. *Clapper*, 568 U.S. at 409–10; *see also Int'l Partners*, 146 F.4th at 851; *In re Baroni*, No. CV 23-1818-MWF, 2023 U.S. Dist. LEXIS 112934, at *26 (C.D. Cal. June 28, 2023); *Munns v. Kerry*, 782 F.3d 402, 409–11 (9th Cir. 2015) (holding theory of future harm was too speculative to be "certainly impending" or "present a substantial risk" of occurrence where "chain of events" leading to injury was hypothetical and attenuated).

A court may also dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). A claim may be dismissed under Rule 12(b)(6) either because it asserts a legal theory that is not cognizable as a matter of law or because it fails to allege sufficient facts to support a cognizable legal claim. *Neitzke v. Williams,* 490 U.S. 319, 325, 327-28 (1989). A court need not accept as true any legal conclusion set forth in a pleading. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, to survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

## I.     The Court should dismiss the amended complaint under Rule 12(b)(1) for lack of subject-matter jurisdiction.

Plaintiffs have failed to demonstrate their standing because they have not alleged an injury-in-fact. Plaintiffs' alleged harm is not actual or imminent and instead is conjectural and hypothetical. *Spokeo*, 578 U.S. at 339. Plaintiffs' theory of harm is that their members are injured by current refinery use of HF because an

unknown member or members may be at risk of future exposure to the chemical in the event of a catastrophic release at one or more facilities. Plaintiffs allege their members live with "fear" and "worry" that a possible accident at an oil refinery would release HF outside the perimeter of the refinery and that could harm their members, their members' loved ones, and the environment.[10] FAC ¶¶ 26-28, 30. But Plaintiffs have not pleaded any facts that show that such an event is "certainly impending." Instead, their alleged harm is based on scenarios that have never happened and require a cascading sequence of unlikely events to unfold. Plaintiffs' theory also does not satisfy the "imminen[ce]" requirement for a future injury; under that standard there must be a "credible threat" of probabilistic harm. *See City of Berkeley*, 89 F.4th at 1100; *Int'l Partners*, 146 F.4th at 852.

**A.    Plaintiffs have not alleged an injury-in-fact that is actual or imminent.**

**1.    Plaintiffs' alleged injury relies on a speculative chain of events and is not "imminent" or "certainly impending."**

The alleged harm to Plaintiffs' members stems from living near oil refineries that use HF—specifically the Trainer, Torrence, and Wilmington refineries. Plaintiffs allege their members are "injured by current refinery use" and "refinery-related HF releases . . . have already caused considerable harm and disruption to people across our country." FAC ¶¶ 31, 116. They also allege that "[c]urrent refinery use of HF also threatens the built environment." *Id.* ¶ 105. But Plaintiffs have not alleged their members have actually been exposed to any HF or that HF use has had any concrete impact on their environment or affected their property

---

[10] Plaintiffs have not alleged injury to any of their organization's core activities and thus have not pleaded facts to show organizational standing. *All. for Hippocratic Med.*, 602 U.S. at 394–95.

values. There is no allegation in the amended complaint that they have interacted at all with this chemical.

Instead, Plaintiffs' members' alleged injury is that they "live in constant fear," are "deeply worried," "concerned," feel "uneasy and unsafe due to the ever-present danger," and "fear . . . serious injury or death." FAC ¶¶ 19, 23–24, 27, 29–30. *See also id.* ¶¶ 19–20, 23–24, 28–30 (alleging fears related to potential evacuation or shelter-in-place scenarios). As an initial matter, fear or worry on the part of Plaintiffs' members cannot be an injury to the environment. *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 776 (1983) (finding contentions of psychological health damage not cognizable under statute that requires analysis of effects on the environment).

Moreover, Plaintiffs' alleged harm to their members is based on the speculative possibility of a future catastrophic release of HF at an unknown point in time, for unknown reasons, at an unspecified facility, *see* FAC ¶¶ 74–79, 83–85, 87–89, 93–98. But such a scenario has never happened, and Plaintiffs can only speculate that such a release will happen. As alleged, Plaintiffs only "belie[ve]"[11] that it is "reasonably foreseeable" that at some unknown point in time and location "refinery-related releases" will "become ever more likely." *Id.* ¶ 116. As such, Plaintiffs' members' alleged harm is based on a hypothetical "possible future injury" and not an imminent injury. *Clapper*, 568 U.S at 409.

