Selena Kyle (246069)
skyle@nrdc.org
(312) 651-7906
Natural Resources Defense Council
20 N. Wacker Drive
Suite 1600
Chicago, IL 60606

Margaret Hsieh (287839)
mhsieh@nrdc.org
(415) 875-6135
Natural Resources Defense Council
111 Sutter Street
21st Floor
San Francisco, CA 94104

Vivian H.W. Wang (*pro hac vice*)
vwang@nrdc.org
Lauren P. Phillips (*pro hac vice*)
lphillips@nrdc.org
(212) 727-4477
Natural Resources Defense Council
40 W. 20th Street
New York, NY 10011

*Counsel for Plaintiffs*

Shana Lazerow (195491)
slazerow@cbecal.org
Kendall Chappell (364731)
kchappell@cbecal.org
(323) 826-9771
Communities for a Better Environment
113 E. Anaheim Street
Wilmington, CA 90744

*Counsel for Communities for a Better
Environment*

Lawrence L. Hafetz (143326)
lhafetz@cleanair.org
(347) 276-4350
Clean Air Council
1617 JFK Boulevard
Suite 1130
Philadelphia, PA 19103

*Counsel for Clean Air Council*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLEAN AIR COUNCIL; COMMUNITIES FOR A BETTER ENVIRONMENT; and NATURAL RESOURCES DEFENSE COUNCIL, INC., | Case No. 8:25-CV-1473-MWF (DFMx)<br><br>**PLAINTIFFS' COMBINED OPPOSITION TO FEDERAL** |

Plaintiffs,

v.

U.S. ENVIRONMENTAL
PROTECTION AGENCY; LEE
ZELDIN, in his official capacity as
Administrator; and
NANCY BECK, in her official
capacity as Principal Deputy Assistant
Administrator for the Office of
Chemical Safety and Pollution
Prevention,

Defendants.

**DEFENDANTS' AND
MOVANT-DEFENDANT-
INTERVENOR'S MOTIONS
TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

BACKGROUND .....................................................................................................2

I.      Legal Background ........................................................................................2

II.     Factual Background.......................................................................................5

        A.      Hydrogen fluoride is extremely dangerous to people .........................................................................................5

        B.      Current refinery-related use of HF threatens the health of millions ..................................................................6

        C.      Refineries have repeatedly released HF, narrowly avoided additional releases, and experienced many other safety failures....................................................11

        D.      HF threatens not only human health, but also the natural and built environment ..............................................14

        E.      The risks of further refinery-related HF releases that harm people and the environment are substantial, foreseeable, and growing ...............................14

        F.      Refinery-related HF use harms Plaintiffs' members .........................15

STANDARD OF REVIEW ...................................................................................16

ARGUMENT .........................................................................................................17

I.      Plaintiffs have standing ..............................................................................17

        A.      Plaintiffs face credible threats of harm from refinery-related HF use and transportation .......................................18

                1.      Plaintiffs' members live and spend time near HF-using refineries and HF transportation routes.....................................................................19

                2.      Because HF is so hazardous, even small releases threaten to impair health and the environment, and near-releases can impose costs on Plaintiffs' members..................................20

                3.      Refineries' age, poor safety records, and other exacerbating conditions magnify the risks to Plaintiffs' members.................................22

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS
(CASE NO. 8:25-CV-1473-MWF (DFMx))

B.   Article III does not require Plaintiffs to establish risk of harm with the degree of certainty that Defendants demand ...................................................... 23

1.   Article III does not require Plaintiffs to show past harm to establish a credible threat of future harm ....................................................... 23

2.   When each part of a chain of causation is materially likely, a risk is not speculative ............................... 25

3.   Defendants rely on cases with far more tenuous injury allegations ..................................................... 27

C.   Defendants conflate the elements of causation and redressability with injury-in-fact ...................................... 29

II.   Plaintiffs have stated a claim for relief ........................................................ 31

A.   Plaintiffs describe and seek protection from risks within TSCA's scope ....................................................... 31

B.   No other regulatory regime displaces TSCA, which mandates far more stringent regulation of refinery-related HF risks ..................................................... 36

1.   TSCA requires EPA to regulate toxic chemicals to eliminate unreasonable risks when other laws fail to do so .................................................... 36

2.   Existing regulations and guidance have not come close to eliminating the unreasonable risks of refinery-related HF use ................................................. 37

III.   The Court has the power to grant Plaintiffs' requested relief ........................................................................... 41

A.   The Court is empowered to order EPA to initiate rulemaking ..................................................... 41

B.   The Court is empowered to set a rulemaking timeline ..................................................... 42

CONCLUSION ..................................................... 44

CERTIFICATE OF COMPLIANCE ..................................................... 46

# TABLE OF AUTHORITIES

**CASES**

*Alaska Ctr. for Env't v. Browner*,
20 F.3d 981 (9th Cir. 1994)......................................................................42, 43

*Am. Unites for Kids v. Rousseau*,
985 F.3d 1075 (9th Cir. 2021)...........................................................................24

*Animal Legal Def. Fund v. Azar*,
No. 20-CV-03703-RS, 2021 WL 4477901, (N.D. Cal. Feb. 23, 2021)...............24

*Baur v. Veneman*,
352 F.3d 625 (2d Cir. 2003)........................................................................21, 25

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................17

*Bennett v. Spear*,
520 U.S. 154 (1997) ........................................................................................30

*Bowen v. Energizer Holdings, Inc.*,
118 F.4th 1134 (9th Cir. 2024) .........................................................................26

*Cal. Rest. Ass'n v. City of Berkeley*,
89 F.4th 1094 (9th Cir. 2024).....................................................................16, 18

*Cal. Unions for Reliable Energy v. U.S. Dep't of the Interior*,
No. 10-cv-9932-GW-SSX, 2011 WL 7505030 (C.D. Cal. Nov. 9, 2011) ...........28

*Ctr. for Cmty. Action and Env't Justice v. BNSF Ry.*,
764 F.3d 1019 (9th Cir. 2014)......................................................................36, 37

*Cent. Delta Water Agency v. United States*,
306 F.3d 938 (9th Cir. 2002).............................................................................25

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013clapp) ....................................................................17, 18, 27

*Council of Ins. Agents & Brokers v. Molasky-Arman*,
522 F.3d 925 (9th Cir. 2008)............................................................................26

*945949Covington v. Jefferson Cnty.*,

358 F.3d 626 (9th Cir. 2004)...................................................................20, 22, 29

*Ctr. for Biological Diversity v. EPA*,

168 F.4th 1164 (9th Cir. 2026) ..........................................................................30

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,

563 F.3d 466 (D.C. Cir. 2009) ...........................................................................28

*Ctr. for Food Safety v. Perdue*,

517 F. Supp. 3d 1034 (N.D. Cal. 2021) .............................................................25

*Dimarzo v. Cahill*,

575 F.2d 15 (1st Cir. 1978) ................................................................................31

*Eng v. EPA*,

No. 25-138, 2026 WL 945949 (9th Cir. Apr. 8, 2026)......................................18

*Env't Def. Fund v. Reilly*,

909 F.2d 1497 (D.C. Cir. 1990) ..................................................................2, 3, 24

*FDA v. All. for Hippocratic Medicine*,

602 U.S. 367 (2024) ...........................................................................................28

*Food & Water Watch, Inc. v. EPA*,

No. 17-cv-02162-EMC, 2024 WL 4291497 (N.D. Cal. Sept. 24, 2024)...............3

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,

528 U.S. 167 (2000) ...........................................................................................17

*Friends of Wild Swan v. EPA*,

74 F. App'x 718 (9th Cir. 2003) ........................................................................43

*Hunt v. Wash. State Apple Advert. Comm'n*,

432 U.S. 333 (1977) ...........................................................................................17

*In re A Cmty. Voice*,

878 F.3d 779 (9th Cir. 2017).........................................................................18, 43

*In re Zappos.com, Inc.*,

888 F.3d 1020 (9th Cir. 2018)............................................................................27

*Int'l Partners for Ethical Care Inc. v. Ferguson,*

146 F.4th 841(9th Cir. 2025) ................................................................... 27

*Khoja v. Orexigen Therapeutics,*

899 F.3d 988 (9th Cir. 2018) ................................................................... 16

*Kootenai Tribe of Idaho v. Veneman,*

313 F.3d 1094 (9th Cir. 2002) ................................................................. 20

*League of United Latin Am. Citizens v. Regan,*

996 F.3d 673 (9th Cir. 2021) ................................................................... 43

*Levine v. Johanns,*

No. 05-cv-4764-MHP, 2006 WL 8441742, (N.D. Cal. Sept. 6, 2006) .......... 24, 25

*Lujan v. Defs. of Wildlife,*

504 U.S. 555 (1992) .......................................................................... 17, 29

*Maya v. Centex Corp.,*

658 F.3d 1060 (9th Cir. 2011) ................................................................. 25

*Metro. Edison Co. v. People Against Nuclear Energy,*

460 U.S. 766 (1983) ............................................................................... 21

*Monsanto Co. v. Geertson Seed Farms,*

561 U.S. 139 (2010) ............................................................................... 24

*Munns v. Kerry,*

782 F.3d 402 (9th Cir. 2015) .............................................................. 17, 28

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*

524 F.3d 917 (9th Cir. 2008) ................................................................... 42

*NLRB v. SW General, Inc.,*

580 U.S. 288 (2017) ............................................................................... 34

*NRC v. Texas,*

605 U.S. 665 (2025) .......................................................................... 20, 31

*NRDC v. EPA,*

735 F.3d 873 (9th Cir. 2013) ................................................................... 19

*NRDC v. FDA*,
  710 F.3d 71 (2d Cir. 2013)........................................................................25, 30

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005)...........................................................................25

*Park v. Thompson*,
  851 F.3d 910 (9th Cir. 2017)...........................................................................16

*Phillips v. U.S. Customs & Border Prot.*,
  74 F.4th 986 (9th Cir. 2023)............................................................................17

*Physicians Comm. for Responsible Med. v. Johnson*,
  436 F.3d 326 (2d Cir. 2006).............................................................................24

*Pub. Watchdogs v. S. Cal. Edison Co.*,
  No. 19-CV-1635-JLS (MSB), 2019 WL 6497886 (S.D. Cal. Dec. 3, 2019),
  a*ff'd,* 984 F.3d 744 (9th Cir. 2020) ..........................................................20, 21, 22

*Safe Air for Everyone v. Meyer*,
  373 F.3d 1035 (9th Cir. 2004)..........................................................................29

*Safer Chems., Healthy Families v. EPA*,
  943 F.3d 397 (9th Cir. 2019).......................................................................34, 37

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014)............................................................................18

*San Luis Obispo Mothers for Peace v. NRC*,
  100 F.4th 1039 (9th Cir. 2024) ........................................................18, 19, 20, 22

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ........................................................................................17

*Texas v. NRC*,
  78 F.4th 827 (5th Cir. 2023).............................................................................20

*Thomas v. Cnty. of Humboldt*,
  124 F.4th 1179 (9th Cir. 2024) ........................................................................21

viii

*Trumpeter Swan Soc'y v. EPA*,

    774 F.3d 1037 (D.C. Cir. 2014) ...........................................................................3

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*,

    412 U.S. 669 (1973) .........................................................................................26

*Wilderness Soc'y v. U.S. Forest Serv.*,

    630 F.3d 1173 (9th Cir. 2011) ..........................................................................20

**STATUTES**

5 U.S.C. § 555(b) ...............................................................................................43

15 U.S.C. § 2601 (1988) .......................................................................................2

15 U.S.C. § 2602(4) ............................................................................................32

15 U.S.C. § 2602(12) ............................................................................................4

15 U.S.C. § 2605(a) ...........................................................3, 4, 5, 29, 30, 39, 40

15 U.S.C. § 2605(a)(2)(A) ....................................................................................4

15 U.S.C. § 2605(a)(2)(A)-(B) .............................................................................4

15 U.S.C. § 2605(a)(3) ..........................................................................................4

15 U.S.C. § 2605(a)(5) ..........................................................................................4

15 U.S.C. § 2605(b)(4)(A) ....................................................................................4

15 U.S.C. § 2605(b)(4)(F)(i) ..............................................................................33

15 U.S.C. § 2605(b)(4)(F)(iv) ......................................................................33, 34

15 U.S.C. § 2605(c)(1) ....................................................................................5, 42

15 U.S.C. § 2605(c)(2)(A)-(C) .............................................................................5

15 U.S.C. § 2605(c)(3) ....................................................................................5, 42

15 U.S.C. § 2608(a)(1), (2) .................................................................................37

15 U.S.C. § 2620(a) .........................................................................................3, 41

15 U.S.C. § 2620(b)(1) ........................................................................................42

15 U.S.C. § 2620(b)(4)(A) ....................................................................................3

15 U.S.C. § 2620(b)(4)(B) ...............................................................................3, 43

15 U.S.C. § 2620(b)(4)(B)(ii) ...........................................................4, 31, 32, 41

Pub. L. No. 114-182, 130 Stat. 448 (2016) ...................................................................4

