ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
BRADLEY CRAIGMYLE
Deputy Assistant Attorney General
Environment & Natural Resources Division
SANYA SHAHRASBI (DC Bar #1671001)
sanya.shahrasbi@usdoj.gov
United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-5810
Fax: (202) 514-8865

*Attorney for Defendants*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CLEAN AIR COUNCIL; COMMUNITIES FOR A BETTER ENVIRONMENT; and NATURAL RESOURCES DEFENSE COUNCIL, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator; and NANCY BECK, in her official capacity as Principal Deputy Assistant Administrator for the Office of Chemical Safety and Pollution Prevention,<br><br>Defendants. | Case No. 8:25-cv-1473-MWF (DFMx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT (DKT. NO. 73)**<br><br>Date: November 18, 2026<br>Time: 10:00 a.m.<br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom: 5A |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

BACKGROUND .......... 2

LEGAL STANDARDS .......... 4

ARGUMENT .......... 6

I. Plaintiffs lack standing because they have not alleged an injury-in-fact that is actual or imminent .......... 6

A. Plaintiffs' alleged injury still rests on a speculative chain of events to occur .......... 7

B. Plaintiffs' allegations regarding refineries' age and safety records, and climate change do not support the inference of an imminent injury .......... 13

C. Plaintiffs' generalized grievances about refinery regulation do not show their members face any imminent harm from HF use .......... 17

II. Plaintiffs fail to state a claim upon which relief can be granted because the exposures Plaintiffs are concerned with are not likely exposures stemming from the conditions of use of HF .......... 19

CONCLUSION .......... 22

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 6, 19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 6

*Blantz v. Cal. Dep't of Corr., & Rehab.*,
727 F.3d 917 (9th Cir. 2013) .......... 11

*Christopher v. Harbury*,
536 U.S. 403 (2002) .......... 5

*Clapper v. Amesty Int'l*,
568 U.S. 398 (2013) .......... 1, 6, 7, 16

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
563 F.3d 466 (D.C. Cir. 2009) .......... 17

*D'Lil v. Best W. Encina Lodge & Suites*,
538 F.3d 1031 (9th Cir. 2008) .......... 5

*Eng v. EPA*,
172 F.4th 747 (9th Cir. 2026) .......... 8

*FDA v. All. For Hippocratic Med.*,
602 U.S. 367 (2024) .......... 5, 6, 7, 18

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. Inc.*,
528 U.S. 167 (2000) .......... 5, 18

*G.B. ex rel. G.P. v. EPA*,
172 F.4th 1042 (9th Cir. 2026) .......... 7

*Holden v. Hagopian*,
978 F.2d 1115 (9th Cir. 1992) .......... 5

*Int'l Partners for Ethical Care Inc v. Ferguson*,
146 F.4th 841 (9th Cir. 2025), *cert. granted*, --- S.Ct. ----, 2026 WL 1855126 (June 29, 2026) .......... 6, 7, 11

*Jones v. L.A. Cent. Plaza LLC*,
74 F.4th 1053 (9th Cir. 2023) .......... 5

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 4, 5, 7, 15, 17

*Munns v. Kerry*,
782 F.3d 402 (9th Cir. 2015) .......... 7

*Neitzke v. Williams*,
490 U.S. 319 (1989) .......... 6

*NRDC v. EPA*,
735 F.3d 873 (9th Cir. 2013) .......... 6, 9, 13

*Or. Advoc. Ctr. v. Mink*,
322 F.3d 1101 (9th Cir. 2003) .......... 5

*Pub. Watchdogs v. S. Cal. Edison Co.*,
CV 19-1635 JLS (MSB), 2019 WL 6497886 (S.D. Cal. Dec. 3, 2019) .......... 18

*San Luis Obispo Mothers for Peace v. NRC*,
100 F.4th 1039 (9th Cir. 2024) .......... 9, 10

*SDI Labs, Inc. v. Sameday Techs., Inc.*,
No. CV-23-05619-MWF (MRWx), 2024 U.S. Dist. LEXIS 44386 (C.D. Cal. Jan. 25, 2024) .......... 11

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......... 6

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 5

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 5

**Statutes**

15 U.S.C. § 2602(4) .......... 3, 19
15 U.S.C. § 2605(a) .......... 19
15 U.S.C. § 2605(b)(4)(F) .......... 19
15 U.S.C. § 2605(b)(4)(F)(i) .......... 3
15 U.S.C. § 2605(b)(4)(F)(iv) .......... 3, 19, 20
15 U.S.C. § 2620(a) .......... 2
15 U.S.C. § 2620(b)(1) .......... 2
15 U.S.C. § 2620(b)(4)(B) .......... 2
15 U.S.C. § 2620(b)(4)(B)(ii) .......... 3, 19, 21

**Rules**

Fed. R. Civ. P. 12(b)(1) .......... 4
Fed. R. Civ. P. 12(b)(6) .......... 5

**Federal Register**

89 Fed. Reg. 37028 (May 3, 2024) .......... 21
90 Fed. Reg. 20575 (May 15, 2025) .......... 4

## INTRODUCTION

Plaintiffs allege that the Environmental Protection Agency ("EPA") should have initiated a rulemaking to ban the use of hydrogen fluoride ("HF") in oil refining, which Plaintiffs assert presents an unreasonable risk of injury to the health or the environment. Despite twice amending their complaint, Plaintiffs are still unable to show the requisite injury-in-fact to establish their members' Article III standing. In its Order granting dismissal of the First Amended Complaint ("FAC"), the Court found Plaintiffs had not alleged sufficient facts to show that their members face certainly impending harm or a credible threat of harm from HF use at oil refineries near them. Plaintiffs do no better this time around. The newly alleged facts in the Second Amended Complaint ("SAC") only underscore the speculative nature of their claimed injury. Indeed, Plaintiffs admit they are unable to allege the "detail[s] necessary to identify vulnerabilities in particular refineries' [HF] alkylation units and mitigation systems." SAC, Dkt. No. 73 ¶ 162.