In *Clapper*, the Supreme Court directly rejected the idea that mere allegations of "possible future injury" are sufficient to show standing. *Id.* There, the plaintiffs challenged a provision of the Foreign Intelligence Surveillance Act of

---

[11] Even at the pleading stage, "[c]onclusory allegations upon information and belief, without specific factual allegations, are insufficient to state a claim." *SDI Labs, Inc. v. Sameday Techs., Inc.*, No. CV-23-05619-MWF (MRWx), 2024 U.S. Dist. LEXIS 44386, at *14 (C.D. Cal. Jan. 25, 2024) (citing *Blanz v. Cal. Dep't of Corr., & Rehab.*, 727 F.3d 917, 926–27 (9th Cir. 2013)).

1978, which permits the Attorney General and the Director of National Intelligence to acquire foreign intelligence information by authorizing the surveillance of individuals who are not "United States persons" and are reasonably believed to be located outside the United States. *Clapper*, 568 U.S. at 401. The plaintiffs alleged that they engaged in sensitive international communications with individuals who they believed were targets of surveillance requested a preliminary injunction against the surveillance. *Id.* The Court found plaintiffs' "theory of *future* injury" was "too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'" *Id.* The plaintiffs did not have "actual knowledge" of the governments' targeting practices and had set forth "no specific facts" to show that their communication with foreign contacts would be targeted. *Id.* at 411–12. Importantly, the Court held that the plaintiffs could not manufacture standing by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending. *Id.* at 416. The Ninth Circuit has repeatedly applied the "certainly impending" standard set in *Clapper* and has also taken note of Supreme Court's finding that a "substantial risk" of harm is needed to find future injury. *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*, 100 F.4th 1039, 1054 (9th Cir. 2024); *Nw. Requirements Utils. v. FERC*, 798 F.3d 796, 805 (9th Cir. 2015) (citing *Clapper*, 568 U.S. at 414 n.5).

Here, Plaintiffs fail to meet their burden to show any "certainly impending" or "substantial risk" of injury. Plaintiffs allege their members fear living near an oil refinery that could at some point experience a significant release of HF that would impact them, but that fear or belief of a possible future harm is far too speculative. There are no alleged facts showing that there is a substantial risk or certainty of a large-scale, worst-case event that would result in a release that would impact any of Plaintiffs' members. Plaintiffs' members' fear of a catastrophic HF release is similarly speculative because they do not allege "specific facts" to show that an HF release that could impact them will or is likely to occur. *Cf. Ctr. for Biological*

1  *Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) (finding no

2  standing because plaintiffs could "only aver that any significant adverse effects of

3  climate change 'may' occur at some point in the future"); *All. For Hippocratic*

4  *Med.*, 602 U.S. at 391 (finding no standing where plaintiffs did not offer "any

5  persuasive evidence or reason to believe that the future will be different").

6       Instead, Plaintiffs' theory of standing rests on the kind of long and

7  speculative chain of causation that has been rejected by both the Supreme Court

8  and Ninth Circuit. *Cf. Clapper*, 568 U.S. at 401, 410 (holding that plaintiffs'

9  "highly speculative fear" relied on a "highly attenuated chain of possibilities" and

10 was "too speculative" to constitute a cognizable injury). As in *International*

11 *Partners for Ethical Care v. Ferguson*, Plaintiffs' theory of future injury rests on a

12 "convoluted series of events [to] transpire[]." 146 F.4th at 850–51 (finding plaintiff

13 organizations and parents of minor children did not have standing to challenge a

14 state statute that regulated minors seeking mental health care when the theory of

15 future injury required the court to make inferences that the child was likely to run

16 away in the future and come within reach of the challenged statute.).

17      Here, Plaintiffs are asking this Court to make unsupported inferences as

18 well. Namely that there is an impending accident that will cause an HF release of

19 such scale that it will harm Plaintiffs' members. For that to happen, the Court must

20 infer that: (1) an accident will happen at an oil refinery near Plaintiffs' members;

21 (2) mitigation measures in place by the refinery will fail; (3) the accident will

22 result in the release of HF; (4) response actions will not contain the release; (5) the

23 amount of HF that is released is significant enough to move beyond the confines of

24 the refinery; (6) weather conditions are such that the HF will spread into the

25 Plaintiff members' communities; and (7) the HF release will injure Plaintiffs'

26 members, their family members, communities, and the local environment. A

27 similarly attenuated chain of events would need to happen for HF that is

28 transported by truck or rail—namely some intervening event such as an accident or

derailment will occur, coupled with the weather and inefficient mitigation, that will release HF into one of Plaintiff members' communities.[12] Plaintiffs' alleged harm from a catastrophic release of HF that would impact their members relies on "an enormity of 'ifs' and 'shoulds,' without any detail or explanation as to when or why these contingencies might occur." *Int'l Partners*, 146 F.4th at 851.