**FEDERAL REGULATIONS**

29 C.F.R. § 1910.119 ................................................................................................38, 39

40 C.F.R. § 68 ..........................................................................................................38, 39

40 C.F.R. § 68.10(g)(4) ..................................................................................................40

40 C.F.R. § 68.25(a)(2)(i) (2024) .....................................................................................7

40 C.F.R. § 68.67(c)(9) ...................................................................................................40

40 C.F.R. § 68.67(c)(9)(h) ..............................................................................................40

40 C.F.R. § 68.67(h) ........................................................................................................40

82 Fed. Reg. 33726 (July 20, 2017) ................................................................................37

88 Fed. Reg. 74292 (Oct. 30, 2023) ...............................................................................38

89 Fed. Reg. 17622 (Mar. 11, 2024) .........................................................................35, 40

89 Fed. Reg. 37028 (May 3, 2024) .................................................................................37

91 Fed. Reg. 8970 (Feb. 24, 2026) .................................................................................40

**LEGISLATIVE HISTORY**

161 Cong. Rec. H4551-01, 4556 (2015) .........................................................................40

162 Cong. Rec. S3511-01, 3519 (2016) ..........................................................................40

Hearing on the Frank R. Lautenberg Chemical Safety for the 21st Century Act
(S. 697), 114th Cong. 69 (March 18, 2015) .............................................................35

S. Rep. No. 114-67, 2015 WL 3852676 (2015) ..................................................4, 34, 36

S. Rep. No. 94-698 (1976), as reprinted in 1976 U.S.C.C.A.N. 4491 .................2, 34

**STATE STATUTES**

Cal. Code Regs. tit. 8, § 3320 .........................................................................................39

Cal. Health & Safety Code Div. 20, Ch. 6.95 .................................................................39

Cal. Lab. Code Div. 5, Pt. 1, Ch. 2.5 ..............................................................................39

Cal. Lab. Code Div. 5, Pt. 7.5 .........................................................................................39

x

**OTHER AUTHORITIES**

Order Denying Def.'s Mot. to Limit Review, *Food & Water Watch* (N.D. Cal. Feb. 7, 2018), Dkt. No. 53 ..................................................................................... 3

Petition, Docket No. EPA-HQ-OPPT-2025-0102-002 (Feb. 11, 2025), https://www.regulations.gov/document/EPA-HQ-OPPT-2025-0102-0002 (last visited Mar. 12, 2026) ................................................................................ 42

**INTRODUCTION**

Congress enacted and strengthened the Toxic Substances Control Act (TSCA) to protect people and the environment from unreasonably dangerous chemical uses. Hydrogen fluoride (HF) is an extraordinarily hazardous chemical that dozens of U.S. refineries use and store in enormous volumes. Trucks and trains carry HF hundreds of miles across our country for refinery use. When released from refinery equipment, railcars, or trucks in temperatures above 67.1°F, HF forms a ground-hugging vapor cloud capable of killing every living thing in its path.

Congress included Section 21 in TSCA to guard against its "lax administration" in cases just like this one. Plaintiffs petitioned the Environmental Protection Agency (EPA) to regulate, under Section 6(a), a chemical use that presents unreasonable risks to health and the environment. EPA refused. Section 21 now empowers this Court to determine that the use presents unreasonable risks, and order EPA to start rulemaking.

Federal defendants and movant defendant-intervenor Western States Petroleum Association (WSPA) (collectively, Defendants) characterize the risks of refinery-related HF releases as too remote or conjectural to form a cognizable injury. If only that were so. Plaintiffs' members, and millions of other Americans, face credible threats of harmful HF releases from refineries and transportation routes near them. The threats are traceable to EPA's ongoing failure to regulate refinery-related HF use under Section 6(a), and redressable through the remedy Plaintiffs seek. Plaintiffs have Article III standing.

Plaintiffs have also stated a claim for relief. The threatened harms they allege are material, anticipable consequences of current refinery-related HF use. TSCA accordingly requires EPA to regulate that use, to the extent necessary to eliminate unreasonable risk.

This Court's remedial power under Section 21 is straightforward. If Plaintiffs prevail, the Court must order EPA to begin Section 6(a) rulemaking.

During rulemaking, industry and the public can comment on the best regulatory approach for eliminating unreasonable risk. Although Plaintiffs believe and stated in their petition that a ban would be best, the substance of a Section 6(a) rule is beyond the scope of this lawsuit.

The risks of further refinery-related HF releases that harm people and the environment are substantial, foreseeable, and growing as refineries and related infrastructure age and our weather becomes more extreme. In 1987, a refinery in Texas City released a toxic cloud of HF into a nearby neighborhood, causing more than a thousand people to seek medical attention and permanently damaging some victims' health. In 2012, a refinery in Corpus Christi, Texas, released another HF cloud. In 2015, debris from an equipment explosion missed—by mere feet—a large HF storage tank near the fenceline of the Torrance, California, refinery; debris from another explosion caused a similar "near miss" at a Wisconsin refinery in 2018. In 2019, a Philadelphia refinery released HF from a corroded pipe during explosions that caused enough damage to close the refinery permanently and came dangerously close to triggering a major release in a densely populated area.

TSCA does not allow EPA to sit back and wait for refinery-related HF use to cause further serious harm. EPA must act to protect health and the environment by issuing a Section 6(a) rule sufficient to eliminate the unreasonable risks Plaintiffs have described. The motions to dismiss should be denied.

## BACKGROUND

**I. Legal Background**

TSCA establishes a "comprehensive program to anticipate and forestall injury to health and the environment from activities involving toxic chemical substances." *Env't Def. Fund v. Reilly*, 909 F.2d 1497, 1498 (D.C. Cir. 1990) (cleaned up) (citing 15 U.S.C. § 2601 (1988)). Its overarching purpose is "to prevent unreasonable risks of injury to health or the environment." S. Rep. No. 94-698, at 1 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 4491, 4491. Congress

2

emphasized TSCA's precautionary purpose in its 1976 enactment, declaring that "[t]he time has passed where human health and the environment [are] protected only after serious injury has occurred." *Id.* at 6.

Congress included Section 21, the provision underlying this Court's subject-matter jurisdiction, to guard against EPA's "lax administration" of TSCA. *Id.* at 13; *see also Env't Def. Fund*, 909 F.2d at 1498. Section 21 empowers "any person" to petition EPA "to initiate a proceeding for the issuance … of a rule under" Section 6(a), which requires EPA to regulate chemical uses that present unreasonable risks of injury to health or the environment. 15 U.S.C. § 2620(a); *id.* § 2605(a) (Section 6(a)). If EPA denies a petition, the petitioners can ask a federal court to determine that unreasonable risk exists and order EPA to start Section 6(a) rulemaking. *Id.* § 2620(b)(4)(A).

Section 21 court proceedings are de novo. *Id.* § 2620(b)(4)(B). The court "considers whether the chemical poses an unreasonable risk" without deference to EPA. *Food & Water Watch, Inc. v. EPA*, No. 17-cv-2162-EMC, 2024 WL 4291497, at *1 (N.D. Cal. Sept. 24, 2024) ("*Food & Water Watch*"). Unlike in many civil environmental cases, the facts are not circumscribed to a record prepared by the agency defendant. Plaintiffs proceed pursuant to the normal rules of federal civil procedure and evidence, including by taking discovery and presenting live testimony and expert opinion relevant to the Court's determination of whether unreasonable risk exists. *See, e.g.*, Order Denying Def.'s Mot. to Limit Review, *Food & Water Watch* (N.D. Cal. Feb. 7, 2018), Dkt. No. 53. Section 21 accordingly provides "unusually powerful procedures for citizens to force EPA's hand." *Trumpeter Swan Soc'y v. EPA*, 774 F.3d 1037, 1039 (D.C. Cir. 2014); *see Env't Def. Fund*, 909 F.2d at 1503 (Section 21 is "a comprehensive as well as unusual remedy open to petitioners denied promulgation of new rules").

The 2016 amendments to TSCA preserved Section 21's provisions for citizen petitions and civil suits to enforce Section 6(a) and strengthened the associated

3

standards for unreasonable-risk determination and ensuing regulation. *See* Frank R. Lautenberg Chemical Safety for the 21st Century Act, Pub. L. No. 114-182, 130 Stat. 448, 509-10 (2016). TSCA now specifies that unreasonable risk should be determined "without consideration of costs or other nonrisk factors."[1] 15 U.S.C. § 2620(b)(4)(B)(ii); *id.* § 2605(b)(4)(A). Determinations must also account for groups of people who "may be at greater risk than the general population [for] adverse health effects" because they are particularly likely to be exposed to a chemical, or particularly susceptible to harm from exposure. *Id.* § 2602(12). In discussing these changes, Congress expressed frustration that EPA had "regulat[ed] only a handful of existing chemicals under Section 6 of TSCA over its history." S. Rep. No. 114-67, 2015 WL 3852676 (2015).

The Section 6(a) regulations that follow unreasonable-risk determinations must now *eliminate* identified unreasonable risks—not just "protect adequately against such risk[s] using the least burdensome requirements."[2] Congress listed a range of measures EPA may use to eliminate unreasonable risk. EPA is expressly authorized to ban ("prohibit") the use of chemicals for specified (or all) purposes. *See* 15 U.S.C. § 2605(a)(2)(A), (a)(5). EPA may also choose less restrictive measures, when sufficient to eliminate unreasonable risk. These include limiting how much of a chemical may be used for a particular purpose, *id.* § 2605(a)(2)(A)-(B); requiring new markings and warnings, *id.* § 2605(a)(3); and "otherwise regulating any manner or method of commercial use" of a chemical, *id.* § 2605(a)(5). EPA may also limit new regulatory requirements to "specified

---

[1] WSPA's claims about the potential economic consequences of regulating refinery HF use under Section 6(a) are accordingly irrelevant.

[2] *Compare* 15 U.S.C. § 2605(a) (requiring regulation "to the extent necessary *so that the chemical substance or mixture no longer presents such risk*") (emphasis added), *with* 130 Stat. at 460 (replacing the original language, "to protect adequately against such risk using the least burdensome requirements," with the italicized language).

4

geographic areas." *Id*. § 2605(a).

Section 6(a) rulemakings are subject to public notice and comment. *See id*. § 2605(c)(1), (3). After it identifies unreasonable risk and when it must select among multiple regulatory options for eliminating that risk, EPA may consider costs and economic factors "to the extent practicable." *Id*. § 2605(c)(2)(A)-(C).

## II.    Factual Background

### A.    Hydrogen fluoride is extremely dangerous to people

HF is an extremely corrosive and reactive chemical. First Am. Compl. (FAC) ¶ 2. It consists of one hydrogen (H) atom bonded to one fluorine (F) atom. *Id*. ¶ 44. When HF mixes with water—including in the air, and in people's eyes, throats, and lungs—it forms hydrofluoric acid. *Id*. ¶ 44. During this process, HF partially dissociates into hydrogen ions and fluoride ions. *Id*. ¶ 49. Both types of ions cause harm, though in different ways. *Id*. Hydrogen ions create an acid environment that destroys proteins essential to core cell functions like metabolism. *Id*. Exposure to concentrated HF (greater than 50%) results in immediate, intensely painful burns, blisters, and lesions. *Id*. A single drop can lead to a burn deep enough to require hospitalization. *See id*. Ex. 1 ¶ 5.