Plaintiffs instead bring new allegations characterizing refinery "culture" and Plaintiffs' general dissatisfaction with government oversight and refinery regulation. But none of these allegations relate specifically to the HF components of refineries or show why Plaintiffs' members face a certainly impending harm from the use of HF at oil refineries near them—especially when those refineries have never released HF outside the refinery perimeter. The new allegations merely reenforce what the Court stated in dismissing Plaintiffs' FAC—that Plaintiffs' allegations "do not support the idea that even if there were a release of HF, the release would spread beyond the refinery fence and cause physical or economic harm to Plaintiffs' members." Order, Dkt. No. 72, at 9. Even if harm were theoretically possible, it is not "certainly impending." *Clapper v. Amesty Int'l*, 568 U.S. 398, 409 (2013).

Standing aside, the SAC should be dismissed for failure to state a claim. Plaintiffs' SAC, like their administrative petition, relies on the possibility of catastrophic and accidental releases of HF. It does not allege facts that establish the likely duration, intensity, frequency, and number of exposures to HF under the conditions of use, which is necessary to analyze whether a risk from exposure is unreasonable under the Toxic Substances Control Act ("TSCA"). By relying on hypothetical exposures, rather than actual or predictable exposures under the conditions of use of HF, Plaintiffs fail to state a claim upon which relief can be granted under Section 21 of TSCA.

The Court should dismiss Plaintiffs' SAC without leave to amend.

## BACKGROUND

TSCA is a national program for assessing and managing unreasonable risks of chemicals to human health and the environment. This case arises under Section 21 of TSCA, which allows "[a]ny person" to petition EPA to initiate a proceeding for the issuance, amendment, or repeal of a rule or order under Section 6 and other specified sections. 15 U.S.C. § 2620(a). A Section 21 petition must "set forth the facts which it is claimed establish that it is necessary" to initiate the action requested. *Id.* § 2620(b)(1).

If EPA denies a petition, as it did here, TSCA provides the petitioner "an opportunity to have such petition considered by the [federal district] court in a de novo proceeding." *Id.* § 2620(b)(4)(B). In reviewing "such petition," if the court finds that a plaintiff has met its burden to prove "by a preponderance of the evidence" that the required statutory elements were met, then "the court shall order [EPA] to initiate the action requested by the petitioner." *Id.* That is, the petitioner must demonstrate that the chemical substance presents an unreasonable risk of

injury to health or the environment, without consideration of costs or other non-risk factors, "under [the chemical's] conditions of use."[1] *Id.* § 2620(b)(4)(B)(ii).

TSCA does not define "unreasonable risk," but Section 6 provides the framework for EPA's evaluation and determination of unreasonable risk. Specifically, since risk is a function of hazard and exposure, Section 6 requires the consideration of, among other things, the available information on "hazards and exposures for the conditions of use" and the "likely duration, intensity, frequency, and number of exposures under the conditions of use of the chemical substance." *Id.* § 2605(b)(4)(F)(i), (iv).

Here, Plaintiffs petitioned EPA to initiate a rulemaking to ban the use of HF at American oil refineries.[2] Plaintiffs provided information about HF as a chemical, descriptions of "worst-case" scenario releases from refineries, discussion of what Plaintiffs describe as past accidents and "near misses" at refineries, and maps, charts, and a discussion of the scope of harm if there were a large-scale HF release during transport to refineries.

EPA denied the petition because "the facts presented in the petition did not establish unreasonable risk under the conditions of use of using and distributing in commerce HF for domestic refining."[3] More specifically, the petition did not

---

[1] "Conditions of use" is defined as "the circumstances, as determined by the [EPA] Administrator, under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." 15 U.S.C. § 2602(4).

[2] Petition for Rulemaking, Petition to Prohibit the Use of Hydrogen Fluoride In Domestic Oil Refining Under Section 21 and 6(a) of the Toxic Substances Control Act (U.S. EPA Feb. 11, 2025), https://downloads.regulations.gov/EPA-HQ-OPPT-2025-0102-0002/content.pdf [https://perma.cc/732U-2ZFA].

[3] Letter from Nancy Beck, Principal Deputy Assistant Administrator at 2 (May 12, 2025), https://www.epa.gov/system/files/documents/2025-05/12651-

establish the likely duration, intensity, frequency, and number of exposures of HF under the conditions of HF use. *Id.* EPA explained that catastrophic and accidental releases that do not lead to regular and predictable exposures are not appropriate for its analysis of unreasonable risk under Section 6. *Id.* EPA's notice of the denial further stated that such catastrophic and accidental releases are not exposures from circumstances that are intended, known, or reasonably foreseen under the conditions of use. 90 Fed. Reg. 20575, 20576 (May 15, 2025).