### 2. Plaintiffs cannot show imminent harm to their members by relying on the potential effects of "worst-case" scenarios.

Plaintiffs seek to allege imminence by focusing on a possible catastrophic release. Plaintiffs' amended complaint includes maps and tables of hypothetical outcomes of "worst-case" scenarios to assert "how far the resulting HF cloud would spread."[13] FAC ¶ 76. But there are no allegations showing that a "worst-case scenario" (or even something close to that) has ever happened in U.S. history—and certainly not at the Trainer, Torrance, and Wilmington refineries that Plaintiffs' members allege are close to their homes. The release at the Galveston Bay Refinery in Texas City, Texas, that is cited by Plaintiffs occurred over 38 years ago and allegedly involved "[t]ens of thousands of pounds of HF" that spread along a "three-mile path from the release point." *Id.* ¶¶ 7, 64, 104. Even this incident comes nowhere near Plaintiffs' worst-case scenario estimates of an HF release of 110,000 to 890,000 pounds, or the release zone estimates that Plaintiffs describe in their amended complaint. *Id.* ¶¶ 3, 76, 79. Plaintiffs never allege that a "worst-

---

[12] Plaintiffs allege one instance of an accident involving a truck released HF to neighboring areas fifteen years ago. FAC ¶ 14. The most recent example they provide in which a railcar carrying HF derailed (but did not release HF) occurred fourteen years ago. *Id.* In addition, Plaintiffs' allegation that HF is currently transported by train is solely based on "information and belief." *Id.* ¶ 90.

[13] Refineries provide information on "worst-case scenarios" to EPA as part of their compliance with EPA's Risk Management Protocol.

1  case" scenario is imminent or provide any specifics to support a finding the

2  scenario "certainly impending."

3         Instead, Plaintiffs attempt to create an inference as to the imminence of harm

4  based on conclusory allegations of "information and belief" that past releases of

5  HF were caused or exacerbated by factors including "aging infrastructure, failure

6  to implement best practices relating to safety systems to control and mitigate HF

7  releases, failure of safety systems even when implemented in accordance with best

8  practices, and extreme weather events." FAC ¶ 116. Plaintiffs likewise broadly

9  allege that "[f]looding, heat waves, deep freezes, high winds, and earthquakes" and

10 future "[e]xtreme weather fueled by climate change" are likely to "increase the

11 frequency and severity of process-safety failures at refineries" and therefore

12 increase the "likelihood" of HF releases. *Id.* ¶¶ 114–15. Based on these

13 unsupported allegations, Plaintiffs assert that "refinery-related releases . . . are

14 reasonably foreseeable" and will be "even worse" than the ones that have occurred.

15 *Id.* ¶ 116. But to satisfy the injury-in-fact element of standing, even a "reasonably

16 foreseeable" event must be imminent or there must be a "substantial risk" that it

17 will occur. Plaintiffs do not allege that any supposed "reasonably foreseeable"

18 release is imminent or that it would reach outside the confines of the oil refinery

19 and harm Plaintiffs' members. These events do not show imminent harm.

20     **3.  Plaintiffs alleged "near miss" events also do not show "certainly**
21         **impending" harm or a "credible threat that a probabilistic harm**
22         **will materialize."**

23         When determining whether an injury is imminent, courts in the Ninth Circuit

24 also consider whether there is a credible threat that a probabilistic harm will

25 materialize. *Int'l Partners*, 146 F.4th at 852. But the "probabilistic" nature of the

26 injury-in-fact requirement means an "increased … risk of future harm" which may

27 be sufficient to confer standing but does not replace the "foundational rule" that a

28 future injury must be imminent. *Id.* Perhaps in recognition of their inability to

allege facts supporting a credible threat of a "worst-case" scenario (indeed, there has not been such a scenario in U.S. history), Plaintiffs attempt to bolster their allegations of fear based on past so-called "near-miss" events and discrete releases of HF at refineries. FAC ¶¶ 8, 104, 107, 108, 111. But the so-called "near miss" events also are not enough to show a "credible threat that a probabilistic harm will materialize." *City of Berkeley*, 89 F.4th at 1100.