Fluoride ions readily penetrate skin, especially when skin is already damaged by acidity from hydrogen ions. *Id*. ¶ 50. As fluoride ions move through the body, they attack cell membranes, causing cells to liquefy and die. *Id*. They also destroy cells by binding to calcium and magnesium ions, making them unavailable for crucial cell functions. *Id*. The resulting tissue destruction can lead to organ damage, permanent disability, or death. *Id*.

Once HF enters the body, it becomes a systemic toxicant, diffusing through the body via blood and lymph vessels. *Id*. ¶ 53. Fatal HF exposures most commonly arise from this systemic toxicity. *Id*. ¶ 54. HF's fluoride ion binds strongly with electrolytes, disrupting essential biological processes including heartbeat, muscle contraction, and nervous system signaling. *Id*. That can lead to irregular heart

5

rhythms, seizures, and death through cardiac arrest. *Id.* ¶ 55. Because of HF's systemic toxicity, exposing just one percent of a person's skin to liquid HF or breathing HF vapor can be fatal. *Id.* ¶¶ 51, 57.

Compounding these dangers, symptoms of HF exposure are not always immediately observable. *Id.* ¶ 59. This is especially true for low-concentration exposures, and for some exposures that later prove fatal. *Id*. After HF exposure, respiratory and skin effects may take 12 to 36 hours to develop. *Id.*

The delayed onset of HF symptoms can mislead victims, first responders, and medical professionals. *Id.* ¶ 60. Victims may not promptly seek treatment, and first responders and other medical personnel may not recognize HF exposure quickly enough to provide effective treatment. *Id.* Even when HF exposure is correctly identified, treatment is sometimes too slow to save a life or prevent permanent bodily damage. *Id.*

Even after treatment, people can suffer long-term and irreversible harm. *Id.* ¶ 61. Some survivors of inhalation injury develop chronic lung disease. *Id.* Some HF burns result in persistent pain, scarring, and permanent tissue death. *Id.*

HF exposure is particularly hazardous to certain vulnerable populations, including adults over 65, people with pre-existing heart and lung conditions (like asthma), and children. *Id.* ¶¶ 62-64.

**B.      Current refinery-related use of HF threatens the health of millions**

At least 40 oil refineries across the United States use HF. *Id.* ¶ 3. Within refineries' alkylation units, a series of pipes and vessels move HF in a process to boost fuel octane. *Id.* ¶¶ 3, 72.

HF boils and vaporizes at 67.1°F, the lower end of room temperature. *Id.* ¶ 3. If equipment holding pressurized liquid HF ruptures at or above that temperature, the chemical tends to form a dense, ground-hugging, spreading cloud. *Id.* ¶¶ 3, 7. Vaporized HF looks like water vapor. *Id.* ¶ 100.

Refineries use, store, and transport significant volumes of HF, often in ambient temperatures above HF's boiling point. *Id.* ¶ 3. This means that HF-using refineries and the associated HF transportation routes present a continuous threat of exposure to dangerous HF clouds for refinery workers and other people who live, work, or otherwise spend time in neighboring communities. *Id.* ¶ 3.

Under the Clean Air Act, EPA requires refiners to submit Risk Management Plans (RMPs) that include analysis of a so-called "worst-case release scenario" describing the furthest distance in any direction that a toxic refinery chemical would spread following "an accidental release … from a covered process" under specified conditions. *See* 40 C.F.R. § 68.25(a)(2)(i) (2024); FAC ¶ 73. Every HF-using refinery, each of which handles various toxic chemicals, has reported to EPA that a major HF release would be its "worst-case" release. FAC ¶ 74.

About 19 million people live within the zone of a worst-case HF release and thereby risk exposure to harmful levels of HF. *See id.* ¶ 66-67, 78. Refiners estimate worst-case release zones by first calculating the "toxic endpoint"—the farthest point in an HF cloud spreading from a refinery where airborne HF concentrations would exceed 0.016 milligrams per liter, equivalent to about 19 parts per million (ppm). *Id.* ¶ 77. The worst-case release zone describes the circle formed by rotating the line between the refinery and the toxic endpoint 360 degrees, to account for different potential wind directions. *Id.* ¶ 77; *see also id.* ¶ 79 (showing the zones for metropolitan Los Angeles, Chicago, and Philadelphia refineries). Even short exposures to air containing 19 ppm of HF may harm people. *See id.* ¶¶ 66-67.

An HF vapor cloud released from a refinery could quickly engulf entire neighborhoods. *See id.* ¶¶ 3, 99. A release in a densely populated area, like urban Torrance, California, or suburban Trainer, Pennsylvania, could spread for 17 or more miles, endangering hundreds of thousands, or even millions, of people. *Id.* ¶¶ 3, 76. Even a release in less densely populated rural or suburban areas (like Garyville, Louisiana, or Channahon, Illinois) could harm thousands. *See id.* ¶ 14.

7

The following table summarizes recent refiner estimates of how much HF would be released in a worst-case scenario, how far HF would spread, and how many people live in the worst-case release zone:

| Refinery | Pounds of HF released (nearest 100) | Miles to endpoint (toxic cloud extent) | People living in worst-case release zone (nearest 100) |
|---|---|---|---|
| Torrance, CA | 110,000 | 6.2 | 840,000 |
| Wilmington, CA | 610,500 | 8.7 | 1,100,000 |
| Channahon, IL | 631,700 | 25 | 1,270,400 |
| Lemont, IL | 302,000 | 22 | 3,370,000 |
| Garyville, LA | 890,000 | 25 | 400,000 |
| Trainer, PA | 217,500 | 17 | 1,900,000 |

*Id.* ¶ 76.

The federal Acute Exposure Guideline Levels (AEGLs) for HF provide additional context for why HF releases can be so harmful. *Id.* ¶ 66. AEGLs represent inhalation exposure levels for the general public that, if exceeded, could harm the health of those exposed. *Id.* There are three AEGL levels: AEGL-1 (potentially harmful, but nondisabling), AEGL-2 (potentially disabling), and AEGL-3 (potentially lethal). *Id.* The HF concentration needed to reach each AEGL level varies with exposure time. *Id.* ¶ 67. The AEGL-1 through AEGL-3 levels for a 60-minute exposure to HF are 1 ppm, 24 ppm, and 44 ppm, respectively. *Id.* Many people exposed may experience adverse health effects at lower concentrations. *Id.* ¶ 68. A 60-minute exposure to 19 ppm of HF—the concentration at the outer boundary of refineries' worst-case release zones—is far above the AEGL-1 level.

A release need not be "worst case" to harm people's health. For example, the release of a truckload's worth of HF (less than half the worst-case volume) from the Torrance refinery could harm people miles downwind. *See infra* Background (Bkgd.) II.B.

Transportation of HF endangers yet more people because HF can escape from trucks and trains traveling to refineries. Refineries do not make HF. FAC ¶ 5.

The sole domestic manufacturer of HF for refinery use is in Geismar, Louisiana. *Id.* Refineries have HF transported by train or truck across long distances; the Torrance and Wilmington, California, refineries both receive truck deliveries of HF from Geismar, approximately 1,800 miles away. *Id.* ¶¶ 5, 81, 86; *see also id.* ¶ 71 (map of HF-using refineries). Trucks delivering HF to those refineries likely pass through urban Phoenix, Arizona, and Baton Rouge, Louisiana. *Id.* ¶ 86. HF has already escaped from trucks and railcars in transit, triggering the evacuation of thousands of people. *See id.* ¶ 14 (detailing a 2009 truck crash and subsequent release, a 1997 railcar release, and a 2012 HF train tanker derailment).

The unloading of HF from trucks and trains at refineries poses particular dangers. *Id.* ¶ 83; *id.* Ex. 1 ¶ 15 (noting a 1998 release of HF during truck transfer at Torrance). A single cargo container, pulled by a standard semi-truck, could release all the HF it holds (approximately 40,000 lbs.) in under seven minutes. *Id.* ¶ 83; *see also id.* ¶ 76 (worst-case release volume for Torrance is 110,000 pounds.). On a 77°F day with a light breeze, such a release would cause an HF cloud to spread more than six miles. *Id.* ¶ 83. The cloud would spread, and HF concentrations at ground level would reach potentially lethal levels (at or above AEGL-3), at a speed of around six miles per hour. *Id.* ¶ 99.

9



Figure 1: Airborne HF concentrations stemming from a Torrance truck release, as modeled by Plaintiffs. *Id.* ¶ 84.

As Figure 1 shows, HF concentrations are highest closest to the release point. *Id.* ¶ 84. Modeling shows potentially lethal airborne concentrations of HF as far as two miles from the release point (AEGL-3 zone, within the red circle); potentially disabling concentrations as far as 2.7 miles from the release point (AEGL-2 zone, within the orange circle); and potentially harmful concentrations as far as 6.2 miles from the release point (AEGL-1 zone, within the yellow circle). *Id.*

The following table shows approximately how many people in the general population, and in some particularly susceptible subpopulations, live within areas where the Torrance HF truck release described above would lead to potentially harmful, potentially disabling, and potentially lethal concentrations of airborne HF:

10

|  | People in areas with HF levels at or above AEGL-3 | People in areas with HF levels at or above AEGL-2 and below AEGL-3 | People in areas with HF levels at or above AEGL-1 and below AEGL-2 |
|---|---|---|---|
| Total residential population | 83,100 | 104,200 | 628,600 |
| Young children (less than 5 years old) | 4,200 | 6,100 | 35,300 |
| People 65+ years old | 13,600 | 17,200 | 93,500 |
| People with asthma | 7,100 | 9,200 | 62,400 |
| People with coronary heart disease | 4,200 | 5,600 | 35,000 |
| People with chronic obstructive pulmonary disease (COPD) | 3,600 | 4,900 | 32,800 |

*Id.* ¶ 85.

Though people indoors would be less exposed to HF from the release, being inside does not guarantee safety. The less airtight a building, the more readily outside air will penetrate, and the faster HF levels will build inside. *Id.* ¶ 102. Older homes will be less protective than newer ones. *Id.* People in some commercial buildings, including schools, restaurants, and factories, will also have less protection. *Id.*

### C. Refineries have repeatedly released HF, narrowly avoided additional releases, and experienced many other safety failures

Over the past four decades, more than half of the refineries that still use HF for alkylation have released HF—*i.e.*, had HF escape into the air from a pipe, container, or other vessel. *Id.* ¶ 108. Refineries have released HF at least 83 times. *Id.* ¶¶ 107, 108, Ex. 1. There have been additional events in which a disastrous HF release from a refinery was narrowly avoided (often called "near-miss" events). *Id.*

11

¶ 107, Ex. 2. These incidents have occurred despite the adoption of the Risk Management Program, other regulatory regimes, and voluntary industry guidance. *See id.* ¶¶ 8-11, 113. Some refinery releases have caused HF clouds to drift past refinery fencelines; at other times, offsite spread was only narrowly averted. The Torrance refinery has released HF at least fourteen times; the Wilmington refinery, at least six times; and the Trainer refinery (near Philadelphia), at least eight times. *Id.* ¶ 107.

In 1987, a refinery in Texas City, Texas, released tens of thousands of pounds of HF after a crane dropped a large piece of equipment on an HF tank. *Id.* ¶ 7. The release formed a cloud that drifted into a nearby residential area. *Id.* 4,000 people were evacuated; hospitals treated more than 1,000 people for burns, lung irritation, and other ailments; and 95 were admitted to the hospital. *Id.* ¶ 7, Ex. 1 ¶ 1. This release was an order of magnitude smaller than the hundred-thousand-pound-plus releases described in many refineries' reported worst-case scenarios. *See id.* ¶¶ 7, 76.