After Plaintiffs filed their complaint, Dkt. No. 1, EPA moved to dismiss the complaint for lack of standing. Dkt. No. 39. Plaintiffs amended as a matter of course, Dkt. No. 50, and EPA moved to dismiss the amended complaint for lack of standing and failure to state a claim. Dkt. No. 53. The Court granted EPA's motion to dismiss for lack of standing, finding that Plaintiffs' FAC did not contain allegations showing a credible threat of a release of HF that could harm Plaintiffs' members. Order at 11. The Court found that the FAC only established that nearby residents have historically rarely been harmed by the release of HF by refineries, and there was not enough information in the FAC to support the idea that there is some increased "credible threat" of exposure to HF in the future due to aging infrastructure, climate change, or failure to implement safety practices. *Id*. at 11-12. The Court permitted Plaintiffs "one more chance" to amend, *id.* at 13, and Plaintiffs have now filed their second amended complaint, Dkt. No. 73.

## LEGAL STANDARDS

Federal courts are courts of limited jurisdiction. The Court must dismiss any claim over which the court lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). It is Plaintiffs' burden to establish the predicates of federal jurisdiction, including standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). In

---

01_letter_petition_response_for_pdaa_esignature-signed_5.12.2025.pdf [https://perma.cc/D65P-8WBK].

the absence of standing, a matter is not justiciable. *Id.* A plaintiff must demonstrate standing at the "outset" of a case. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. Inc.*, 528 U.S. 167, 180 (2000); *Jones v. L.A. Cent. Plaza LLC*, 74 F.4th 1053, 1056-57 (9th Cir. 2023). Standing is assessed based on "the facts as they existed at the time the plaintiff filed the complaint." *D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1036 (9th Cir. 2008). Although a reviewing court accepts the complaint's factual allegations as true, it does not accept "conclusory allegations" or "conclusory legal assertions." *Holden v. Hagopian*, 978 F.2d 1115, 1121 (9th Cir. 1992) (quotation marks omitted).

To establish standing under Article III, a plaintiff must demonstrate a "personal stake" in the dispute, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021), supported by "specific allegations" of "imminent harm" to a "concrete interest." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494-98 (2009). Organizational plaintiffs can demonstrate injury by showing that the challenged action harms its organizational interests, *see FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 394-95 (2024), or under an associational standing theory by showing, among other things, that at least one of its members can demonstrate individual standing—meaning "its members would otherwise have standing to sue in their own right," *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1109 (9th Cir. 2003) (citation omitted). When a plaintiff challenges the government's purported "unlawful regulation (or lack of regulation) of *someone else*," "standing is not precluded, but it is ordinarily substantially more difficult to establish." *All. for Hippocratic Med.*, 602 U.S. at 382 (citing *Lujan*, 504 U.S. at 562).

A court may also dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Such a motion tests the sufficiency of the complaint. *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). A claim may be dismissed because it asserts a legal theory that is not cognizable as a matter of

law or because it fails to allege sufficient facts to support a cognizable legal claim. *Neitzke v. Williams*, 490 U.S. 319, 325, 327-28 (1989). A court need not accept as true any legal conclusion set forth in a pleading. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## ARGUMENT

Plaintiffs' SAC suffers from the same threshold defects as the two prior complaints. The SAC does not contain allegations showing a credible threat of a release of HF that could harm Plaintiffs' members living near refineries. And Plaintiffs have also failed to state a claim upon which relief can be granted under Rule 12(b)(6). TSCA does not authorize regulation of a chemical based on hypothetical exposures that are not part of the chemical's conditions of use.

### I. Plaintiffs lack standing because they have not alleged an injury-in-fact that is actual or imminent.

The "irreducible minimum of standing" requires Plaintiffs to show they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation modified). The Supreme Court has explained that "'threatened injury must be *certainly impending* to constitute injury in fact,' and that 'allegations of *possible* future injury' are not sufficient." *Clapper*, 568 U.S. at 409. Put differently, an injury must be "likely to occur soon." *All. for Hippocratic Med.*, 602 U.S. at 381.

In the Ninth Circuit, a future injury is "certainly impending" where there is a "credible threat" that a probabilistic harm will materialize. *NRDC v. EPA*, 735 F.3d 873, 879 (9th Cir. 2013). Probabilistic harm "merely recognizes" that a plaintiff may show injury-in-fact by showing the likelihood of harm has "significantly

increased, bringing his potential for injury from certainly imaginable to 'certainly impending.'" *Int'l Partners for Ethical Care Inc v. Ferguson*, 146 F.4th 841, 852 (9th Cir. 2025), *cert. granted*, --- S.Ct. ----, 2026 WL 1855126 (June 29, 2026). "Although probabilistic harm can create standing, it does not replace the foundational rule that a future injury must be imminent in order to satisfy the injury-in-fact requirement." *Id.* (citing *Lujan*, 504 U.S. at 564 n.2). Courts have repeatedly rejected theories of standing that rest on a chain of speculative events to occur. *See, e.g.*, *Clapper*, 568 U.S. at 401; *Int'l Partners*, 146 F.4th at 850-51; *Munns v. Kerry*, 782 F.3d 402, 411 (9th Cir. 2015); *G.B. ex rel. G.P. v. EPA*, 172 F.4th 1042, 1058 (9th Cir. 2026).

Here, Plaintiffs still have not shown that they have been actually injured by HF, or that an injury from HF is "certainly impending," because: (1) their alleged injury still rests on a speculative chain of events to occur; (2) the allegations regarding aging refineries, safety culture, and climate change do not make the chain imminent; and (3) dissatisfaction with the regulation of refineries does not demonstrate that a release of HF is likely to occur and result in an injury to Plaintiffs' members. The new allegations in the SAC only reinforce the conclusion that the probability of any harm to Plaintiffs' members is low.