The Ninth Circuit's analysis in *NRDC v. EPA* is helpful here. There, the court found standing where the probability of exposure to risk of harm was "quite high." *NRDC v. EPA*, 735 F.3d 873, 879 (9th Cir. 2013). The court examined the probability of exposure to the risk of harm and whether the plaintiff members could avoid exposing their children to the newly registered pesticide that was found in textiles. The court found that the probability of exposure was "quite high" and that absent EPA's authorization there was "roughly no chance" that the children of NRDC members would be exposed to the pesticide. *Id.* at 878. The court also looked to the ubiquity of textiles and found the probability that members would be able to avoid exposing their children to the risk of harm was quite low. *Id.* at 879. The court held that EPA's registration of the pesticide had increased the threat of future harm to plaintiffs' members. *Id.* at 878. As such, plaintiffs had shown there was a "credible threat" of exposure and that they would not be able to eliminate the threat from their children's lives. *Id.* at 879.

Here, Plaintiffs fail to allege facts to support a finding that the probability of exposure is "quite high." Although Plaintiffs allege an inability to avoid a possible exposure, *see* FAC ¶¶ 19-20, 23-24, 28-30, there is no potential harm for Plaintiffs' members to avoid because there is no "credible threat" that Plaintiffs will be exposed to HF to begin with. Unlike the conditionally approved pesticide at issue in *NRDC v. EPA*, EPA's decision here did not allow refineries to use HF in a new way that would significantly increase the chances that those living near the refineries would be exposed to HF. Nor is the use of HF at a refinery akin to a

pesticide that involves exposure through textiles, which people touch and wear every day and do not readily reveal chemical contents. Rather, Plaintiffs are relying on the status quo that has existed for decades, in which there has been no "worst-case" release scenario. The status quo shows that the probability of exposure is very low, and Plaintiffs have not plausibly alleged otherwise.

This is especially true where Plaintiffs' theory of standing relies on their members' proximity to the Trainer, Torrence, and Wilmington refineries.[14] First, Plaintiffs allege there were fourteen "HF-release events" at Torrance, six at Wilmington, and eight at Trainer between 1987 and 2025. FAC ¶ 107. Notably, Plaintiffs do not allege that any of these "HF-release events" reached outside the confines of the refinery. Next, Plaintiffs allege that more than 500 people have been injured and 40 people have died as a result of serious safety incidents at U.S. refineries. *See id.* ¶ 109. But they do not allege these figures are specific to HF or identify what, if any, of this total from "serious safety incidents . . . at U.S. refineries" is the number of people outside a facility injured or killed as a result of an exposure to HF after a release. Nor do they allege any injuries or deaths as a result of an HF release outside of the Trainer, Torrence, or Wilmington refineries located near where Plaintiffs' members live. And the last precautionary shelter-in-place order issued "after a release of modified HA acid" from Torrance was in 2001. *See* FAC Ex. 1. But Plaintiffs do not allege that HF reached outside the confines of the refinery or that anyone was injured. Plaintiffs have not alleged that there has ever been a shelter-in-place order relating to HF issued for the Wilmington or Trainer refineries. In fact, there is no allegation that HF has ever

---

[14] Because Plaintiffs' theory of standing is based on their individual members' exposure by nature of distance from the refinery, they would not have standing if they were outside of their "potential impact zone." FAC ¶ 19. For example, Plaintiffs would in no way would be at risk of exposure to HF by an oil refinery in Texas.

reached outside the confines of the Trainer, Torrence, and Wilmington refineries.[15] Thus, there is nothing in the amended complaint that shows Plaintiffs' members' probability of exposure to risk from HF harm is "quite high."