In 2012, a fire at a refinery in Corpus Christi, Texas, burned for days, causing equipment failures that triggered the release of 42,000 pounds of HF from the alkylation unit. *Id.* Ex. 1 ¶ 38. Earlier, the refinery had had smaller HF releases, and the equipment releasing HF had been temporarily repaired with clamps multiple times. *Id.* The released HF formed a toxic vapor cloud. *Id.* The mitigation spray system meant to control vaporized HF ran out of water. *Id.* Fortunately, the HF cloud drifted over an unpopulated area. *Id.*

The same refinery released several hundred more pounds of HF two months later. *Id.* Ex. 1 ¶ 39. The U.S. Chemical Safety and Hazard Investigation Board (CSB), the agency dedicated to investigating chemical-safety incidents, stated that "the continued releases [at this refinery] suggest that there may be significant weaknesses in the [refinery owner's] dedication to the safety and health of its workers and the community." *Id.*

In 2015, a large pollution-control device at the Torrance refinery exploded. *Id.* ¶ 9. The explosion catapulted a 40-ton piece of debris onto scaffolding surrounding an HF tank in the nearby alkylation unit; the debris landed within a few feet of the tank itself. *Id.* The Torrance refinery is in metropolitan Los Angeles, surrounded by residential neighborhoods. *See supra* Fig. 1. The explosion caused industrial ash to fall on people a mile away, and approximately 9,200 residents had to shelter in place. FAC ¶¶ 9, 27.

In 2018, a large explosion at a refinery in Superior, Wisconsin, punctured a storage tank, causing a fire and nearly resulting in a release from a nearby tank holding 50,000 pounds of an HF mixture. *Id.* ¶ 10. According to the CSB, it was pure luck that those fragments did not puncture the HF storage tank, which was closer to the explosion than the ruptured tank. *Id.* More than 2,500 people were evacuated, and the city of Duluth, Minnesota, issued a shelter-in-place order. *Id.*

In 2019, at the former Philadelphia Energy Solutions (PES) refinery, a 50-year-old pipe ruptured, releasing approximately 5,200 pounds of HF and causing explosions that hurled wreckage across the Schuylkill River. *Id.* ¶ 11. The explosions severed communications links to water pumps intended to help suppress vaporized HF, seriously delaying their activation; the refinery's backup power supply system also failed. *Id.* The incident injured five refinery workers and a first responder, and the refinery was so badly damaged it never reopened. *Id.*

Refineries that use HF have also had numerous fires, explosions, and releases of toxic substances besides HF. *See id.* Ex. 2 (listing 100 incidents at HF-using refineries between 1987 and 2025). As the near-release events in Torrance, California, and Superior, Wisconsin, illustrate, an explosion, fire, or other incident in one part of a refinery exacerbates the risk of an HF release elsewhere in the refinery. As the CSB observed regarding the 2011-2012 Corpus Christi HF releases, *see id.* Ex. 1 ¶ 39, repeated safety issues point to systemic weaknesses in refineries' operational safety. In the past four decades, serious safety incidents

13

(including HF releases) at HF-using U.S. refineries have killed more than 40 people and injured more than 500 people, including workers, first responders, and people beyond refinery fencelines. *Id.* ¶ 109.

### D. HF threatens not only human health, but also the natural and built environment

Refinery-related HF releases also harm the natural environment—animals, plants, and ecosystems. *Id.* ¶¶ 103-04. HF kills and injures animals besides humans, burning their skin, damaging their organs, and causing other serious health problems. *Id.* ¶ 103. It also kills plants. *Id.* When an unloading tanker released HF in 2012 in South Korea, the resulting HF cloud drifted across farmland, killing and injuring thousands of livestock and destroying crops. *Id.* ¶ 104. The 1987 Texas City HF cloud killed plants and animals along a three-mile path from the release point. *Id.* Because HF does not biodegrade in soil and dissolves in water, it poses a long-term risk to ecosystems. *See id.* ¶¶ 103-04.

Refinery-related HF releases also damage the built environment, undermining the efficacy of shelter-in-place and evacuation orders. HF is so corrosive that common materials, including glass and aluminum, cannot be used in refinery alkylation units, because HF would eat through them. *See id.* ¶ 105. The HF cloud from the 2012 truck release in South Korea damaged nearby houses and vehicles. *Id.* Damage to buildings can reduce their efficacy as shelters by making them less airtight. *See id.* ¶ 102. And damage to vehicles, including cars, fire trucks, and ambulances, can compromise evacuations and other emergency responses.

### E. The risks of further refinery-related HF releases that harm people and the environment are substantial, foreseeable, and growing

The risks of further refinery-related HF releases are growing with time, for at least two reasons. First, the United States' HF-using refineries are all more than 40 years old, and some, including the Trainer refinery, are more than a century old. *Id.*

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS
(CASE NO. 8:25-CV-1473-MWF (DFMx))

¶ 106. Aging refineries are generally more prone to failures and releases; original components (like pipes) have had longer to deteriorate. *Id.*

Second, climate change and increasingly frequent extreme weather events are enhancing the risk of HF releases. Average ambient temperatures near refineries are rising, which increases the likelihood that releases will occur above HF's 67.1°F boiling point and form a vapor cloud. *Id.* ¶ 115. Temperatures around the Torrance refinery, for example, are expected to rise 4.4°F-5.8°F by mid-century (2040-2069), with more pronounced increases in extreme heat events along the Southern California coast. *Id.* Ever-more-common extreme weather events—flooding, heat waves, deep freezes, hurricanes, and high winds—risk damaging refinery equipment and causing power losses, which can compromise systems that contain HF and mitigate its release. *Id.* ¶¶ 114-115. As happened during the PES refinery HF release, a loss of power to mitigation measures can allow HF to escape. *See id.* ¶ 11. The Channahon refinery south of Chicago has already lost power due to tornados; the Wilmington refinery's operator has identified hurricanes as a risk factor for an HF release. *Id.* ¶ 114.

### F.    Refinery-related HF use harms Plaintiffs' members

Plaintiffs' members are among the many people threatened by refinery-related HF use. Some members live less than a mile from an HF-using refinery. *See id.* ¶¶ 19, 24, 30. Others attend college, go to doctor's appointments, or run errands near these refineries. *Id.* ¶¶ 23, 27-29. Members who take care of young children or elderly relatives would not be able to evacuate family in time. *Id.* ¶¶ 19, 23. Given their proximity to these refineries, and rail or truck routes used to deliver HF to the refineries, even a small release puts them at risk, especially if they do not receive prompt warning. In prior serious incidents, including the 2015 Torrance explosion where an HF tank was nearly struck, no warning sirens went off. *Id.* ¶¶ 23, 27.

Even if a refinery-related HF release did not physically injure Plaintiffs' members, and others who live near HF-using refineries and transportation routes,

the disruption associated with a release or near-release is still likely to harm them. HF threatens their property and the natural environments where they recreate. *See, e.g.*, *id.* ¶ 27 (explaining that a release threatens the nature preserve where an NRDC member birdwatches). Refinery-related HF releases and near-releases have already forced mandatory evacuations and shelter-in-place orders impacting thousands of people around the country. *See id.* ¶¶ 10, 14, 92. Plaintiffs' members face harm from evacuating, sheltering-in-place, or taking other measures to ensure their safety following an HF release; they face lost wages, increased expenses, and disrupted access to necessary medications. *Id.* ¶¶ 28, 29.

## STANDARD OF REVIEW

When considering a motion to dismiss under Rule 12(b), courts accept the complaint's material allegations as true and construe the complaint in the plaintiff's favor. *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1100 (9th Cir. 2024) ("*Berkeley*"). To survive the motion, the plaintiff must simply allege sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Because there has been no discovery opportunity, a plaintiff may rely on general factual allegations, and courts presume that those allegations embrace any more specific facts necessary to support a claim. *See Berkeley*, 89 F.4th at 1100. Courts also may accept as true allegations made on information and belief. *Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017). Courts may not consider materials outside the pleadings for the purpose of "disput[ing] facts stated in a well-pleaded complaint." *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 1003 (9th Cir. 2018).[3]

---

[3] The Court should accordingly disregard Defendants' extrinsic factual claims, *see, e.g.*, WSPA Br. 1, and cited agency reports, websites, and industry comments, *see* EPA Br. 3-4; WSPA Br. 6. Plaintiffs' petition should be considered only to the extent that its content may bear on subject-matter jurisdiction, *see infra* Arg. III.A.

16

**ARGUMENT**

**I.     Plaintiffs have standing**

To establish Article III standing, a plaintiff must have an injury in fact that is (1) actual or imminent, (2) traceable to the defendant's actions, and (3) redressable by the court. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). A plaintiff organization has associational standing to sue "on behalf of its members when its members would otherwise have standing to sue in their own right." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).[4]

Plaintiffs' members face credible threats of harm from refinery-related HF use and transportation. Their injury is traceable to EPA's continued refusal to act, and redressable by a court order requiring EPA to start a Section 6(a) rulemaking to address the unreasonable risks posed by refinery-related HF use and transportation. Defendants focus on the first prong: whether Plaintiffs have alleged actual or imminent injury. EPA Br. 10-18; WSPA Br. 16-19.

Injury-in-fact may be based on a showing of future harm that is "certainly impending," or on a "substantial risk that the harm will occur." *Phillips v. U.S. Customs & Border Prot.*, 74 F.4th 986, 991 (9th Cir. 2023) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Defendants distort the injury-in-fact standard, stating that Plaintiffs must show a "certainty" that EPA's decision not to regulate HF "will" result in a release that harms Plaintiffs' members. WSPA Br. 16; *see also* EPA Br. 12. That is not the test. *See Munns v. Kerry*, 782 F.3d 402, 409 (9th Cir. 2015) (noting that the court does not "require[] literal certainty," but rather, a substantial risk that the harm will occur).

---

[4] Defendants do not contest that Plaintiffs satisfy the other two elements of associational standing. The health, aesthetic, and other interests alleged are germane to the organizations' purposes, FAC ¶¶ 17-18, 21-22, 25-26, 31, and individual members do not need to participate in the lawsuit to assert the TSCA claims or seek relief. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

17

The Ninth Circuit has "consistently held" that an injury is cognizable "where there is a 'credible threat' that a probabilistic harm will materialize." *NRDC v. EPA*, 735 F.3d 873, 878 (9th Cir. 2013). This "credible threat" test squares with *Clapper*'s "substantial risk" and "certainly impending" standards. *See, e.g., San Luis Obispo Mothers for Peace v. NRC*, 100 F.4th 1039, 1054-55 (9th Cir. 2024); *Berkeley*, 89 F.4th at 1100; *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 645 n.49 (9th Cir. 2014).

The credible threat to Plaintiffs' members includes the risk of "catastrophic" chemical release that the Ninth Circuit recently found sufficient for standing in *Eng v. EPA*, No. 25-138, 2026 WL 945949 (9th Cir. Apr. 8, 2026). Someone who lives near an HF-using refinery has standing to challenge regulatory "deficiencies" that increase the risk of a release that "could conceivably threaten residents within several miles from the facility." *Id.* at *2 n.1, *4.

### A.    Plaintiffs face credible threats of harm from refinery-related HF use and transportation

The risk that an HF release will harm Plaintiffs' members beyond refinery borders is grounded in Plaintiffs' members' (1) proximity to HF-using refineries (and/or their HF transportation routes); that (2) use and store massive amounts of highly volatile and toxic HF, which must be regularly replenished by truck or train; and (3) have documented histories of fires, explosions, and HF releases and near-releases, and are increasingly vulnerable to releases due to aging infrastructure and climate change. *See* FAC ¶¶ 19-30, 45-48, 75-76, 114-16 & Ex. 1. HF exposure threatens serious and even lethal health harm, and HF use and transportation pose an ongoing danger of releases and close calls that impose costly burdens on Plaintiffs' members' everyday lives. *Supra* Bkgd. II.B-C, II.F.

These threats are not "conjectural" or "generalized anxieties." *Contra* EPA Br. 9, WSPA Br. 2. Rather, all the conditions needed for harm to occur exist here

and now. Nor do the harms hinge on a worst-case event. Smaller releases and near-releases also inflict harm beyond refinery boundaries. *Supra* Bkgd. II.C (describing how an HF tank rupture was narrowly averted but nonetheless required the evacuation of 2,500 people and a city-wide shelter-in-place order).