### A. Plaintiffs' alleged injury still rests on a speculative chain of events to occur.

Plaintiffs have not identified a "credible threat" to their members who live near the Torrance, Wilmington, Trainer, and Lemont refineries.[4] The SAC identifies two new members, both of whom live in proximity to HF-using oil

[4] While Plaintiff NRDC alleges that it "has long advocated for more stringent regulations of toxic chemicals, SAC ¶ 32, it still has not alleged injury to any of the organization's core business activities and thus has not pleaded facts to show organizational standing. *All. For Hippocratic Med.*, 602 U.S. at 394-95.

refineries.[5] None of Plaintiffs' members are alleged to be directly exposed to HF use at oil refineries.[6] None of Plaintiffs' members work at the refineries or interact with HF. Their claim of standing continues to rest on their members' proximity to HF-using oil refineries. As EPA explained in moving to dismiss the FAC, a Plaintiff member in Torrance, California cannot claim injury from a HF-using oil refinery in Texas City, Texas. Such a member—as Plaintiffs concede—would be outside even the "worst-case" release zone. SAC ¶ 89. Thus, Plaintiffs must allege facts that show that their identified members suffer actual or imminent harm from a refinery near them, and that the requested relief would redress that harm. They have not done so.

Plaintiffs continue to allege that they are "injured by current refinery-related use of HF" and that "[r]efinery-related HF releases… have already caused considerable harm and disruption to people across our country." SAC ¶¶ 40, 137. Plaintiffs' members' alleged injury is fear, worry, and concern about living near HF-using oil refineries and perhaps one day being exposed to the chemical. SAC ¶¶ 26-27, 30-31, 34, 36-39. They believe HF could spread into the community because refineries are "aging," have "poor safety records and cultures," and "[e]xtreme weather fueled by climate change is likely to increase . . . failures that lead to HF releases." SAC at 44; *Id.* ¶¶ 119, 129. Plaintiffs continue to rely on "near-misses" and other unrelated events to support their belief. *Id.* ¶ 7, Ex. 2.

---

[5] One new member is Petitioner in the Ninth Circuit case *Eng v. EPA*, 172 F.4th 747 (9th Cir. 2026). Plaintiffs previously relied on *Eng*, but as the Court held in its order dismissing the FAC, the facts of *Eng* are distinguishable and did not affect Plaintiffs' standing. Order at 8.

[6] Plaintiffs allege that the wind blows "noxious fumes" and that one member notices these odors. SAC ¶ 39. Plaintiffs have not alleged that these fumes are HF-related or even that the fumes come from the refinery near them.

The alleged harm is still based on the speculative possibility of a future release of HF outside the bounds of the refinery in question at an unknown point in time, for unknown reasons, at an unspecified facility or transportation route. Such a scenario has never happened at the refineries near Plaintiffs' members, and they only speculate that such a release could happen at some unspecified time in the future. Plaintiffs hypothesize that "[f]urther refinery-related releases … are reasonably foreseeable" and that at some future point in time "even worse" releases "will become ever more likely." *Id.* ¶ 137. But Plaintiffs fail to allege facts to support their hypotheses and meet the standard for showing "certainly impending" harm.

The Court previously identified two Ninth Circuit cases that are instructive here. Order at 6-7. In *NRDC v. EPA*, the court examined the probability of exposure to a newly registered pesticide and held that because the risk of exposure was "quite high" and the members' ability to avoid exposing their children to the risk of harm was "quite low," the plaintiff had standing to challenge EPA's conditional approval of the pesticide. 735 F.3d at 878-79. The court found there was "roughly no chance" that the children of the plaintiff members would be exposed to the pesticide absent EPA's authorization and that the registration of the pesticide had increased the threat of future harm to the plaintiffs' members. In making this determination, the court stated that the "ubiquity of textiles and the lack of public information concerning the chemical treatments applied to them" would make it "nearly impossible" for the plaintiffs' members to eliminate the treated textiles from their children's lives. *Id.* at 878. Because the probability of exposure to harm from the pesticide was "quite high," the court found the plaintiffs sufficiently showed injury. *Id.* at 879.

Similarly, in *San Luis Obispo Mothers for Peace v. NRC*, the Ninth Circuit examined standing based on proximity to a nuclear facility. 100 F.4th 1039, 1053-

55 (9th Cir. 2024). There, the court found standing because the nuclear facility's license was going to expire and the agency acknowledged age-related degradation that had not been addressed since the original permit was issued. *Id*. at 1054. The court found it was nearly certain or "almost guaranteed" that the nuclear power units would not be approved for a new license by the time the old license expired and thus there was a credible risk of harm from a possible release of radioactive materials that could affect those living in proximity to the site. *Id.* at 1054-55.

The guidance in the Ninth Circuit's precedent dictates that Plaintiffs' SAC falls far short of establishing that an HF release will occur that would harm Plaintiffs' members.

***Release at a Refinery.*** For Plaintiffs to show injury in fact, the Court must infer that an (1) accident will happen at an oil refinery near Plaintiffs' members; (2) mitigation measures in place by the refinery will fail; (3) the accident will release HF; (4) response actions will not contain the release; (5) the amount of HF that is released is significant enough to move beyond the confines of the refinery; (6) weather conditions are such that the HF will spread into the Plaintiff members' communities; and (7) the HF release will injure Plaintiffs' members, their family members, communities, and the local environment. That attenuated chain continues to be fundamental to Plaintiffs' theory.