While Plaintiffs broadly characterize "our country's refineries" as outdated, improperly maintained, inadequately regulated, and "prone to failures and releases," FAC ¶¶ 15, 106, 108, they have not alleged specific facts to show that those characterizations apply to the facilities near their homes or communities. Many of these allegations are conclusory in nature or offer legal conclusions that need not be accepted as true. Further, Plaintiffs acknowledge that the American Petroleum Institute has published best practices for the operation of alkylation units. *Id.* ¶ 113. Given Plaintiffs' inability to show one example of when there was an HF release outside the refineries in question here, there is no "credible threat" that a probabilistic harm will materialize at the Trainer, Torrence, or Wilmington refineries, and Plaintiffs' asserted future injury is not imminent. Just because a harm is possible does not make it probable. *Clapper*, 568 U.S. at 409 (stating that "allegations of *possible* future injury" are not sufficient to show a threatened injury is *certainly impending* to constitute injury in fact).

### 4. Plaintiffs have not alleged harm founded on EPA action.

Plaintiffs also do not identify what has changed now for their members in light of EPA's denial that makes their alleged harm anything other than conjectural. *See, e.g.*, *San Luis Obispo Mothers for Peace*, 100 F.4th at 1054 (finding injury-in-fact where plaintiffs lived within 50 miles of a nuclear facility, the facility's license was going to expire, and the agency recognized age-related

---

[15] Plaintiffs allege that industrial ash fell on one of their members and his car during a 2015 explosion, FAC ¶ 27, but do not allege there was any release of HF from that incident.

degradation of the facility could lead to safety and environmental risks for persons living near the facility).

Plaintiffs have not alleged that EPA's decision has changed their conduct or is affecting them now in concrete ways. *See Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1150 (9th Cir. 2000) (finding injury in fact because the plaintiff was deterred from "fully enjoying" recreational activities in and around a body of water due to defendant's conduct). On the contrary, Plaintiffs here acknowledge that they continue their day-to-day lives going shopping, commuting to work, and engaging in recreational activities. FAC ¶¶ 27, 29. One would expect that if the risk of exposure was imminent, akin to a "ticking time bomb," one would take steps to protect themselves from this imminent harm. *Id.* ¶ 27. Plaintiffs do not allege that here. Nor have Plaintiffs alleged increased fear or changed practices in response to EPA's decision. And even if they had, Plaintiffs would still be "inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.

## II.    The Court should dismiss the complaint under Rule 12(b)(6) because it fails to state a claim upon which relief can be granted.

As stated above, TSCA Section 21 allows "[a]ny person" to petition EPA "to initiate a proceeding" for the promulgation of a regulation under section 6(a). 15 U.S.C. § 2620(a). The petition must "set forth the facts which it is claimed establish that it is necessary to issue . . . a rule under . . . section [6]." *Id.* § 2620(b)(1). If EPA denies a petition for rulemaking under Section 6, the petitioner shall have the opportunity to have "such petition" considered by the court in a de novo proceeding. *Id.* § 2620(b)(4)(B). The plaintiff must then demonstrate, by a preponderance of the evidence, that the chemical substance presents an unreasonable risk of injury to health or the environment under the "conditions of use." *Id.* § 2620(b)(4)(B)(ii).

1    Plaintiffs here have not stated a claim because they have not plausibly

2    alleged that using HF at oil refineries presents an unreasonable risk of injury to

3    health or the environment under the conditions of use. This is because they are

4    unable to show that any large-scale community exposures to HF from catastrophic

5    accidents are likely to occur at all, let alone in the regular and predictable manner

6    required by TSCA. TSCA requires consideration of "the likely duration, intensity,

7    frequency, and number of exposures under the conditions of use of the chemical

8    substance." *Id.* § 2605(b)(4)(F)(iv). And this dooms Plaintiffs' theory.

9    First, the catastrophic events that Plaintiffs rely on are not themselves a

10   condition of use of HF because they are not "reasonably foreseen." *See id.* §

11   2602(4) (defining "conditions of use" as "the circumstances, as determined by the

12   Administrator, under which a chemical substance is intended, known, or

13   *reasonably foreseen* to be manufactured, processed, distributed in commerce, used,

14   or disposed of" (emphasis added)). These events are, by definition, unexpected and

15   highly unlikely accidents that are *sui generis*. Even if it is conceivable that a

16   catastrophic event could occur, Plaintiffs fail to allege facts that the location,

17   conditions, scope, and all other information needed to assess hazard and exposure

18   are reasonably foreseeable.