### 1. Plaintiffs' members live and spend time near HF-using refineries and HF transportation routes

Plaintiffs' members live, work, and go to school near refineries that use and store tens to hundreds of thousands of pounds of HF. *See* FAC ¶¶ 19-20 (Clean Air Council (CAC)), 21-24 (Communities for a Better Environment (CBE)), 26-30 (Natural Resources Defense Council (NRDC)), 76 (table). Especially because of this proximity, the harm they face does not turn on the occurrence of a large HF release. For example, CBE member Emilza Guzman lives about 2 miles from the Wilmington refinery and attends college 2.4 miles away. *Id.* ¶ 23. NRDC member Christopher Houseman lives just over a half mile from the Torrance refinery. *Id.* ¶ 30. And CAC member Pamela Verdi lives less than half a mile from the Trainer refinery. *Id.* ¶ 19. A release far short of a worst-case release could result in an HF cloud that engulfs these members' homes or school. *Id.* ¶ 76. Plaintiffs' members, including Mr. Houseman, also live well within the threat zone for releases from a truck unloading HF. *Supra* Bkgd. II.B & fig. 1. They routinely run errands, exercise, visit friends, or go to doctor's appointments near the refineries, which further exposes them to danger. FAC ¶¶ 27, 29.

Living within an identified threat zone is one factor that makes Plaintiffs' members' risk of harm "credible" rather than "conjectural." In finding a "realistic threat of harm should there be a release of radioactive materials" from a nuclear facility, the Ninth Circuit referenced plaintiffs' proximity to the facility. *San Luis Obispo Mothers*, 100 F.4th at 1054. In a case challenging the storage of spent nuclear waste, the court rejected defendants' argument that plaintiffs needed to

show an "*actual*" hazardous leak to have standing, noting (among other factual allegations) that "at least one member…lives within the zone of exposure" to a radioactive release. *Pub. Watchdogs v. S. Cal. Edison Co.*, No. 19-cv-1635-JLS (MSB), 2019 WL 6497886, at *7 (S.D. Cal. Dec. 3, 2019) (emphasis added), *aff'd*, 984 F.3d 744 (9th Cir. 2020); *accord Texas v. NRC*, 78 F.4th 827, 836 (5th Cir. 2023) (finding "proximity is sufficient to establish injury" in the context of radioactive materials), *rev'd on other grounds*, 605 U.S. 665, 669 (2025); *Covington v. Jefferson Cnty.*, 358 F.3d 626, 638 (9th Cir. 2004) ("[R]isks from improper operation of a landfill are in no way speculative when the landfill is your next-door neighbor."); *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1112 (9th Cir. 2002) (finding injury to landowners based on risks that wildfires, pests, and forest diseases would spread from adjacent national forests), *abrogated on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011).

## 2. Because HF is so hazardous, even small releases threaten to impair health and the environment, and near-releases can impose costs on Plaintiffs' members

The grave consequences of exposure to even a small amount of HF help establish the credible threat. Because HF is so toxic and volatile, a worst-case release is not the only harmful scenario. To be sure, refineries' use and storage of tens or hundreds of thousands of pounds of HF create the conditions for a catastrophic release. *Supra* Bkgd. II.B. But much smaller releases still threaten to injure people and damage the ecosystem. *Supra* Bkgd. II.B, II.E. *Contra* EPA Br. 14. Refineries must regularly replenish their HF supplies; the recurring transportation, loading, and unloading of HF from trucks and railcars adds to the danger. *Supra* Bkgd. II.B. And because an HF cloud can resemble water vapor,

people are unlikely to know, based on the cloud's appearance, to take measures to try to protect themselves. *Id.*

The disabling and deadly effects of exposure to even small amounts of HF help establish Plaintiffs' standing here. *See, e.g.*, *Pub. Watchdogs*, 2019 WL 6497886, at *7 (finding that plaintiffs had sufficiently alleged "the conditions that will lead to probabilistic harm" from potential radiation exposure, which could have "deadly" consequences); *Baur v. Veneman*, 352 F.3d 625, 634 (2d Cir. 2003) (concluding that plaintiff's potential exposure to beef that might be tainted with deadly mad cow disease constituted injury-in-fact). EPA cites *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983), *see* EPA Br. 11, but that case was not decided on Article III standing grounds.[5] There, the court concluded that analysis under the National Environmental Policy Act need not encompass mental health effects from subjective perceptions of nuclear risks. *Id.* at 771, 775 (reaching the merits notwithstanding the finding that the alleged injury was too speculative). Here, Plaintiffs' members' fears are grounded not in speculative worries, but in objective circumstances that create a credible threat of harm.

Harm from an HF release is not limited to physical injury. Because HF spreads rapidly and is highly toxic and corrosive, releases and near-releases—whether from a refinery, truck, or train—can and have already resulted in evacuation and shelter-in-place orders affecting thousands of people near refineries and along transportation routes. *Supra* Bkgd. II.B, II.C. Emergency measures are disruptive and costly: Plaintiffs' members face lost income and increased expenses. *Supra* Bkgd. II.F. Such costs are also a cognizable injury. *See, e.g.*, *Thomas v. Cnty. of Humboldt*, 124 F.4th 1179, 1188 (9th Cir. 2024).

---

[5] To the extent EPA makes a zone-of-interests argument, TSCA expressly concerns risks to human health.

21

HF's extreme toxicity also threatens ecosystems by harming plant life and wildlife and contaminating soil and water. *Supra* Bkgd. II.D. Truck and refinery HF releases have already killed livestock and crops. *Id.* Continued HF use and transport thus impairs the recreational and aesthetic interests of Plaintiffs' members. *Supra* II.F.

### 3. Refineries' age, poor safety records, and other exacerbating conditions magnify the risks to Plaintiffs' members

Several factors magnify the risks that a refinery-related HF release will harm Plaintiffs' members. One is aging infrastructure. Just as "age-related degradation of nuclear facilities may lead to safety and environmental risks," *San Luis Obispo Mothers*, 100 F.4th at 1054, the aging and degradation of our country's refineries and transportation infrastructure pose increasing threats to Plaintiffs' members. *See supra* Bkgd. II.C (describing rupture of decades-old pipe that caused explosions and HF release); FAC ¶ 106 (noting that the Wilmington refinery was built over 45 years ago, the Torrance refinery is almost a century old, and the Trainer refinery is even older); *id.* ¶ 15.

Another factor is refineries' poor safety records. *Supra* Bkgd. II.C; FAC Exs. 1-2 (citing HF releases, near-releases, and other incidents at HF-using refineries, which have caused hundreds of injuries and numerous fatalities); *see, e.g., Covington*, 358 F.3d at 638 (noting landfill's history of fires and vermin); *Pub. Watchdogs*, 2019 WL 6497886, at *7 (citing alleged defects in, and mishandling of, nuclear waste storage canisters). Time and again, refineries across the country—including Los Angeles- and Philadelphia-area refineries near Plaintiffs' members—have released HF or had fires or explosions that affected people beyond the refinery fenceline. *See supra* Bkgd. II.C. The 2015 Torrance explosion is illustrative: it hurled a 40-ton slab of debris across the site, crashing just short of an HF tank, and propelled ash as far as a mile away, including on one of Plaintiffs' members. *Id.*; FAC ¶ 27. People who live or work near refineries and transportation routes cannot

22

count on mitigation systems to contain dangerous releases. For example, water deluge systems designed to suppress HF levels in spreading clouds, and isolation valves designed to stem HF flow to a broken vessel or pipe, have historically failed to control releases. FAC ¶¶ 11, 113-14.

Past refinery incidents are connected to the risk of a future HF release. *Contra* EPA Br. 17; WSPA Br. 18. "[C]ontinued releases" of HF "suggest that there may be significant" systemic "weaknesses" in the safety of a facility's operation. *See* FAC Ex. 1 ¶ 39 (quoting the CSB). Safety incidents that do not directly involve HF equipment are relevant, too. Unintentional releases and other safety incidents stem from degrading components, inadequate hazard procedures or instrumentation, or other contributing factors that also increase the risk of an HF release. *Cf. id.* ¶ 116. As the Torrance, Superior, and Philadelphia fires and explosions show, failure in one part of a refinery can damage other parts that contain HF. *Supra* Bkgd. II.C.

Extreme weather fueled by climate change is a third factor that exacerbates HF release risks. More frequent and more intense storms, floods, and other climate-amplified events make refineries increasingly prone to process-safety failures and chemical releases. *Supra* Bkgd. II.E. And rising ambient temperatures increase the likelihood of HF cloud formation after a release. *Id.*

These factors all compound the risks of harmful HF releases and disruptive near-release events that affect people beyond refinery boundaries.

**B.    Article III does not require Plaintiffs to establish risk of harm with the degree of certainty that Defendants demand**

**1.  Article III does not require Plaintiffs to show past harm to establish a credible threat of future harm**

Defendants fault Plaintiffs for not alleging that offsite HF-related injuries or deaths have already occurred at the refineries near Plaintiffs' members, EPA Br. 17, WSPA Br. 18, but Article III does not require such a showing. EPA has burdened

23

Plaintiffs' members with a credible threat of harm by failing to eliminate unreasonable risks presented by refinery-related HF use. Plaintiffs provide ample details establishing that all the predicate conditions for a harmful HF release persist and continue to worsen. Prior refinery-related releases and near-releases—combined with refineries' poor safety records, aging refinery and transportation infrastructure, worsening climate conditions, and HF's high volatility and toxicity—show that conditions are primed for harm that extends beyond refinery boundaries. *Supra* Bkgd. II.C, II.E. That is more than enough to establish a cognizable injury. *See, e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153-54 (2010) (finding, without discussing past injury, that farmers had standing to challenge deregulatory action based on "risk" of crop contamination); *San Luis Obispo Mothers*, 100 F.4th at 1054 (holding that plaintiffs had standing based on threat of harm without requiring showing of past radioactive releases); *Levine v. Johanns*, No. 05-cv-4764-MHP, 2006 WL 8441742, at *9 (N.D. Cal. Sept. 6, 2006) ("[A] plaintiff can demonstrate that future injury is likely without alleging past injury.").

Defendants' attempt to impose an elevated injury standard is particularly inappropriate where plaintiffs seek to vindicate rights under a statute, like TSCA, that aims to *prevent* harm *before* it occurs. *See Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1094 (9th Cir. 2021) ("Congress enacted TSCA … with the express purpose of limiting the public health and environmental risks associated with exposure to and release of toxic chemical[s] [.]" (quoting *Physicians Comm. for Responsible Med. v. Johnson*, 436 F.3d 326, 327 (2d Cir. 2006)); *Env't Def. Fund*, 909 F.2d at 1498 (Congress intended for TSCA to "anticipate and forestall injury to health and the environment"); *Animal Legal Def. Fund v. Azar*, No. 20-cv-03703-RS, 2021 WL 4477901, at *3 (N.D. Cal. Feb. 23, 2021) (where relevant statute required FDA to assess safety "*before* [the challenged drug] is released on the market," plaintiffs did not have to wait for the drug to be detected in their food or

24

nearby feedlots before bringing suit (emphasis added)).

In *Central Delta Water Agency v. United States*, 306 F.3d 938 (9th Cir. 2002), the court emphasized that "[t]he ability to challenge actions creating *threatened* environmental harms is particularly important because" they are "frequently difficult or impossible to remedy." *Id.* at 950 (emphasis added). And in *Baur*, the court focused on "the very purpose of … the statutes which [plaintiff] alleges the USDA ha[d] violated," which was "to ensure the safety of the nation's food supply and to minimize the risk to public health from potentially dangerous" food. 352 F.3d at 634. A court in this Circuit cited *Baur* approvingly in finding that "potential harm from exposure to dangerous food products or drugs is by nature probabilistic, yet an unreasonable exposure to risk may itself cause cognizable injury." *Ctr. for Food Safety v. Perdue*, 517 F. Supp. 3d 1034, 1040 (N.D. Cal. 2021) (quoting *Baur*, 352 F.3d at 634); *see also NRDC v. FDA*, 710 F.3d 71, 81 (2d Cir. 2013) ("[T]he injury contemplated by exposure to a potentially harmful product is not the future harm that the exposure risks causing, but the present exposure to risk.").