In the SAC, Plaintiffs now broadly allege that oil refineries are "[l]arge-scale, complex systems" with an increased number of "critical points" where an error can occur and "trigger a cascading chain of failures." SAC ¶ 117. They further speculate that an "initiating event . . . (e.g., fire, explosion, debris strike) *can* disable mitigation systems." *Id.* ¶ 159 (emphasis added). In support, they provide a single example from a refinery nowhere near any identified member to allege that a mitigation system that requires activation by a device or person is an "inherent weakness in the chain of response." *Id.* ¶¶ 159, 160. But even in that

example, a refinery employee activated the water pumps to mitigate the HF release. *Id.* ¶ 160. And no "significant concentrations of HF" left the perimeter of the refinery. *Id.* ¶ 13. Rather than support Plaintiffs' speculative allegations, this incident shows that mitigation measures were initiated and external factors, such as weather, did not contribute to any increased harm to the community. Indeed, Plaintiffs do not allege that the community or environment was harmed from the release of HF in that event or that such a similar failure has happened or will happen at the refineries near Plaintiffs' members.

And unlike in *NRDC*, there is no ubiquity of HF exposure in Plaintiffs' lives. Plaintiffs' members do not interact with this chemical at all, and absent some unpredictable large-scale accident involving HF—which has never occurred in the history of the refineries near their members—they are unlikely to be exposed to HF. Plaintiffs' theory relies on "an enormity of 'ifs' and 'shoulds,' without any detail or explanation as to when or why these contingencies might occur." *Int'l Partners*, 146 F.4th at 851.

***Release by Truck.*** Plaintiffs allege that because refineries must regularly replenish HF for alkylation units, "release risks associated with refinery HF use" extend to road and rail corridors used to transport HF to refineries. SAC ¶ 19. In support, they allege that the transfer of HF from trucks is a particularly release-prone procedure, *id.* ¶ 95, and that based on information and belief[7] the Torrance refinery receives about ten truckloads and the Wilmington refinery receives about

---

[7] Plaintiffs allege facts "on information and belief" seventeen times in their SAC—more than double the amount in their FAC. Even at the pleading stage, "[c]onclusory allegations upon information and belief, without specific factual allegations, are insufficient to state a claim." *SDI Labs, Inc. v. Sameday Techs., Inc.*, No. CV-23-05619-MWF (MRWx), 2024 U.S. Dist. LEXIS 44386, at *14 (C.D. Cal. Jan. 25, 2024) (citing *Blantz v. Cal. Dep't of Corr., & Rehab.*, 727 F.3d 917, 926-27 (9th Cir. 2013)).

eight to nine truckloads of HF per month. *Id.* ¶ 94. But these numbers only emphasize how rare even small HF-releases actually are. Based on Plaintiffs' allegations, out of the 96-120 cargo truckloads per year (about 3,840-4,800 for the last 40 years) that get delivered to the Wilmington and Torrance refineries, there have been only two releases during a truck-to-container transfer, and Plaintiffs do not allege either of those impacted members of the community. *Id.* Ex. 1 ¶¶ 15, 77. Plaintiffs do not allege that the Wilmington, Trainer, or Lemont refineries have ever had an HF release by truck. *Id.* Ex. 1.

Plaintiffs reference an HF release from a truck that impacted members of a community nowhere near any of Plaintiffs' identified members.[8] SAC ¶ 20 (citing release in Wind Gap, Pennsylvania). Taking all of Plaintiffs' allegations into consideration, the probability of harm from a truck release is quite rare. Plaintiffs have not alleged facts to show a "credible threat" that the harm will materialize now. For Plaintiffs' members to be harmed by release of HF from a truck, a chain of events must occur, including some intervening event such as an accident, coupled with weather and inefficient mitigation, that will cause an HF release that will reach Plaintiffs' members. Plaintiffs do not allege facts to show a likelihood of such an event.

***Release by Rail***. The same is true with HF transportation by rail—that is, Plaintiffs must allege facts to show that some derailment would occur, with insufficient mitigation, and that the release would harm Plaintiffs' members. Based on the alleged facts, such events are exceedingly rare. Plaintiffs allege (on information and belief) that the Trainer and Lemont refineries each receive about

---

[8] Plaintiffs do not allege that this release was a truck that was at or headed to a refinery. Plaintiffs petitioned EPA for regulation based on the "movement of HF to refineries by truck and railcar." SAC at 61. But a ban on HF use at refineries would not mean that HF would not continue to be transported for another industry.

one railcar containing HF per month—12 per year and 480 over 40 years. SAC ¶ 105. But contrary to Plaintiffs' conclusory allegation that "[r]ailcars carrying HF have derailed repeatedly," they cite only two incidents of derailment and only one of those resulted in a HF release (a 1997 release in Memphis, Tennessee). *Id.* ¶¶ 20, 106. Plaintiffs do not allege HF is transported by rail to the Torrance or Wilmington refineries, or that there has been a railcar HF spill near their members. *Id.* ¶ 104. None of these alleged facts support a conclusion that the threat of exposure to HF by truck or train is "quite high." *NRDC*, 735 F.3d at 879.

Plaintiffs have not alleged facts to show a "credible threat" that HF will release from truck or rail and injure their members now. These scenarios all rest on a series of "what-ifs" and assume that everything that could go wrong will go wrong. The Court should again reject Plaintiffs' unsupported assertion of injury.

### B. Plaintiffs' allegations regarding refineries' age and safety records, and climate change do not support the inference of an imminent injury.