19   Second, assuming that using HF in oil refining is the condition of use under

20   Plaintiffs' theory, the potential exposures they rely on still fail to satisfy the

21   statutory standard. TSCA requires the analysis to "take into account, where

22   relevant, the likely duration, intensity, frequency, and number of exposures under

23   the conditions of use of the chemical substance." *See id.* § 2605(b)(4)(F)(iv). As

24   EPA has explained, "it is not appropriate to consider catastrophic or accidental

25   releases, extreme weather events, and natural disasters that do not lead to regular

26   and predictable exposures." 90 Fed. Reg. at 20577. This makes sense given the

27   statutory directive to account for the "likely duration, intensity, frequency, and

28   number of exposures" and Congress's intent that unreasonable risk determinations

1   be based, in part, on an assessment of the actual exposures occurring under the

2   conditions of use. 15 U.S.C. § 2605(b)(4)(F)(iv); 161 Cong. Rec. 10255 (2015).

3   Yet that is exactly what Plaintiffs rely on to support their purported unreasonable

4   risk: the mere potential for accidental releases and "near-miss" incidents. *See, e.g.*,

5   FAC ¶¶ 7, 9–11.

6       Separately, as discussed above, Plaintiffs do not allege that catastrophic

7   releases of HF, and therefore exposures from such releases, have ever happened.

8   Instead, their amended complaint focuses on so-called "near-miss" events and one

9   historic example from 1987 of a HF release that resulted in exposures to the nearby

10  community and environment. These near-miss events and potential catastrophic

11  accidents do not lead to regular and predictable exposures—which is what the

12  statute requires—and thus do not "present[] an unreasonable risk of injury to health

13  or the environment." 15 U.S.C. § 2605(a); *see also* 90 Fed. Reg. at 20577 (EPA

14  "weigh[s] whether exposures from spills, leaks, accidents and climate-related

15  impacts would be regular or predictable versus those that are unsubstantiated,

16  speculative or otherwise not likely to occur.") (citing 89 Fed. Reg. at 37033).

17      Even assuming the allegations in Plaintiffs' amended complaint are true,

18  they do not plausibly allege that using HF at oil refineries presents an unreasonable

19  risk of harm under TSCA.

20  **III.    Plaintiffs seek relief that is not available under Section 21**

21      Plaintiffs have also failed to state a claim because they are not entitled to,

22  and this Court lacks the jurisdiction to grant, at least some of the relief requested.

23  Even where a plaintiff in a Section 21 proceeding is successful, a court can only

24  "order the [EPA] to initiate the action requested by the petitioner." 15 U.S.C.

25  § 2620(b)(4)(B). Respectfully, this Court lacks the authority to order EPA to

26  "publish a proposed rule within 1 year of the court's ruling" and "to publish a final

27  rule within 2 years of the court's ruling" as requested by Plaintiffs. FAC ¶ 134; *see*

28  *Ctr. for Env't Health v. Regan,* 103 F.4th 1027, 1038 (4th Cir. 2024) (holding that

under § 2620(b)(4)(B) a court can only order EPA to initiate a proceeding for a rule or order). Plaintiffs' request for relief mirrors the timeline included in Section 6(c)(1), 15 U.S.C. § 2605(c)(1), but that timeline only applies in instances where the Administrator has made a determination that a chemical substance presents an unreasonable risk of injury to health or the environment in accordance with Section 6(b)(4)(A). Here, EPA has made no such determination.

## CONCLUSION

The Court should dismiss Plaintiffs' amended complaint.


Dated: February 20, 2026                ADAM R.F. GUSTAFSON
                                        Principal Deputy Assistant Attorney General

                                        BRADLEY CRAIGMYLE
                                        Deputy Assistant Attorney General
                                        United States Department of Justice
                                        Environment & Natural Resources Division

                                        */s/ Sanya Shahrasbi*
                                        SANYA SHAHRASBI
                                        Trial Attorney
                                        Environmental Defense Section
                                        Environment & Natural Resources Division
                                        Ben Franklin Station P.O. Box 7611
                                        Washington, D.C. 20044
                                        Ph: (202) 305-5810
                                        sanya.shahrasbi@usdoj.gov

                                        *Attorney for Defendants*

## <u>Certificate of Compliance</u>

The undersigned, counsel of record for Defendants, certifies that this brief contains 6,992 words, which complies with the word limit of L.R. 11-6.1.


Dated: February 20, 2026   <u>*/s/ Sanya Shahrasbi*</u>
            SANYA SHAHRASBI
            *Attorney for Defendants*