### 2. When each part of a chain of causation is materially likely, a risk is not speculative

Injury-in-fact is not defeated by the existence of multiple steps when "each step in the causal chain is credible." *Levine*, 2006 WL 8441742, at *7; *see also Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) ("A causation chain does not fail simply because it has several links, provided those links … remain plausible." (cleaned up)); *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2005) (finding injury based on a challenged dock extension, which "risks increased tanker traffic," which in turn creates "a greater potential" for an oil spill). Harm to Plaintiffs' members does not rely on speculative what-ifs, *contra* EPA Br. 12, 14-15. If Plaintiffs' members lived hundreds of miles from any

25

HF-using refinery or transportation route, or if they asserted only that they might one day move near a refinery that may use HF, or if they averred fears that a state-of-the-art refinery with a pristine safety record might someday start using HF, the standing analysis would be different. The inquiry would also be different if HF were a stable substance that remained in more containable liquid form when released, or if it were only mildly toxic over a long period of exposure. But reality is the opposite. The facts are that Plaintiffs' members live next to aging refineries that receive, store, and use large quantities of lethal and volatile HF and that have a history of HF releases, close calls, and other evidence of poor maintenance and weak safety processes. *See supra* Bkgd. II.B-C, II.E-F. In short, all the necessary conditions for harm exist here and now.

Defendants miscast Plaintiffs' discussion of HF release scenarios. *See* EPA Br. 14-15; WSPA Br. 19. The full extent of possible harm from a catastrophic release is relevant to the *merits* question of whether refinery use of HF poses unreasonable risks in violation of TSCA. *See, e.g.*, *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1146, 1147-49 (9th Cir. 2024) (holding that the "safe" level of a chemical is a disputed question on the merits, not of Article III standing). Moreover, whether a release is worst-case goes to the *extent* of harm, not whether the harm is cognizable—smaller releases and near-releases harm Plaintiffs' members, too. *Supra* Arg. I.A.2. Even a single hour of sheltering in place or a brief evacuation following a smaller HF release could cause Plaintiffs' members to lose wages, which is more than the "identifiable trifle" of harm needed for standing. *Council of Ins. Agents & Brokers v. Molasky-Arman,* 522 F.3d 925, 932 (9th Cir. 2008) (*quoting United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)).

### 3. Defendants rely on cases with far more tenuous injury allegations

The specific, undisputed conditions Plaintiffs describe distinguish this case from those Defendants cite. In *Clapper*, *see* EPA Br. 11-13, WSPA Br. 19, plaintiff attorneys and journalists feared that the government would monitor their conversations with foreign nationals. 568 U.S. at 411. The Court noted, however, that a federal statute prevented the government from lawfully surveilling plaintiff journalists, who were U.S. citizens. *Id*. And because the plaintiffs had no knowledge of how the government was potentially targeting plaintiffs' foreign contacts, they made only vague statements that they "assume[d]" conversations were wiretapped. *Id.*[6] Whereas the government would have to break the law to surveil U.S. citizen journalists in *Clapper*, a harmful HF release does not depend on a refinery's breaking any law or deviating from any ordinary refinery operation or HF transportation practice. Moreover, Plaintiffs' understanding of the risks here is grounded in HF's unique toxicology and chemistry; refineries' poor safety history; and facts reported by the industry to federal agencies and in CSB investigations, among other sources.

*International Partners for Ethical Care Inc. v. Ferguson*, *see* EPA Br. 13, is also inapt. There, the court found that plaintiff parents failed to allege a bevy of facts to substantiate their fear that their children might receive gender-affirming care at a shelter without the parents' knowledge. 146 F.4th 841, 851 (9th Cir. 2025) (noting that plaintiffs had not alleged their children had expressed interest in running away, identified as transgender, or were seeking gender-affirming care). Without such details, the plaintiffs' articulations of future injury were a

---

[6] *Clapper* is distinguishable for other reasons. The "standing inquiry [is] especially rigorous" when courts adjudicate a challenge to the constitutionality of acts of other branches of government, 568 U.S. at 408, and the case "arose in a sensitive national security context," *In re Zappos.com, Inc.*, 888 F.3d 1020, 1026 (9th Cir. 2018).

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS
(CASE NO. 8:25-CV-1473-MWF (DFMx))

"convoluted series" of what-ifs. *Id.*

In *FDA v. Alliance for Hippocratic Medicine*, *see* EPA Br. 13, doctors alleged fear that they would have to perform abortion procedures that violated their moral beliefs, but federal conscience laws shielded doctors from that purported dilemma. 602 U.S. 367, 388 (2024). Here, in contrast, Plaintiffs have sufficiently alleged a present risk of harm and "reason to believe that the future will be different," *id.* at 391, and even more dangerous. Unlike conjectural harms that simply "'may' occur at some point in the future," *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009), *see* EPA Br. 12-13, the risks faced by Plaintiffs' members are credible given their proximity to refineries and transportation routes, the large volumes of HF at issue, refineries' poor safety records, and HF's extreme toxicity and volatility, *supra* Bkgd. II.

*California Unions for Reliable Energy*, *see* WSPA Br. 18-19, is not on point, either. The plaintiffs feared a reduction in their water supply from the Colorado River, but the agency projected no need whatsoever to draw water from that river; moreover, plaintiffs' irrigation district had "first priority" in water allocation. *Cal. Unions for Reliable Energy v. U.S. Dep't of the Interior*, No. 10-cv-9932-GW-SSX, 2011 WL 7505030, at *6 (C.D. Cal. Nov. 9, 2011). Given those facts, there was essentially zero chance of harm.

*Munns v. Kerry*, *see* EPA Br. 9, is also inapposite. *Munns* involved a challenge to policies governing security contractors' immunity and the handling of kidnappings in Iraq. 782 F.3d at 408. But the plaintiff had not been re-hired to provide security services, and the policy that caused past harm was no longer in effect. *Id.* at 409-10.

Plaintiffs are endangered by their proximity to an inherently risky industrial process involving an extremely hazardous substance. Living next to an aging refinery with a spotty safety record that uses a chemical that is deadly, unstable, and hard to contain when released, is a daily, material danger.

28

## C.   Defendants conflate the elements of causation and redressability with injury-in-fact

Defendants blur the separate elements of standing. EPA argues that the injury here is not "founded on" its inaction because Plaintiffs' members have not changed their conduct, EPA Br. 18-19. But changed behavior in response to a credible threat goes to injury-in-fact, while the relationship between EPA's action (or inaction) and the alleged harm goes to causation. Just because Plaintiffs' members "continue their day-to-day lives," *id.* at 19, does not mean they do not face imminent injury traceable to EPA's refusal to regulate.

Standing law requires injury to be "actual or imminent," *Lujan*, 504 U.S. at 560-61, and efforts to avoid an injury are not what make the injury "actual or imminent." For example, a person who lives next to an open dump containing hazardous waste faces "actual and imminent" injury from toxic air pollution emanating from the dump regardless of whether that person minimizes leaving their house to reduce their potential exposure. *Cf. Covington*, 358 F.3d at 638.

Whether EPA has authorized a *new* use of HF, EPA Br. 18-19, is also immaterial to Plaintiffs' standing. EPA presumes that it has no legal obligation to address the status quo. *See* EPA Br. 16-17. But if current refinery-related HF use poses unreasonable risks, TSCA requires EPA to eliminate those *existing* risks. 15 U.S.C. § 2605(a); *cf. Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1040 (9th Cir. 2004) (noting that 12(b)(1) dismissal was in error when "the question of jurisdiction is dependent on the resolution of factual issues going to the merits"). Furthermore, the risks of harmful HF releases are mounting as refinery and transportation infrastructure age, the climate warms, and extreme weather becomes more common. *Supra* Bkgd. II.E.

In Defendants' view, people must change schools, skip doctor's appointments, abandon caretaking duties, or desert entire metro areas to

29

demonstrate injury-in-fact.[7] That is not what standing law requires. Even *if* Plaintiffs' members could take steps to avoid their risk of exposure to HF, the costs they incur would simply be an *alternative* injury. *See, e.g.*, *NRDC v. FDA*, 710 F.3d 71, 85 (2d Cir. 2013) (explaining that, where a plaintiffs' member faced a risk of exposure to a harmful chemical in antibacterial soap, the cost of buying a different soap "would itself constitute an injury in fact").

WSPA similarly conflates the law on the separate prongs of standing. *See* WSPA Br. 15-16. Whether a third party will likely react in a predictable way to government action goes to traceability and redressability, *e.g.*, *Ctr. for Biological Diversity v. EPA*, 168 F.4th 1164, 1176, 1179 (9th Cir. 2026)—not to whether an injury is certainly impending. Here, the injury is unquestionably redressable. If plaintiffs prevail on the merits, EPA will initiate rulemaking to eliminate the unreasonable risks presented by refinery-related HF use. *See* 15 U.S.C. § 2605(a). The resulting regulation—whether it takes the form of mandated physical safeguards, volume limits, a ban on refinery HF use, or other measures—will have a "determinative or coercive effect upon" refineries and transporters. *Bennett v. Spear*, 520 U.S. 154, 169 (1997); *see also infra* Arg. II.B.

EPA's refusal to eliminate the unreasonable risks of refinery-related HF use is a source of Plaintiffs' members' injury, and an order compelling EPA to commence Section 6 rulemaking would help redress that injury. Plaintiffs have standing.

***

There are accidents, and then there are accidents waiting to happen. Defendants downplay the wealth of evidence showing that all the circumstances forming a risk of a harmful HF release (or near-miss event) are present now and

---

[7] Alternatively, if Plaintiffs took steps to protect themselves, Defendants could argue that they no longer suffer a concrete injury. This "heads we win, tails you lose," logic would make environmental harms unreviewable.

continue to worsen. In Defendants' view, the catalog of narrowly avoided releases renders Plaintiffs' injury speculative, *see* EPA Br. 17; WSPA Br. 17-18, but their logic is backwards. Barely averted disasters signal disasters in the making.

A regulatory agency shirking its duty and an industry dodging regulation have every incentive to keep plaintiffs out of court by insisting that the feared harm is speculative. The court need not trust the fox who says the henhouse is safe. *Cf. NRC v. Texas*, 605 U.S. at 711 (Gorsuch, J., dissenting). Plaintiffs' members face a credible and cognizable threat of harm because EPA has refused to regulate refinery-related HF use under TSCA. This Court "need not wait for the conflagration before concluding that a real and present threat exists." *Dimarzo v. Cahill*, 575 F.2d 15, 18 (1st Cir. 1978).

**II. Plaintiffs have stated a claim for relief**

Plaintiffs have plausibly alleged that HF "presents unreasonable risk[s] of injury to health [and] the environment … under the conditions of use" their complaint describes. 15 U.S.C. § 2620(b)(4)(B)(ii). Neither TSCA's text nor its legislative history authorizes EPA to disregard these kinds of risks. No other law displaces or duplicates TSCA's risk-elimination mandate, and existing regulations and industry guidance have not eliminated the unreasonable risks Plaintiffs' complaint describes. Plaintiffs have stated a claim for relief.

### A. Plaintiffs describe and seek protection from risks within TSCA's scope

Defendants' claims that TSCA does not encompass risks stemming from "accidental" or "catastrophic" exposures, *see* EPA Br. 20-21; WSPA Br. 23-26, misconstrue Plaintiffs' complaint and contravene statutory text, Congressional intent, and common sense.

For starters, Plaintiffs' claim that refinery-related HF use presents unreasonable risks is not predicated solely on the potential for "catastrophic" HF

releases. *See supra* Bkgd. II.B; Arg. I.A; FAC ¶¶ 80-105; *contra* EPA Br. 20. It is not based on "a handful of isolated incidents," WSPA Br. 26, but rather on an extensive record of HF releases, narrowly avoided releases, and other serious safety failures, and on infrastructure and climate trends that make harmful refinery-related releases ever more likely. *See supra* Bkgd. II.C; Arg. I.A.3.

This incident history is germane to the dangers at issue here. TSCA directs the Court to determine whether HF—an exceptionally toxic and volatile chemical, *see supra* Bkgd. II.A, B—"presents an unreasonable risk to health or the environment, … including an unreasonable risk to a potentially exposed or susceptible subpopulation, under the conditions of use," *id.* § 2620(b)(4)(B)(ii). "Conditions of use" are, in turn, "the circumstances, as determined by [EPA], under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." *Id.* § 2602(4). The conditions of use here encompass the storage and use for alkylation of HF at refineries, and the distribution of HF in commerce to refineries. They necessarily include the associated circumstances that have contributed to the many HF releases, near-releases, and other safety incidents described in Plaintiffs' complaint. These circumstances are known and reasonably foreseeable; they form "part of the status quo that has existed for decades," EPA Br. 17, and continue contributing to unreasonable risk. In addition, they are worsening—in ways that increase risk—as our infrastructure continues aging, and our climate becomes ever more extreme.[8]

---

[8] Arguably, the "conditions of use" also include past HF releases, near-releases, and other chemical-safety failures at HF-using refineries, as well as transportation-related releases and near-releases, insofar as those incidents are part of the "known" and/or "reasonably foreseen," 15 U.S.C. § 2602(4), backdrop against which refineries continue to use HF and have HF distributed to them. *Contra* EPA Br. 20; WSPA Br. 23-26. Whether or not these safety failures are *themselves* "conditions of use," however, the circumstances that led to the failures are among the "conditions

(continued…)

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS
(CASE NO. 8:25-CV-1473-MWF (DFMx))

Courts adjudicating EPA's responsibilities under Section 21 do not defer to the agency's constructions of TSCA. *Supra* Bkgd. I. EPA's recent interpretation of "conditions of use" to exclude events that "do not lead to regular and predictable exposures," EPA Br. 20; WSPA Br. 25, warrants no deference.