Plaintiffs' allegations in the SAC about the state of refineries continue to be conclusory and generalized. For example, Plaintiffs broadly allege that oil refineries are "complex systems" that pose risks to workers and the community. SAC ¶ 117. They further allege that "aging refineries" are "particularly prone to failures and unintended releases" because they were "built and running" before the first HF field-release test in 1986 and are "inherently behind the state-of-the-art knowledge." *Id.* ¶ 119. Plaintiffs allege that older refineries are more failure- and release-prone because their "components . . . have not been replaced or properly maintained." *Id.* ¶ 120.

None of these general allegations is supported by facts to support a finding that there will be a release from one of the HF-using refineries near Plaintiffs' members. Plaintiffs allege no facts to show that the HF components of any

refineries have sat unreplaced or improperly maintained and ask this Court to assume that refineries built before 1986 have not undergone any updates, improvements, or changes and continue to be "inherently behind the state-of-the-art knowledge." *Id.* ¶ 119.

Even Plaintiffs' allegations of releases of HF do not support such a leap. First, they allege there have been "at least 94 HF-release events," including 17 at Torrance, 8 at Wilmington, and 8 at Trainer. *Id.* ¶ 121. Notably, Plaintiffs allege no releases of HF at the Lemont refinery even though it was built in 1926. And even more notably, Plaintiffs do not allege that there were any events in which HF reached outside of the refineries near Plaintiffs' members. Even where Plaintiffs allege that at least 28 refineries have released HF since 1987 and at least 4 of those "HF release incidents" resulted in evacuation or shelter-in-place orders, *id.*, Plaintiffs do not allege that any of those incidents impacted their identified members.

Next, Plaintiffs allege that more than 500 people have been injured and 40 people have died from serious safety incidents. *Id.* ¶ 122. But they do not allege these figures are specific to HF or if any people outside the facility were injured or killed as a result of an HF release. *Id.* Nor do they allege that any injuries or deaths were a result of an HF release that escaped the Torrance, Wilmington, Trainer, or Lemont refineries. The last shelter-in-place order issued "after a release of modified HF acid" from Torrance was in 2001, but Plaintiffs do not allege that any HF reached outside the refinery or that anyone was injured. *Id.* Ex. 1 ¶ 75. Plaintiffs have not alleged that there has ever been a shelter-in-place order due to an HF release for the Trainer, Wilmington, or Lemont refineries. In fact, there is no allegation that HF has ever reached outside the confines of the refineries near Plaintiffs' members. Thus, even crediting all of Plaintiffs' factual allegations, the

probability of a release of HF that would impact members of the community such as Plaintiffs' members is quite low.

Next, in support of their general allegation that all refineries have "poor safety records," Plaintiffs cite a so-called "near-miss" more than ten years ago at the Torrance refinery in which no HF was released and no injuries were reported in the community. SAC ¶¶ 9, 123. They assert facts regarding a subsequent investigative report and EPA inspection in 2016 and 2017, and point to other minor incidents that did not involve any release of HF outside of the refinery, *id.*; *see also id.* ¶ 147, but do not explain why these facts demonstrate a credible threat that the probabilistic harm will materialize *now* and harm their members. Plaintiffs appear to presume that there have been no maintenance or improvements to the HF systems or the management of the refinery to avoid such accidents in the future. Based on Plaintiffs' own allegations, there have been no additional accidents relating to the electrostatic precipitator ("ESP") that caused the 2015 incident, and the HF releases alleged in Plaintiffs' exhibits were contained within the refinery. *Id.* Exs. 1, 2.

Plaintiffs' allegations (on information and belief) that the HF tanks at the Torrance refinery are still located close to the ESP also do not demonstrate an imminent threat of harm. *Id.* ¶ 123. Taken as true, the Court would still have to assume that the ESP is likely to explode, that the debris would damage or perforate the HF tanks and cause an HF release, that the mitigation measures would fail, that the weather would allow an HF cloud to form, and that HF would spread to Plaintiffs' members' community. This scenario is even more attenuated because it assumes that multiple components of the refinery would malfunction and is simply too speculative for an injury-in fact and would "stretch[] [the concept] beyond its purpose." *Lujan*, 504 U.S. at 564 n.2.

Moreover, Plaintiffs do not allege that mitigation measures that day would not have prevented the HF release at Torrance, or that the weather was such that it would spread into the community. EPA does not minimize the 2015 Torrance event; it only points out that there are still missing gaps between that accident and the likelihood of any injury to Plaintiffs' members from HF, and that its occurrence in no way means that a release of HF that would harm Plaintiffs' members is "certainly impending."

Similarly, general allegations of accident rates at oil refining and coal manufacturing, SAC ¶ 124, insurance and risk advisory analysis for industrial facilities, *id.* ¶¶ 125-126, and employment lawsuits relating to rest breaks, *id.* ¶ 127, also do not speak to the integrity or quality of the HF tanks and whether Plaintiffs' members face imminent harm from HF.

Finally, Plaintiffs allege extreme weather fueled by climate change is likely to increase the risk of failures that lead to HF releases. *Id.* ¶¶ 129, 130. Plaintiffs speculate that "[f]looding, heat waves, deep freezes, and high winds *can* damage refinery equipment and cause refineries to lose power" which Plaintiffs allege increases the likelihood that HF will be released and mitigation measures would be compromised. *Id.* ¶ 128 (emphasis added). Plaintiffs allege that the Lemont refinery lies within a 100-year floodplain and that another refinery in Illinois once lost power during a tornado. *Id.* But they do not allege how a hypothetical flood at the Lemont refinery would impact the HF components or that the loss of power at the Illinois refinery caused any HF release. *Id.* And Plaintiffs' reliance on the temperatures increasing in the next 20 years, *id.* ¶ 129, is still too speculative to support the inference that their injury is a "certainly impending." *Clapper*, 568 U.S. at 409.