Defendants' myopic focus on "regular and predictable" exposures cannot be reconciled with TSCA. The words "regular" and "predictable" do not even appear in Sections 6 and 21, and Defendants' effort to ground their argument in Section 6(b), which governs EPA-conducted "risk evaluations," is unavailing. *See* EPA Br. 20 (citing 15 U.S.C. § 2605(b)(4)(F)(iv)); WSPA Br. 24 (same). Section 6(b) unsurprisingly directs EPA, in its evaluations, to "integrate and assess" information on "hazards and exposures for the conditions of use of the chemical substance." 15 U.S.C. § 2605(b)(4)(F)(i). Congress's direction to "take into account … the likely duration, intensity, frequency, and number of exposures," *id.* § 2605(b)(4)(F)(iv), in no way authorizes EPA to *exclude* from consideration any category of potential exposures. Rather, it is an instruction to assign appropriate weight to likely exposure characteristics—and to analyze that information alongside data on a chemical's hazards. *See id.* § 2605(b)(4)(F)(i).

EPA may thus *consider* how "regular and predictable," EPA Br. 20; WSPA Br. 25, refinery-related HF exposures are, but it cannot simply *ignore* potential exposures it deems less regular or predictable.[9] Had Congress wanted to exclude from TSCA risks stemming from certain kinds of exposures, such as those caused of [refinery-related HF] use."

[9] Defendants' characterization of "accidental" exposures as not foreseeable or predictable, EPA Br. 20-21; WSPA Br. 23-26, does not square with Plaintiffs' allegations. The refinery-related releases and near-releases that Plaintiffs describe may be "accidental" insofar as they are unintentional. But when events like these occur again and again, their occurrence *is* foreseeable and predictable—even if the exact time, place, and reason for any specific future release cannot be forecast with precision.

33

by unintended industrial failures or natural disasters, it could have included language to that effect. It never did.

Turning to legislative history, Congress had no reason to enumerate the specific kinds of chemical risks cognizable under TSCA, because it envisioned a holistic inquiry. It enacted TSCA to protect human health and the environment before, not after, "serious injury has occurred." S. Rep. No. 94-698, at 6 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 4491, 4495. Congress understood that other laws already regulated chemical risks in certain contexts; its concern was that "no agency" had "the authority to look *comprehensively* at" the health and environmental risks associated with toxic chemical use. *Id*. at 1-2 (emphasis added). Through TSCA, it directed EPA "to look at the hazards in total."[10] *Id*. at 2. That is why TSCA regulates "chemicals themselves," not just those chemicals' presence in more specific contexts such as air, water, or products. *Safer Chems., Healthy Families v. EPA* ("*Safer Chems.*"), 943 F.3d 397, 406 (9th Cir. 2019) (citing S. Rep. No. 94-698, at 1); *contra* WSPA Br. 26-27.

When Congress strengthened TSCA in 2016, it reiterated its intent "to provide broad protection of human health and the environment." *Safer Chems.,* 943 F.3d at 406 (quoting S. Rep. No. 114-67, at 6 (2015)). When a Congressional committee asked EPA's then-Assistant Administrator for Chemical Safety whether TSCA's revised language empowered EPA "to consider accidental releases and

[10] EPA's insistence that risk determinations should concern only "actual exposures," EPA Br. 21, contravenes the very idea of risk, which is necessarily forward-looking and therefore includes *potential* exposures. *See also* 15 U.S.C. § 2605(b)(4)(F)(iv) (instructing EPA to consider "likely" exposure characteristics). The passing reference to "actual exposure" in a floor statement, EPA Br. 5, conflicts with another statement concerning "potential" exposure. *Id.* (quoting 162 Cong. Rec. S3511-01, 3519 (2016)). The legislator did not elaborate on his word choice, *see* 161 Cong. Rec. H4551-01, 4556 (2015). And "floor statements by individual legislators rank among the least illuminating forms of legislative history." *NLRB v. SW General, Inc.*, 580 U.S. 288, 307 (2017).

spills" when evaluating risks, he replied: "It does."[11]

Defendants' claims that TSCA risk determinations should *exclude* risks stemming from "accidental" releases, *see* EPA Br. 20-21; *accord* WSPA Br. 23-26, would foreclose Section 6(a) regulation of some of the most serious threats presented by HF and other chemicals. EPA acknowledges that "[a]ccidental releases occur much more often than intentional events." 89 Fed. Reg. 17622, 17675 (Mar. 11, 2024). Most, if not all, of the past events the complaint describes, including ones that caused or nearly caused a major HF release, were accidents. *See* FAC ¶¶ 7-11, 107-111, & Exs. 1-2. The prospect of future harmful accidents is unquestionably relevant to the risks presented by current refinery-related HF use. EPA's more specific argument that TSCA forecloses consideration of releases from "catastrophic accidents" is at odds with its longstanding requirement that refiners model and report threatened population counts for catastrophic accidental-release scenarios— the same scenarios it dismisses as too "unexpected," "unlikely," and "*sui generis*," EPA Br. at 20, to inform risk determination under TSCA. *See supra* Bkgd. II.B; FAC ¶¶ 73-79 (discussing worst-case scenario reporting).

As a practical matter, there is nothing unusual about TSCA's direction to consider health and environmental risks generally, rather than focusing on whatever subset could be characterized as stemming from "regular and predictable" chemical releases and exposures. Many harmful events whose future timing, location, and severity are impossible to forecast with precision are nevertheless foreseeable enough to be an appropriate subject for regulation. The federal government routinely regulates and spends to reduce the chances and consequences of industrial and natural disasters that harm human life, property, welfare, and the environment—

---

[11] Hearing on the Frank R. Lautenberg Chemical Safety for the 21st Century Act (S. 697), 114th Cong. 69 (March 18, 2015) (exchange between Senator Capito and Jim Jones).

35

without being able to say exactly when, where, and how disaster may strike next. *See, e.g.*, *supra* Arg. I.A(1)-(3) (discussing federal cases on nuclear and landfill safety). These are the "ordinary, real-world circumstances," EPA Br. at 5, we live in, and in which Congress chose to protect the public from unreasonable chemical risks.

### B. No other regulatory regime displaces TSCA, which mandates far more stringent regulation of refinery-related HF risks

#### 1. TSCA requires EPA to regulate toxic chemicals to eliminate unreasonable risks when other laws fail to do so

TSCA gives EPA a clear mandate: to eliminate unreasonable risks to health and the environment from toxic chemicals. Congress wanted TSCA to give the public and the environment the comprehensive protection Congress found lacking in other laws. *Supra* Arg. II.A.1. Congress strengthened TSCA's unreasonable-risk standard in 2016, notwithstanding the intervening passage of other laws including the 1990 Clean Air Act Amendments, and the promulgation of new regulations under both newer laws and laws existing at TSCA's enactment. *Supra* Bkgd. I. At reauthorization, Congress continued to describe TSCA as "*the fundamental* [f]ederal law regulating the manufacture, processing, distribution in commerce, use and disposal of chemical substances." S. Rep. No. 114-67, at 1 (2015) (emphasis added).

Defendants have not identified any language in the other laws they reference that requires any federal agency (or court) to determine whether toxic chemicals present an unreasonable risk to health or the environment and, if so, to pursue regulation adequate to eliminate that risk.[12] There is no support for WSPA's more specific claim, WSPA Br. 29, that Congress made "a careful and reasoned decision" to exclude "releases of HF from refineries" from TSCA's scope. The sources WSPA

---

[12] Because there is no indication that Congress meant to "exclude … from federal regulation" unreasonable risks from refinery-related HF use, WSPA Br. 27, 29, *Center for Community Action and Environmental Justice v. BNSF Railway*, 764 F.3d 1019 (9th Cir. 2014), is inapposite.

cites do not even mention HF or oil refining. *See id.* (citing *Center for Community Action*, 764 F.3d at 1030, and the preamble to EPA's defunct 2017 regulations implementing Section 6(b), 82 Fed. Reg. 33726, 33729 (July 20, 2017)). The Ninth Circuit has also rejected the proposition that TSCA allows EPA to exclude "conditions of use" from risk evaluations. *Compare* 82 Fed. Reg. at 33729 (2017 preamble), *with Safer Chems.*, 943 F.3d at 424-25.[13]

WSPA is also wrong to suggest that Section 9(a) displaces the Court's authority to determine whether refinery-related HF use presents unreasonable risks, that EPA must eliminate through Section 6(a). Section 9 provides that EPA may defer regulation only if it completes a Section 6(b) risk evaluation; finds unreasonable risk; and makes an additional, discretionary finding "that such risk may be prevented or reduced to a sufficient extent by" regulatory action under a law administered by another federal agency—*and* that other agency then either timely acts to address that risk or disagrees with EPA's risk finding. *Id*. § 2608(a)(1), (2).

Section 9 has no bearing here. EPA has never evaluated the risks of refinery-related HF use under Section 6(b). Plaintiffs are pursuing the alternative path to Section 6(a) regulation Congress provided in Section 21. Now that EPA has denied Plaintiffs' petition, Section 21 empowers this Court to determine whether refinery-related HF use presents an unreasonable risk to health or the environment and, if so, to order EPA to initiate Section 6(a) rulemaking.

### 2. Existing regulations and guidance have not come close to eliminating the unreasonable risks of refinery-related HF use

So long as refinery-related HF use continues to present unreasonable risks to health or the environment, as Plaintiffs have alleged, the fact that the use is also

---

[13] When adopting the regulations that presently govern risk evaluations, EPA said it "does *not* … view [TSCA] as providing authority to categorically exclude known conditions of use or exposures." 89 Fed. Reg. 37028, 37032 (May 3, 2024) (emphasis added).

37

regulable, in part, under other law, does not excuse EPA from regulating the use under Section 6(a). As EPA has previously acknowledged, "the mere existence of authority to assess or regulate a chemical … under a statute other than TSCA does not equate to effective risk management of the chemical." 88 Fed. Reg. 74292, 74300 (Oct. 30, 2023). By extension, "an assumption that risk will—or could be—managed in the future cannot be used to satisfy [EPA's] statutory obligations to evaluate existing chemical substances under TSCA and manage identified risks." *Id*.

The contrast between existing regulation and the measures Section 6(a) requires EPA to enact, following an unreasonable-risk determination, is stark. The Risk Management Plan (RMP) and related process-safety regulations EPA has promulgated under the Clean Air Act, and the Process Safety Management (PSM) regulations for highly hazardous chemicals OSHA has promulgated under the Occupational Safety and Health Act, are overwhelmingly focused on reporting, recordkeeping, training, planning, and similar procedural measures, as opposed to specific substantive requirements that would directly restrict how refineries may handle and store HF. *See generally* 40 C.F.R. Part 68 (Chemical Accident Prevention Provisions under the Clean Air Act); 29 C.F.R. § 1910.119 (Process Safety Management of Highly Hazardous Chemicals under the Occupational Safety and Health Act). Although EPA could address accidental-chemical-release dangers to the public under Section 112 of the Clean Air Act, the Section 112 process-safety standards that exist today are—as WSPA concedes—largely coextensive with OSHA's PSM standards for occupational settings.[14] WSPA Br. at 6 ("The RMP

---

[14] EPA's 1993 report under Section 112(n)(6) is not germane to this facial challenge, *supra* n.3, and could never excuse EPA from regulating under TSCA Section 6(a). Since that report, there have been dozens of refinery-related HF releases and near-release events; risks have increased; and Congress has strengthened TSCA. EPA's views on what further HF regulation was warranted under one subsection of another law, 33 years ago, are immaterial.

requirements generally run parallel with OSHA's PSM requirements[.]"). *Compare* 40 C.F.R. Pt. 68 Subpts. C-D, *with* 29 C.F.R. § 1910.119.