Plaintiffs further allege that the Torrance and Wilmington refineries are located in a high-hazard earthquake zone. SAC ¶ 131-136. But Plaintiffs

acknowledge that the U.S. Geological Service estimated only a 7% chance of a large earthquake somewhere in the State of California between 2014-2044, and Plaintiffs' speculation that there *could* be a *simultaneous* joint rupture of two fault systems that *could* affect the Los Angeles area, *id*. ¶ 134, yet again relies on a speculative chain of events that cannot be predicted to occur with any certainty. *See* Order at 8-9; *see also Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 478 (D.C. Cir. 2009) (finding no standing because plaintiffs could "only aver that any significant adverse effects of climate change 'may' occur at some point in the future"). The probability that such an earthquake would also damage the HF-component of a refinery near Plaintiffs' members and release HF outside the refinery is too attenuated and low to show injury. Moreover, the examples provided by Plaintiffs of smaller earthquakes impacting refinery operations do not speak to any harm related to HF. SAC ¶ 135. There is no likelihood that such an event would occur and that it would occur close to the HF systems at an oil refinery.[9] Order at 8-9.

In sum, the allegations in the SAC still do not support a "credible threat" of exposure to HF in the future. Plaintiffs' interpretation of "actual or imminent" injury, if adopted, would "stretch[] [the concept] beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Lujan*¸ 504 U.S. at 564 n.2.

### C. Plaintiffs' generalized grievances about refinery regulation do not show their members face any imminent harm from HF use.

Plaintiffs now allege that existing regulations, agency oversight, and industry self-governance "have not eliminated the unreasonable risks posed by

---

[9] Plaintiffs' allegations that "tanks *can* buckle" and "pipes *can* crack" reflects the speculative nature of their allegations. SAC ¶ 135 (emphases added).

refinery-related HF use." SAC at 51; *see* SAC ¶¶ 141-159, 162-165. However, nowhere do Plaintiffs connect their allegations of insufficient regulation, enforcement, and management practices to any certainty or likelihood that a release of HF will impact their members. *See All. for Hippocratic Med.*, 602 U.S. at 381-82 (citation omitted) (explaining that the standing doctrine "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular" action).

While Plaintiffs disparage current regulatory oversight of refineries, they also cite regulatory and other inspections and penalties. ¶ 103. Thus, Plaintiffs have not and cannot allege that EPA has "abdicated meaningful supervision" of HF. *Pub. Watchdogs v. S. Cal. Edison Co.*, CV 19-1635 JLS (MSB), 2019 WL 6497886, at *7 (S.D. Cal. Dec. 3, 2019) (finding standing based in part on agency failure to exercise oversight in several instances).

Finally, Plaintiffs allege that "[r]efinery operations are largely a black box," and complain about a purported lack of transparency. SAC at 57; ¶¶ 162-166. Specifically, they allege that "the publicly accessible information lacks the detail necessary to identify vulnerabilities in particular refineries' alkylation units and mitigation systems." *Id.* ¶ 162. Plaintiffs' frustration with being unable to look for potential areas of vulnerability in refineries' use of HF does not excuse them from pleading sufficient facts at the "outset" of the case to show their standing. *Friends of the Earth, Inc*, 528 U.S. at 180. Plaintiffs' admission that they lack information to establish any such vulnerabilities only highlights the speculative nature of their claimed injury.

## II. Plaintiffs fail to state a claim upon which relief can be granted because the exposures Plaintiffs are concerned with are not likely exposures stemming from the conditions of use of HF.

The SAC should independently be dismissed under Rule 12(b)(6). Plaintiffs must plead sufficient facts to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678. For Plaintiffs' TSCA Section 21 claim, the Court is being asked to determine whether HF presents an unreasonable risk under its conditions of use. *See* 15 U.S.C. § 2620(b)(4)(B)(ii). While TSCA does not define the term "unreasonable risk," it does prescribe analyses that EPA must undertake to inform its decision on whether a chemical substance presents an unreasonable risk under Section 6. *See id.* § 2605(b)(4)(F). TSCA section 6 is the rulemaking provision Plaintiffs are asking this Court to order EPA to initiate an action under. *Id.* § 2605(a); SAC ¶¶ 181, 183. Therefore, TSCA requires this Court to similarly "take into account, where relevant, the likely duration, intensity, frequency, and number of exposures under the conditions of use of the chemical substance." 15 U.S.C. § 2605(b)(4)(F)(iv).

Here, the kinds of releases Plaintiffs are concerned about—hypothetical worst-case scenario releases, catastrophic accidents, or other unpredictable accidents—do not result in likely exposures under the conditions of use that would allow this Court (or EPA) to examine whether the chemical poses an unreasonable risk.[10] In essence, Plaintiffs are asking this Court to make an unreasonable risk

---

[10] EPA previously explained that hypothetical accidents and exposures are not themselves conditions of use (*i.e.*, the known, intended, or reasonably foreseen circumstances of manufacture, processing, distribution in commerce, use, or disposal). EPA Reply, Dkt. No. 60, at 14; *see also* 15 U.S.C. § 2602(4) (defining conditions of use). Plaintiffs appear to acknowledge this point, and their current allegations rely on "[c]urrent refinery use of HF—including the storage and use of

determination under TSCA and order EPA to regulate HF based on rare and unpredictable events that are not part of the ordinary use of the chemical. Because Plaintiffs have not plausibly alleged facts on the likely exposures under HF's conditions of use, they are unable to show unreasonable risk, and the SAC should be dismissed for failure to state a claim under TSCA Section 21.