The other federal regulations WSPA cites are likewise procedurally focused. *See* WSPA Br. 7-9 (citing parts of the Emergency Planning and Community Right-to-Know Act; the Comprehensive Environmental Response, Compensation and Liability Act; the Clean Water Act; the Department of Transportation's Hazardous Materials Regulation). So are California's RMP and PSM schemes,[15] which do not apply to the dozens of HF-using refineries outside California and have not eliminated the unreasonable risks stemming from HF's use at Torrance and Wilmington. *See supra* Bkgd. II; FAC ¶¶ 4, 9, 65, 76-79, 86-89, 106-107, 114-115.

WSPA's own characterization of other regulatory schemes belies its claim that a Section 6(a) regulation on refinery-related HF use, which as a matter of law must eliminate unreasonable risk, 15 U.S.C. § 2605(a), would merely "duplicat[e]" existing regulation. *Contra* WSPA Br. 30. For example, WSPA cites no current regulation that caps how much HF refineries may store, or bring in by truck and rail—consistent with Plaintiffs' allegation that "EPA does not limit the amount of HF refineries can store, import or use." FAC ¶ 110. WSPA cites no regulation that mandates particular mechanical safeguards to reduce the chances of further refinery-related releases, or mitigate ensuing health or environmental harm—consistent with Plaintiffs' allegation that "EPA does not require refineries to install or maintain any particular equipment to reduce the risks that HF will be released, or to reduce the likelihood that released HF will spread offsite." *Id*. TSCA Section 6(a), in contrast, *requires* EPA to adopt these kinds of prescriptive measures, and more stringent ones

---

[15] *See generally* Cal. Lab. Code Div. 5, Pt. 7.5 (Refinery and Chemical Plants"); Cal. Lab. Code Div. 5, Pt. 1, Ch. 2.5 (Occupational Safety and Health, Hazardous Substances Information and Training); Cal. Health & Safety Code Div. 20, Ch. 6.95 (Hazardous Materials Release Response Plans and Inventory); Cal. Code Regs. tit. 8, § 3320 (Emergency Action Plan); *id*. § 5189.1 (Process Safety Management for Petroleum Refineries).

including bans, to the extent necessary to eliminate unreasonable risk. *Supra* Bkgd. I & Arg. II.B (discussing 15 U.S.C. § 2605(a)).

Defendants' claims that existing regulations adequately shield Plaintiffs' members and millions of other Americans from refinery-related HF exposures and other harms are particularly unpersuasive given EPA's latest rollback efforts. In 2024, EPA finalized updates to the RMP regulations that, come their effective date in May 2027, would have required refiners to "consider" safer alternatives to HF alkylation, and then adopt at least one additional "passive [mitigation] measure, or an inherently safer technology or design, or a combination of active and procedural measures equivalent or greater to the risk reduction of a passive measure."[16] EPA has proposed rescinding even those modest additions.[17]

Industry guidance is also inadequate to eliminate the unreasonable risks from refinery-related HF use. The guidance is voluntary; it fails to recommend safety systems and measures that (if adopted) would help reduce risks; and industry adoption has been uneven and incomplete. FAC ¶ 112. Like the regulatory schemes Defendants emphasize, industry guidance has existed since at least the early 1990s—yet HF releases and near-releases have continued. *Id.*; *supra* Bkgd. II & Arg. II.A.

In sum, the existence of other laws, regulations, and industry guidance concerning refinery-related HF use does not excuse EPA from regulating the use under TSCA, to the extent necessary to eliminate unreasonable risk. A lawful

---

[16] *See* 89 Fed. Reg. at 17643-44 (describing new requirements to be codified at 40 C.F.R. § 68.67(c)(9) and (h)); 40 C.F.R. § 68.67(c)(9) (safer alternatives analysis); *id.* § 68.67(h) (mitigation); *id.* § 68.10(g)(4) (effective dates).

[17] *See* 91 Fed. Reg. 8970, 8978 (Feb. 24, 2026) (proposing to rescind the requirements, except as to safer-alternatives analyses for "newly designed and built processes"). Even if the 2024 updates stand long enough for the deferred provisions to take effect, "[n]othing in [those regulations] forces the adoption or abandonment of any technology or design." 89 Fed. Reg. at 17652.

Section 6(a) regulation on refinery-related HF use will be substantially more protective of health and the environment than the status quo—furthering TSCA's precautionary purpose.

### III.     The Court has the power to grant Plaintiffs' requested relief

#### A.     The Court is empowered to order EPA to initiate rulemaking

WSPA claims that Plaintiffs cannot request initiation of Section 6(a) rulemaking on refinery-related HF use, as opposed to the specific form of regulation their petition suggested: a ban. WSPA Br. 20-21. But Section 21(a) makes clear that the relief available to petitioners is for EPA "to *initiate* a proceeding" to issue, amend, or repeal a rule or order under other enumerated parts of TSCA. *See* 15 U.S.C. § 2620(a) (emphasis added); *see also id*. § 2620(b)(4)(B)(ii) ("[T]he court shall order [EPA] to *initiate* the action requested by the petitioner." (emphasis added)). Although Plaintiffs seek the issuance of a new regulation under Section 6(a), Section 21 also authorizes petitions for the "issuance" of new regulations under TSCA Sections 4 and 8, and for the "amendment[] or repeal" of regulations under Sections 4, 6, and 8. The Section 21(b) language WSPA emphasizes, authorizing litigation "to compel [EPA] to initiate a rulemaking proceeding *as requested in the petition*," WSPA Br. 20, refers back to the general form of rulemaking the plaintiff originally petitioned for under Section 21(a)—i.e., an "issuance, amendment, or repeal," "under [Sections 4, 6, or 8]"—and not to any specific regulatory approach.

WSPA's premise that Plaintiffs may seek (at most)[18] a court order compelling a specific form of regulation is also irreconcilable with Section 6, which contemplates a rulemaking process informed by additional information available only after the unreasonable-risk determination. That process is subject to notice and comment, *see* 15 U.S.C. § 2605(c)(1), (3), and may incorporate facts beyond the

---

[18] WSPA never claims that this Court is empowered to specify the content of a Section 6(a) regulation.

scope of an unreasonable-risk determination. *See supra* Bkgd. I (discussing, e.g., information on costs). If EPA were locked into a specific regulatory approach at the time unreasonable risk was determined, further factual development on how best to eliminate the unreasonable risk would be futile.[19]

Plaintiffs staked their claim to Section 21 relief—initiation of a Section 6(a) rulemaking to eliminate the unreasonable risks to health and the environment presented by refinery-related HF use—by presenting EPA with facts establishing the existence of those unreasonable risks. They did not foreclose that relief by also commenting on a particular regulatory approach.

### B.    The Court is empowered to set a rulemaking timeline

The Court is unquestionably empowered to order EPA to "publish a proposed rule within 1 year of the court's ruling" and "to publish a final rule within 2 years of the court's ruling," FAC ¶ 134; *contra* EPA Br. 21-22.

Courts have equitable discretion to set deadlines for agency action to ensure compliance with the law. *See Alaska Ctr. for Env't v. Browner*, 20 F.3d 981, 987 (9th Cir. 1994) (disagreeing that the Clean Water Act "relegates the pace at which [certain pollution limits] shall be established entirely to the EPA's discretion," and affirming an order requiring steps—by specific deadlines—to set those limits); *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 937 (9th Cir. 2008) (affirming an order requiring "a reasonable combination of a time limit and progress reports"); *Intertribal Sinkyone Wilderness Council v. Nat'l Marine*

---

[19] Plaintiffs' petition honored this distinction. It first "set forth the facts which … establish that it is necessary to issue a rule under [Section 6]," 15 U.S.C. § 2620(b)(1)—i.e., establishing that current refinery-related HF use presents unreasonable risks to health and the environment. It presented additional facts extraneous to the risk determination, but potentially relevant to Section 6(a) rulemaking, in a separate section, "[i]n anticipation of rulemaking." Petition, Docket No. EPA-HQ-OPPT-2025-0102-002 (Feb. 11, 2025), at 55, available at https://www.regulations.gov/document/EPA-HQ-OPPT-2025-0102-0002 (last visited Mar. 12, 2026).

*Fisheries Serv.*, No. 1:12-cv-00420 NJV, 2013 WL 8374150, at *2 (N.D. Cal. Nov. 26, 2013) ("Ninth Circuit precedent expressly permits imposition of deadlines on the remand process."). Indeed, courts routinely set deadlines for agencies even without explicit statutory authorization. *See, e.g.*, *League of United Latin Am. Citizens v. Regan*, 996 F.3d 673, 703 (9th Cir. 2021); *In re A Cmty. Voice*, 878 F.3d 779, 788 (9th Cir. 2017).

EPA cites no authority, *see* EPA Br. 21-22—and there is none—indicating that TSCA stripped this Court of its "broad latitude in fashioning equitable relief." *Alaska Ctr. for Env't*, 20 F.3d at 986. That Section 21 explicitly empowers the Court to order EPA to "initiate" Section 6(a) rulemaking, 15 U.S.C. § 2620(b)(4)(B), does not diminish judicial power to ensure the timely conclusion of that process. *Cf.* 5 U.S.C. § 555(b) ("[W]ithin a reasonable time, each agency shall proceed to conclude a matter presented to it."). *Contra* EPA Br. 21.

If the Court agrees that current refinery-related use of HF poses unreasonable risks, it would be appropriate to set the deadlines Plaintiffs seek for Section 6(a) rulemaking, which mirror those that apply under Section 6(c)(1) after EPA finds unreasonable risk. *Cf. Friends of Wild Swan v. EPA*, 74 F. App'x 718, 720, 723 (9th Cir. 2003) (affirming a schedule modeled after one adopted by the state legislature). The ensuing rulemaking process is the same regardless of whether a court or EPA initially finds unreasonable risk; that process should therefore take the same amount of time under either scenario.

## CONCLUSION

The motions to dismiss should be denied.

Date: April 10, 2026                    Respectfully submitted,


                                        */s/Selena Kyle*
                                        Selena Kyle (246069)
                                        skyle@nrdc.org
                                        (312) 651-7906
                                        Natural Resources Defense Council
                                        20 N. Wacker Drive
                                        Suite 1600
                                        Chicago, IL 60606

                                        Margaret Hsieh (287839)
                                        mhsieh@nrdc.org
                                        (415) 875-6135
                                        Natural Resources Defense Council
                                        111 Sutter Street
                                        21st Floor
                                        San Francisco, CA 94104

                                        Vivian H.W. Wang (*pro hac vice*)
                                        vwang@nrdc.org
                                        Lauren P. Phillips (*pro hac vice*)
                                        lphillips@nrdc.org
                                        (212) 727-4477
                                        Natural Resources Defense Council
                                        40 W. 20th Street
                                        New York, NY 10011

                                        *Counsel for Plaintiffs*

                                        Lawrence L. Hafetz (143326)
                                        lhafetz@cleanair.org
                                        (347) 276-4350
                                        Clean Air Council
                                        1617 JFK Boulevard
                                        Suite 1130
                                        Philadelphia, PA 19103

44

*Counsel for Clean Air Council*

Shana Lazerow (195491)
slazerow@cbecal.org
Kendall Chappell (364731)
kchappell@cbecal.org
(323) 826-9771
Communities for a Better Environment
113 E. Anaheim Street
Wilmington, CA 90744

*Counsel for Communities for a Better
Environment*

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS
(CASE NO. 8:25-CV-1473-MWF (DFMx))

## CERTIFICATE OF COMPLIANCE

Undersigned counsel for Plaintiffs certifies that this brief contains 13,469 words, in compliance with the word-count limit set by this Court's order dated March 12, 2026, Dkt. No. 56.

/s/ Selena Kyle
Selena Kyle
*Counsel for Plaintiffs*

PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS
(CASE NO. 8:25-CV-1473-MWF (DFMx))