Plaintiffs acknowledge that risk is a function of hazard and exposure. SAC ¶ 48. Thus, to prove that HF presents an unreasonable risk under TSCA Section 6, Plaintiffs must demonstrate that exposures to HF of the kind they are concerned with are occurring or are likely to occur in the future. Absent such a showing, the risk from the chemical substance is entirely speculative. Plaintiffs are unable to make this showing because they have failed to allege that the conditions of use of HF result in or are likely to result in the type of community exposures described in the SAC. *See, e.g.*, SAC ¶¶ 89, 92, 97-101, 107-111. The SAC is based on concerns of community exposure that have only occurred once in the long history of HF use in refineries. *See* SAC ¶¶ 6, 76. As this Court previously found, "release of HF to an extent and in a manner that harms Plaintiffs' members appears to be quite rare." Order at 9. Such releases are far from "likely … exposures." 15 U.S.C. § 2605(b)(4)(F)(iv).

"Likely" means "having a high probability of occurring or being true, very probable."[11] The potential releases and exposures that Plaintiffs rely on do not have a high probability of occurring. There is no relevant exposure to HF that is occurring or likely to occur under the conditions of use, and Plaintiffs' allegations of releases are hypothetical. There is thus no basis for this Court to find that the

---

HF at refineries, and the movement of HF to refineries by truck and railcar" as the conditions of use of HF. SAC ¶ 178.

[11] *See Likely,* Merriam-Webster, https://www.merriam-webster.com/dictionary/likely [https://perma.cc/48XB-YDGS].

conditions of use present an unreasonable risk. Plaintiffs' SAC rests on speculative and conclusory maps and charts that do not support the conclusion that catastrophic events are likely to occur in the future.

TSCA does not demand that EPA (or this Court) take into account irregular and unpredictable releases of a chemical when determining whether a condition of use presents an unreasonable risk. Instead, TSCA mandates taking into account the exposures under the conditions of use that are "likely," thus evincing Congress' intent to have determinations of unreasonable risk be based, in part, on the assessment of the exposures under the conditions of use of a chemical that are regular and predictable. There is no indication that Congress wanted an unreasonable risk determination to be based on hypothetical and speculative exposures that are the exception to the ordinary consequence of a chemical substance's use instead of exposures that are occurring or are likely to occur. After all, the regulatory trigger is "*unreasonable* risk." 15 U.S.C. § 2620(b)(4)(B)(ii) (emphasis added).

When conducting risk evaluations, EPA considers exposures that are regular and predictable because they allow the Agency to determine the likelihood of exposures. *See, e.g.*, 89 Fed. Reg. 37028, 37033 ("Procedures for Chemical Risk Evaluation Under the Toxic Substances Control Act (TSCA)") (May 3, 2024) (discussing analysis of reasonably available information when determining exposures under conditions of use). This can include catastrophic events, depending on the facts. In one example from Louisiana, EPA had six recent years of chemical-and facility-specific release data, and EPA considered the range of releases and corresponding conditions, particularly given the frequency of storm events in Louisiana at the time.[12] There, EPA had quantifiable numbers that

---

[12] *See* EPA, Office of Chemical Safety and Pollution Prevention, Risk Evaluation for 1,1- Dichloroethane at 87 (2025),

allowed it to assess the concentration of the chemical in the receiving water body and the likelihood of chemical exposure to the surrounding aquatic environment in the event of large storm events.

This example does not necessarily set the bar for how much information EPA (or a court) must possess in every case to determine that the potential for catastrophic events factors into unreasonable risk, but Plaintiffs' petition provided nothing close to this level of information that would have allowed EPA to assess whether the incidents cited by Plaintiffs were likely to lead to exposures in the future. Similarly, nothing is alleged in the SAC that would allow this Court to make those same assessments. Instead, the allegations are conclusory and unspecific with respect to the HF components of the refineries, and the exposures listed are random outliers of HF's regular use at oil refineries. Given that these incidents are, as this Court put it, "quite rare," Order at 9, and that widespread community exposures of the type Plaintiffs are concerned with have happened just one time in the long history of HF use, it is no surprise that the SAC lacks such specifics.

Plaintiffs have failed to state a claim because they have not plausibly alleged that using HF or distributing HF to oil refineries presents an unreasonable risk of injury to their members.

## CONCLUSION

The Court should dismiss Plaintiffs' SAC without leave to amend.

---

https://www.epa.gov/system/files/documents/2025-06/01.-1-1-dichloroethane-.-risk-evaluation-.-public-release-.-hero-.-june-2025.pdf [https://perma.cc/J6UU-2AEB].

Respectfully Submitted,

Dated: August 19, 2026

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

/s/ *Sanya Shahrasbi*
SANYA SHAHRASBI
Trial Attorney
Environmental Defense Section
Environment & Natural Resources Division
Ben Franklin Station P.O. Box 7611
Washington, D.C. 20044
Ph: (202) 305-5810
sanya.shahrasbi@usdoj.gov

*Attorney for Defendants*

**Certificate of Compliance**

The undersigned, counsel of record for Defendants, certifies that this brief contains 6,968 words, which complies with the word limit of L.R. 11-6.1.

Dated: August 19, 2026

*/s/ Sanya Shahrasbi*
SANYA SHAHRASBI
*Attorney for Defendants*