Jason S. Mills (SBN 225126)
jason.mills@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
300 S. Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 612 7387
Facsimile: +1 213 612 2501

Justin A. Savage (*pro hac vice*)
jsavage@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711

Brooklyn Hildebrandt (SBN 350707)
bhildebrandt@sidley.com
SIDLEY AUSTIN LLP
350 S. Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

Nima H. Mohebbi (SBN 275453)
nima.mohebbi@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: +1 310 595 9500
Facsimile: +1 310 595 9501

*Attorneys for Western States Petroleum Association*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

CLEAN AIR COUNCIL; COMMUNITIES FOR A BETTER ENVIRONMENT; and NATURAL RESOURCES DEFENSE COUNCIL, INC.,

Plaintiffs,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator; and NANCY BECK, in her official capacity as Principal Deputy Assistant Administrator for the

Case No. 8:25-cv-01473-MWF-DFMx
Assigned to Hon. Michael W. Fitzgerald

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF WESTERN STATES PETROLEUM ASSOCIATION'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

Office of Chemical Safety and Pollution Prevention,

Defendants.

| | |
|---|---|
| Hearing Time: | 10:00 a.m. |
| Hearing Date: | November 18, 2026 |
| Courtroom: | 5A |
| Action Filed: | July 8, 2025 |
| Trial Date: | Not set |

## TABLE OF CONTENTS

Table of Authorities ..... iv

I. Introduction ..... 1

II. Plaintiffs' Theory of Injury Remains Too Speculative to Confer Standing. ..... 2

A. Plaintiffs Fail to Allege an Injury-in-Fact. ..... 3

B. Plaintiffs Fail to Allege a Traceable or Redressable Injury. ..... 13

III. Plaintiffs' Reframed Request Still Leaves This Court Without Jurisdiction—and Their Deadline Demand Is Abandoned. ..... 14

IV. Plaintiffs' Interpretation of "Conditions of Use" Contradicts TSCA. ..... 15

V. Conclusion ..... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Cmty. Action on Toxics v. EPA*,
180 F.4th 1188 (9th Cir. 2026) ........ 19

*Bennett v. Spear*,
520 U.S. 154 (1997) ........ 14

*Beyond Nuclear, Inc. v. NRC*,
182 F.4th 977 (D.C. Cir. 2026) ........ 5

*Bost v. Ill. State Bd. of Elections*,
607 U.S. 71 (2026) ........ 11

*Bowen v. Energizer Holdings, Inc.*,
118 F.4th 1134 (9th Cir. 2024) ........ 11

*Citizens for Clean Air & Clean Water v. U.S. Dep't of Transp.*,
188 F.4th 384 (5th Cir. 2026) ........ 10, 11

*City of San Francisco v. EPA*,
604 U.S. 334 (2025) ........ 16

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........ 2, 3, 11

*Covington v. Jefferson Cnty.*,
358 F.3d 626 (9th Cir. 2004) ........ 6, 10

*Ctr. for Cmty. Action & Env't Just. v. BNSF Ry.*,
764 F.3d 1019 (9th Cir. 2014) ........ 19

*Ctr. for Env't Health v. Regan*,
103 F.4th 1027 (4th Cir. 2024) ........ 15

*East Fork Enters., Inc. v. EPA*,
Nos. 24-60227 & 24-60256 (5th Cir. Sept. 15, 2026) ........ 4, 12, 17

*Eng v. EPA*,
172 F.4th 747 (9th Cir. 2026) ........ 3

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)........................................................................................ 3

*G.B. v. EPA*,
172 F.4th 1042 (9th Cir. 2026)........................................................................ 14

*Int'l Partners for Ethical Care Inc. v. Ferguson*,
146 F.4th 841 (9th Cir. 2025), *cert. granted*, 146 S. Ct. 2804 (2026) .................... 3

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)........................................................................................ 2

*Merrell v. Fla. Crystals Corp.*,
No. 25-cv-02264-SVK, 2026 WL 1179867 (N.D. Cal. Apr. 30, 2026).................. 9

*Murthy v. Missouri*,
603 U.S. 43 (2024)........................................................................................ 6

*NRDC v. EPA*,
464 F.3d 1 (D.C. Cir. 2006)............................................................................ 4

*NRDC v. EPA*,
735 F.3d 873 (9th Cir. 2013)........................................................................ 10

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
402 F.3d 846 (9th Cir. 2005)........................................................................ 4

*Safer Chems., Healthy Fams. v. EPA*,
943 F.3d 397 (9th Cir. 2019)........................................................................ 18

*San Luis Obispo Mothers for Peace v. NRC*,
100 F.4th 1039 (9th Cir. 2024)........................................................................ 5

*Sierra Club v. U.S. Dep't of Transp.*,
125 F.4th 1170 (D.C. Cir. 2025)........................................................................ 5

*Solar Energy Indus. Ass'n v. FERC*,
80 F.4th 956 (9th Cir. 2023)........................................................................ 14

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009)........................................................................................ 3

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)........................................................................................ 4

*Sweaney v. Ada Cnty.*,
119 F.3d 1385 (9th Cir. 1997) .......... 19

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) .......... 2

**Statutes**

15 U.S.C. § 2602 .......... 16

15 U.S.C. § 2605 .......... 14, 15, 16

15 U.S.C. § 2608 .......... 19

15 U.S.C. § 2620 .......... 14, 15

33 U.S.C. § 1321 .......... 16

42 U.S.C. § 7412 .......... 16

42 U.S.C. § 7607 .......... 19

**Other Authorities**

40 C.F.R. § 68.3 .......... 18

40 C.F.R. § 68.5 .......... 18

8 CCR § 5189 .......... 18

19 CCR §§ 5050.1–5160.1 .......... 18

CSB, Recommendations Status Change Summary,
No. 2015-02-I-CA-R6 (May 29, 2018) .......... 7

EPA, General RMP Guidance—Chapter 6: Prevention Program (Program 2) (Apr. 2004), https://www.epa.gov/sites/default/files/2013-11/documents/chap-06-final.pdf .......... 18

EPA, Office of Chemical Safety and Pollution Prevention, Risk Evaluation for 1,1-Dichloroethane (June 2025), https://www.epa.gov/system/files/documents/2025-06/01.-1-1-dichloroethane-.-risk-evaluation-.-public-release-.-hero-.-june-2025.pdf .......... 18

News Release, CSB, *CSB Deploys to Investigate Release of Hydrofluoric Acid at CITGO Refinery in Corpus Christi, Texas* (Mar. 6, 2012), https://www.csb.gov/csb-deploys-to-investigate-release-of-hydrofluoric-acid-at-citgo-refinery-in-corpus-christi-texas/ ..................................................................... 8

News Release, EPA, *U.S. EPA settlement with Southern California refinery improves chemical safety at Torrance facility* (updated Feb. 21, 2023), https://www.epa.gov/newsreleases/us-epa-settlement-southern-california-refinery-improves-chemical-safety-torrance ......................................................................... 7

South Coast AQMD, Torrance Refinery – Supplemental Environmental Project Fund, ExxonMobil Settlement (July 7, 2017), https://www.aqmd.gov/home/news-events/community-investigations/torrance/sep-exxonmobil .................................... 8

## I. Introduction

This is Plaintiffs' third attempt to plead a case that defies both Article III and TSCA. The Court dismissed the First Amended Complaint (FAC) because Plaintiffs alleged only "possible future injury," not harm that is "certainly impending," Order at 5, and the Court further cautioned that only "drastically different allegations" could cure that defect, Order at 12. The opposition confirms the SAC supplies no such cure. Indeed, Plaintiffs practically concede this point in their introduction, describing the alleged injury-in-fact as nothing more than "mounting threats posed by refinery-related HF use." Opp. 1. And Plaintiffs describe their sought-after recourse as requiring the use of "[s]afer refinery alternatives to HF"—a form of relief more appropriate for political or legislative engagement than the courts. *Id.*; Dkt. 70, Tr. 3:25–4:14.

Contrary to the Court's suggested "drastically different allegations," Plaintiffs still identify no member who has been exposed to HF, no offsite HF migration at any refinery near their members, and no impending release. Although Plaintiffs allege new facts underlying historical releases, nearly all relate to equipment malfunctions, and none support the requisite "probability of the putative harm materializing and affecting plaintiffs." Order at 7. Rather, Plaintiffs' injury theory remains the same "highly attenuated chain of possibilities"—that is, an accident that results in an HF release, failure of HF mitigation measures at both first and second levels of defense, weather conditions that carry a sufficient quantity of HF beyond the refinery

perimeter, and finally, resulting harm to a member living near the refinery where the accident occurred—that both this Court and the Supreme Court have held insufficient. Order at 7, 9–11; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). In short, Plaintiffs' "new facts" continue to read as a general grievance with refinery operations writ large, not a particularized and concrete injury from refineries' specific uses of HF.

Plaintiffs also concede two independent defects. Plaintiffs now agree that this Court may do no more than order EPA to initiate a rulemaking: it "[can]not dictate the resulting rule's content." Opp. 42–43. That concession confirms the disconnect between the categorical ban Plaintiffs petitioned EPA to adopt and the undefined rulemaking they seek now in this instance from the Court, and abandons the SAC's demand for judicially imposed rulemaking deadlines, SAC, Prayer ¶ C. On the merits, Plaintiffs' new theory that Section 6(b)'s standards "do[] not apply" in Section 21 suits, Opp. 35, is contrary to the statute's text and is at odds with the Fifth Circuit's intervening decision vacating EPA's 2024 risk management rule for methylene chloride. The SAC should be dismissed with prejudice.

## II. Plaintiffs' Theory of Injury Remains Too Speculative to Confer Standing.

Plaintiffs bear the burden of showing that at least one identified member faces injury that is concrete, particularized, and actual or imminent. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Grievances about particular refineries belong in facility-specific

proceedings—such as permitting, enforcement, and RMP review—where the Ninth Circuit has recognized standing for fenceline neighbors. *See* Order at 8 (distinguishing *Eng v. EPA*, 172 F.4th 747 (9th Cir. 2026), on that basis); Dkt. 70, Tr. 3:25–4:14. Such grievances—which is all that Plaintiffs plead in the SAC—do not demonstrate that EPA's refusal to commence nationwide rulemaking inflicts imminent injury on any member; a plaintiff may not challenge a regulatory program "apart from any concrete application that threatens imminent harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009); *see FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381–82 (2024).

The question presented in this motion is whether the SAC supplies the "drastically different allegations" the Court required to confer Article III standing. Order at 12. It does not.

**A. Plaintiffs Fail to Allege an Injury-in-Fact.**

*First*, Plaintiffs attack a strawman, accusing Defendants of demanding proof that a release "will occur" at a specified time or to a numerical probability. Opp. 15–16. The governing standard is the one this Court applied: a threatened injury must be "certainly impending," or there must be a "substantial risk" that it will occur. Order at 5; *Clapper*, 568 U.S. at 409 & 414 n.5. Probabilistic harm suffices only where the likelihood of harm has "significantly increased," moving injury "from certainly imaginable to 'certainly impending.'" *Int'l Partners for Ethical Care Inc. v. Ferguson*, 146 F.4th 841, 852 (9th Cir. 2025) (citing *Clapper*, 568 U.S. at 414),

*cert. granted*, 146 S. Ct. 2804 (2026). Plaintiffs' extensive reliance on *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846 (9th Cir. 2005), is confusing as it is inapplicable to this case. *See, e.g.*, Opp. 15, 29. In traditional environmental cases, such as challenges to permits authorizing construction of a new project, courts generally find standing where an individual shows that they have "an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct," as the court found in *Ocean Advocates*. 402 F.3d at 860. In describing an "increased risk of harm" as sufficient for the injury-in-fact inquiry, the court was describing standing to demonstrate "increased risk *based on a violation of [a] statute*," a factor absent here where Plaintiffs make no allegation of a specific TSCA violation. *Id.* (emphasis added).

*Second*, Plaintiffs' increased-risk-of-harm claim still fails to allege facts demonstrating a substantial probability that any of its members might be injured in the future. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *NRDC v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006). None of Plaintiffs' cited cases holds otherwise. Instead, this case is most like the Fifth Circuit's recent TSCA decision where the court concluded the Sierra Club's members lacked standing to challenge EPA's allegedly inadequate rulemaking as each step in the causal chain was conjectural and "even unlikely" because EPA already regulated the chemical at issue as a hazardous air pollutant under the CAA. *East Fork Enters., Inc. v. EPA*, Nos. 24-

60227 & 24-60256, slip op. at 42 (5th Cir. Sept. 15, 2026) ("EPA's allegedly inadequate regulation might lead to an insufficient decrease in emissions of [methylene chloride], which might survive long enough in the atmosphere to break down atmospheric ozone, which might increase the amount of ultraviolet radiation to which Sierra Club's members are exposed over a lifetime, which in turn might increase those members' risk of developing cancer."). Indeed, Plaintiffs' claim has the same flaw. Their own illustration of the "necessary conditions" for their domino-theory injury shows how conjectural and generic the alleged risk is: "when something fails in a tightly integrated refinery operating under pressure, heat, and chemical volatility, it tends to produce cascading failures," that failure then might cause a fire or other accident, which might in turn disable relevant safety or mitigation systems, and this might separately result in the release of HF. Opp. 33. Plaintiffs provide no specific facts to support even an inference that each of these actions would occur and lead to a substantial probability that a member might be injured in the future.

*Third*, Plaintiffs continue to conflate severity with imminence. The Plaintiffs spend a number of pages describing how serious a release could be, Opp. 21–22, but not whether one is impending—i.e., what Article III requires. *San Luis Obispo Mothers for Peace v. NRC*, 100 F.4th 1039, 1054 (9th Cir. 2024). The licensing cases Plaintiffs add, *Beyond Nuclear, Inc. v. NRC*, 182 F.4th 977 (D.C. Cir. 2026) and *Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170 (D.C. Cir. 2025), Opp. 16,

22, involved procedural harms stemming from review of affirmative federal approvals under the National Environmental Policy Act (NEPA) that authorized the very activity creating the risk and are inapposite here. Where plaintiffs instead challenge the government's decision not to further regulate third parties, the burden is heavier, not lighter. *Murthy v. Missouri*, 603 U.S. 43, 57–58 (2024).

*Fourth*, the Plaintiffs' focus on four historical incidents that are different in place, time, and cause, Opp. 2–6, 18, cannot carry Plaintiffs' burden. Not only are these incidents the same as those described in the dismissed FAC, they still fail to cure Plaintiffs' standing defect because past incidents matter only insofar as Plaintiffs attempt to use them to support an inference that *these* members face a credible threat that HF will be released from a refinery near an identified member and cause that member concrete harm. Order at 9 (allegations of incidents at refineries do not show that community members outside them will be injured); *cf. Covington v. Jefferson Cnty.*, 358 F.3d 626, 634–38 (9th Cir. 2004) (record of recent, recurring violations at the facility abutting the plaintiffs' home). None of the four incidents was caused by the refineries' use of HF. None of the four incidents is alleged to have exposed any Plaintiffs' member to HF. Nor is any incident alleged to have caused offsite HF exposure at a refinery near any member. The 2015 Torrance event released no HF, caused no offsite HF exposure, and did not result in

a shelter-in-place order attributable to a HF release.[1] Notably, the refinery met the very requirements of the recommendations issued in the CSB reports that Plaintiffs cite—not one of which was specific to the refinery's use of HF.[2] The 2018 Superior event released no HF and occurred hundreds of miles from any alleged member. The 2009 Corpus Christi release is sixteen years old, caused no offsite release of HF, and caused no offsite injury. And the 2019 Philadelphia release is not alleged to have exposed anyone offsite, SAC ¶ 13, and did not occur at any of the four refineries near Plaintiffs' members. On Plaintiffs' own allegations, nearly three decades of operations at more than forty refineries have produced only four releases with any offsite protective order— and none at Wilmington, Trainer, or Lemont. SAC ¶ 121 & Exs. 1–2.[3] And contrary to Plaintiffs' allegations, these four incidents

---

[1] Plaintiffs separately point to a 2016 Torrance Refinery inspection, Opp. 7, but once again fail to provide this Court with relevant details from the publicly-filed settlement with EPA that Torrance Refinery entered in January 2020 as a result of that inspection or that EPA announced that the Refinery had corrected all alleged violations. News Release, EPA, *U.S. EPA settlement with Southern California refinery improves chemical safety at Torrance facility* (updated Feb. 21, 2023), https://www.epa.gov/newsreleases/us-epa-settlement-southern-california-refinery-improves-chemical-safety-torrance.

[2] *See, e.g.*, CSB, Recommendations Status Change Summary, No. 2015-02-I-CA-R6 (May 29, 2018), https://www.csb.gov/assets/recommendation/status_change_summary_torrance_(em_torrance_r6)_c-aa.pdf (closing recommendation to implement protective systems that prevent ignition of flammable gases inside of the electrostatic precipitator).

[3] The SAC's separate reference to a purported 2001 Torrance HF leak, SAC ¶ 9, rests on unspecified local news reports. WSPA has not identified any records to substantiate Plaintiffs' characterization of that event as an HF release that caused offsite impacts. Even if taken as true, Plaintiffs do not allege that any identified

illustrate a working regulatory regime, not one that requires an overhaul by the misuse of TSCA.[4] Taken together, Plaintiffs' effort to describe historical offsite HF impacts conflates HF releases with general refinery incidents and protective actions not attributable to offsite HF exposure. None of these events show a recent or recurring pattern of offsite HF releases and, thus, do not establish that Plaintiffs' members presently face an imminent threat of offsite HF exposure.

Despite this, Plaintiffs insist the SAC now supplies the specific allegations the Court requested, pointing to isolated incidents of aging equipment and safety lapses irrelevant to Plaintiffs' standing here. Opp. 24–25. The SAC is more detailed, yes, but these details fail to increase any probability that Plaintiffs are likely suffer

---

member was exposed or connect that decades-old allegation to the present condition of the refinery's HF systems.

[4] Plaintiffs make much of their citations to the U.S. Chemical Safety Board (CSB) reports covering these four incidents—despite their lack of relevance to HF releases—but, even so, fail to discuss or even acknowledge subsequent corrective actions by the refineries. For example, after the 2009 Corpus Christi incident, the "CSB issued urgent safety recommendations … called on CITGO to perform third-party audits to ensure the safety of its hydrogen fluoride units at its Corpus Christi, Texas, and Lemont, Illinois refineries" and "CITGO met the requirements of the recommendations … in 2011." News Release, CSB, *CSB Deploys to Investigate Release of Hydrofluoric Acid at CITGO Refinery in Corpus Christi, Texas* (Mar. 6, 2012), https://www.csb.gov/csb-deploys-to-investigate-release-of-hydrofluoric-acid-at-citgo-refinery-in-corpus-christi-texas/. And after the 2015 Torrance incident, Torrance agreed to a supplemental environmental project as part of a settlement with the City of Torrance and the South Coast Air Quality Management Division to spend $2.77 million to enhance the monitoring and alert system at the Torrance Refinery. South Coast AQMD, Torrance Refinery – Supplemental Environmental Project Fund, ExxonMobil Settlement (July 7, 2017), https://www.aqmd.gov/home/news-events/community-investigations/torrance/sep-exxonmobil.

an imminent injury. The corroded pipe featured in the SAC belonged to a different refinery, not one near Plaintiffs' members. SAC ¶ 13. The Torrance allegations dated 2015–2017, involved no offsite exposure, and were addressed through EPA inspection and enforcement. SAC ¶¶ 103, 123. Construction dates—and the Plaintiffs' "1920s car" analogy, Opp. 25 n.13—only add to Plaintiffs' arguments regarding what *might* be true of unexamined equipment, not allegations about the present condition of any HF unit near Plaintiffs' members. Industry-wide accident statistics and insurance commentary, SAC ¶¶ 118, 125–26, likewise say nothing about HF equipment at the refineries near plaintiffs' members. The SAC therefore still does not support the inference required by the Order: that members "face a credible threat of a release of HF" from nearby refineries. Order at 7. Nor does Plaintiffs' asserted "information asymmetry," Opp. 27, excuse this deficiency where the SAC itself relies on publicly-available information, often reported by the refineries themselves. Plaintiffs' further contention that this alleged asymmetry excuses more specific injury allegations finds no support in *Merrell v. Florida Crystals Corp.*, No. 25-cv-02264-SVK, 2026 WL 1179867, at *5 (N.D. Cal. Apr. 30, 2026), which evaluated whether allegations were sufficiently specific to survive a motion to dismiss for failure to allege the necessary element of each cause of action—not Article III standing.

Plaintiffs' renewed reliance on *San Luis Obispo*—now arguing that the imminent license expiration there was "immaterial," on the strength of the

government's answering brief rather than the court's opinion, Opp. 20–21—asks this Court to overrule its own Order, which distinguished the case. Order at 7. Their reading would reduce *San Luis Obispo* to "proximity plus facility age" as sufficient to confer standing on every neighbor of every older industrial facility.

Even so, the proximity cases Plaintiffs cite are equally unavailing. *Covington* involved a summary-judgment record of alleged environmental violations, including contaminated groundwater, at a landfill next door to plaintiff seeking compliance with the environmental statute, 358 F.3d at 634–38, and *NRDC v. EPA* involved a "quite high"—almost guaranteed—probability of exposure through ordinary product use, 735 F.3d 873, 878–79 (9th Cir. 2013). Plaintiffs allege no comparable circumstances here.

*Fifth*, the "mounting risks" asserted by Plaintiffs—climate projections, tornado tallies, seismic research, and 2025–2026 regulatory developments—describe evolving background conditions, not an imminent injury to an identified member and no fact that supports the probability of that imminent injury is more likely. The Order has already rejected standing premised on events that "cannot be predicted to occur with any certainty." Order at 8. And Plaintiffs find no support for this position in *Citizens for Clean Air & Clean Water v. U.S. Department of Transportation*, 188 F.4th 384, 390–91 (5th Cir. 2026), Opp. 24. There, the Fifth Circuit concluded that an individual had standing to challenge the affirmative approval of a proposed deepwater port where the individual demonstrated "plans to

make use of the specific sites" affected by the port and, thus, had "cognizable interests threatened by the project." *Citizens for Clean Air*, 188 F.4th at 393. The standing question there turned on whether the individuals planned to make use of the specific areas that would be affected by the port project's construction, not whether some meteorological event increased the likelihood of a single event within an attenuated string of contingencies.

*Sixth*, Plaintiffs' defense of their dispersion modeling misses the point. Opp. 26–27. Process modeling is not the same as release probability—the relevant question here. Whatever the pedigree of its inputs, Plaintiffs' ALOHA modeling estimates the consequences of an assumed release; it says nothing about the probability that a release will occur, that mitigation will fail, and that the hypothesized plume will reach a member—the questions on which imminence turns. A worst-case model of an event that has never occurred cannot make that event impending. *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134 (9th Cir. 2024), Opp. 27, involved alleged present exposure to benzene in products the plaintiffs actually used—a far cry from the string of contingencies here.

*Seventh*, the evacuation-cost theory remains derivative of the same hypothetical. No member alleges ever having been evacuated or ordered to shelter in place; the orders Plaintiffs catalogue issued to other people near other facilities. A cost that would be incurred only if a future incident occurs remains hypothetical. *Clapper*, 568 U.S. at 416. *Bost v. Illinois State Board of Elections*, 607 U.S. 71

(2026), is inapposite to Plaintiffs' arguments here as it merely underscored Article III's requirement that any injury to a plaintiff be distinct from an injury suffered by the public at large. Opp. 24, 34. In *Bost*, the Supreme Court held an individual candidate had a unique injury on which to premise standing in a challenge to a state mail-in ballot law. In contrast, Plaintiffs here share the same general grievance and alleged fear by any refinery neighbor of a future refinery accident that interacts with HF. *See* Opp. 17 ("Plaintiffs' members *fears* are grounded in their proximity to aging refineries….").

*Eighth*, Plaintiffs' "dominoes" theory, Opp. 28–31, fails for a simple reason: interdependence among the later steps does nothing to establish the likelihood of the first—an initiating accident at a refinery near Plaintiffs' members. Standing turns on whether that triggering event is imminent, and the probability of each subsequent event leading to harm of Plaintiffs' members, and the SAC nowhere alleges that it is. The theory also presumes what the law forbids: that the RMP, PSM, HMR, and state safeguards governing HF will simultaneously fail. Compliance with "other federal, state, and local mandates" is itself a "reasonably foreseen" circumstance of a chemical's condition of use, and noncompliance may not be presumed "unless case-specific facts indicate otherwise." *East Fork*, slip op. at 16–17. Plaintiffs' disagreement with the scope of existing regulatory programs does not establish that those programs will fail or that an HF release is imminent. Nor may noncompliance

and simultaneous failure of multiple independent safeguards be presumed without relevant case-specific facts that are absent here.

### B. Plaintiffs Fail to Allege a Traceable or Redressable Injury.

Plaintiffs' alleged injury is not "fairly traceable" to EPA's petition denial; Plaintiffs' allegations instead nearly all point to the conduct of refineries. Plaintiffs once again rely on *Ocean Advocates*, but the injury there stemmed from, among other things, increased risk of an oil spill from a new, illegally-constructed dock because the dock would increase traffic in the area—a single link between the new dock and increased traffic that the court found neither tenuous nor abstract. In contrast, Plaintiffs make no claim that EPA's decision to promulgate a TSCA rule prohibiting HF has resulted in any new or increased use of HF. Rather, Plaintiffs' alleged injury requires the court's review of multiple links, each of which is tenuous. As discussed above, the causal connection put forth by the Plaintiffs is both speculative and reliant on conjecture about the behavior of individual refineries and, most importantly, fails to trace back to EPA's challenged conduct.

Further, connecting the alleged injury to EPA's denial of Plaintiffs' TSCA petition adds a new link to the chain: EPA's denial must set off the first domino—a refinery accident. This illustrates well why Plaintiffs' TSCA pursuit is ill-advised. Any potential HF rulemaking by EPA pursuant to TSCA is irrelevant to increasing the likelihood of any refinery accident. Plaintiffs thus similarly cannot establish redressability because the relief they seek here—an order that EPA initiate a

rulemaking—fails to address the alleged injury traceable to third-party refineries, not the EPA. Plaintiffs' authorities presuppose the opposite: *Bennett v. Spear*, 520 U.S. 154, 169 (1997), and *Solar Energy Industries Ass'n v. FERC*, 80 F.4th 956 (9th Cir. 2023), Opp. 30, involved agency action with a "determinative or coercive effect" on the relevant actors. Plaintiffs concede no such effect exists here because the Court "[can]not dictate the resulting rule's content." Opp. 42–43. Whether any rule ever issues, what it requires, and when, remain with EPA, subject to notice and comment and statutory factors. 15 U.S.C. § 2605(c)(2). Redress that depends on an agency's discretionary choices at multiple future junctures is insufficient to confer standing. *See G.B. v. EPA*, 172 F.4th 1042 (9th Cir. 2026).

## III. Plaintiffs' Reframed Request Still Leaves This Court Without Jurisdiction—and Their Deadline Demand Is Abandoned.

Section 21 authorizes suit only "to compel the Administrator to initiate a rulemaking proceeding *as requested in the petition*." 15 U.S.C. § 2620(b)(4)(A) (emphasis added). Plaintiffs' Petition demanded a rule "prohibiting the use of HF in domestic oil refining" and told EPA that lesser measures "cannot eliminate the unreasonable risks." Dkt. 60-2, Petition at 3, 53–54. The SAC seeks an undefined "risk-management rulemaking" instead. SAC, Prayer ¶ B. Plaintiffs' reading of "as requested in the petition" to mean only the species of relief listed in Section 21(a), Opp. 42, repeats the argument they made in the last round and still reads those words out of the statute. And their assertion that EPA "would have analyzed" a

different request no differently, Opp. 43 n.24, concedes the problem: EPA never evaluated a request for measures short of a ban, and Section 21 makes EPA—not this Court—the first evaluator of a petition's request. *Ctr. for Env't Health v. Regan*, 103 F.4th 1027, 1038 (4th Cir. 2024).

The opposition also nowhere defends the SAC's demand that this Court order EPA to publish a proposed rule within one year and a final rule within two. SAC, Prayer ¶ C. Plaintiffs instead describe the Court's authority as "limited to ordering EPA to initiate a Section 6(a) rulemaking." Opp. 42. The deadline demand is abandoned—and rightly so, because Section 21 authorizes an order to "initiate" a proceeding and nothing more. 15 U.S.C. § 2620(b)(4)(B); *Ctr. for Env't Health*, 103 F.4th at 1038.

## IV. Plaintiffs' Interpretation of "Conditions of Use" Contradicts TSCA.

Plaintiffs' lead merits theory—that Section 6(b)'s standards "do[] not apply" to Section 21 suits, Opp. 35—flounders on the text. Section 21 itself frames the de novo question as whether the chemical "presents an unreasonable risk . . . under the conditions of use," 15 U.S.C. § 2620(b)(4)(B)(ii)—the same standard, in the same words, that governs the Administrator, *see id.* § 2605(b)(4)(A)—and Section 6(a) directs that unreasonable-risk determinations be made "in accordance with" Section 6(b)(4)(A). *Id.* § 2605(a). "Unreasonable risk" cannot mean one thing when EPA evaluates a chemical and something looser when a petitioner sues; Plaintiffs'

reading would leave a district court with broader authority under the statute than the agency responsible for administering it.

Plaintiffs' grammatical parsing of Section 2605(b)(4)(F)(iv)—that "likely" modifies "duration, intensity, frequency, and number" rather than "exposures," Opp. 35–36—is not at odds with WSPA's position. But on either reading, the statute directs attention to the "likely . . . frequency . . . of exposures under the conditions of use," and a category of exposure with no likely frequency—community exposures that have materialized once in four decades anywhere, never near Plaintiffs' members, and not since the introduction of EPA's RMP program—fails to qualify here.

"[C]onditions of use" is defined as the "circumstances . . . under which a chemical substance is intended, known, or reasonably foreseen to be . . . used," 15 U.S.C. § 2602(4)—circumstances of commercial activity, not every consequence conceivably flowing from the remote probability of a complex series of failures. Plaintiffs' own illustration makes the point: launching a space shuttle is a planned activity, Opp. 39 n.20, but an explosion is not a "condition" of launching; it is the failure of the launch. The one example Plaintiffs' legislative history offers of an excluded condition—"intentional misuse," Opp. 39 n.21—confirms that departures from ordinary use fall outside the definition. Congress reached accidents expressly in other statutes and omitted that vocabulary from TSCA. 42 U.S.C. § 7412(r); 33 U.S.C. § 1321; *City of San Francisco v. EPA*, 604 U.S. 334, 335 (2025).

The Fifth Circuit's decision last month in *East Fork*—vacating EPA's methylene chloride rule[5]—confirms each point. The court held that there is "no getting around the conclusion" that TSCA determines and regulates risk "according to the actual, separate 'conditions of use'" of a chemical, and it vacated EPA's "whole-chemical" risk determination for departing from that framework. *East Fork*, slip op. at 13–15. The court read Section 6(b)(4)(F) as requiring EPA to "assess . . . the *likely* . . . exposures under the conditions of use," confirming that likelihood of exposure is the statutory touchstone. *Id.* at 13. And it reiterated that "Congress did not enact TSCA as a zero-risk statute" and that "unreasonable risk [of injury]" "does not incorporate any precautionary principle." *Id.* at 19–20 (quoting *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1215 (5th Cir. 1991)). That holding forecloses Plaintiffs' contention that TSCA's purpose of "forestall[ing] injury" changes the statutory standard. Opp. 38.

Plaintiffs' counterexample also fails to establish that *misuse* or unrelated equipment malfunctions constitute a "condition of use" under TSCA. In the 1,1-dichloroethane risk evaluation cited by Plaintiffs, Opp. 37 & n.18, EPA does not—contrary to Plaintiffs' assertion—state that it includes "catastrophic risks" as a

[5] Although East Fork is not binding in this Circuit, its reasoning is persuasive here—not least because Plaintiffs themselves invoke EPA's TSCA risk-evaluation procedural framework, Opp. 38 n.19 (citing 89 Fed. Reg. 37028 (May 3, 2024)), the direct successor to the 2017 procedural rule whose use-by-use commands *East Fork* enforced. *See East Fork*, slip op. at 14–15 (citing 82 Fed. Reg. 33726 (July 20, 2017)).

condition of use. Rather, EPA explicitly stated that it does not "generally … include exposures associated with extreme weather events within the scope of the risk evaluation," but that the Agency may consider as part of its "fact-specific, chemical-specific analysis" when specific information is available and "can provide additional characterization of facility operations and associated exposures." EPA, Office of Chemical Safety and Pollution Prevention, Risk Evaluation for 1,1-Dichloroethane at 87 (June 2025); Opp. 37, n.18. EPA included such exposures in its 1,1-dichloroethane risk evaluation precisely because a facility reported chemical discharge events associated with large storms that frequently affected its permitted chemical discharges—making those exposures "known" or "reasonably foreseen." That a certain type of release is sufficiently frequent to warrant consideration is not the same as redefining the statutory term "conditions of use" to encompass accidental releases. Regardless, analysis of an increase in the likelihood of an accidental release of a chemical due to natural hazards, including earthquakes, is addressed through RMP regulations, 40 C.F.R. §§ 68.3, 68.50; *see, e.g.*, EPA, General RMP Guidance—Chapter 6: Prevention Program (Program 2) (Apr. 2004), and, for California refineries, through Cal/OSHA's PSM and CalARP's mandatory seismic assessment requirements, 8 CCR § 5189, 19 CCR §§ 5050.1–5160.1.

Finally, *Safer Chemicals, Healthy Families v. EPA* held that EPA could not exclude from a risk evaluation activities indisputably within the statutory definition; it did not hold that accidents are conditions of use, and it reaffirmed TSCA's gap-

filling design. 943 F.3d 397, 406, 424–25 (9th Cir. 2019). *Alaska Community Action on Toxics v. EPA*, Opp. 41, addresses whether EPA may decline to regulate an acknowledged condition of use, including recycling, disposal, wastewater discharge, and use as sewage sludge, by invoking another statute—not whether accidents are conditions of use. 180 F.4th 1188, 1198 (9th Cir. 2026). Congress addressed accident prevention through the CAA, the OSH Act, and the HMTA, *see* WSPA Mot. to Dismiss, 4–6, 22–23 (also discussing these statutory programs' state counterparts); Section 9 of TSCA directs coordination, not duplication, 15 U.S.C. § 2608(a); and grievances about RMP amendments belong in the D.C. Circuit, 42 U.S.C. § 7607(b)(1). *Ctr. for Cmty. Action & Env't Just. v. BNSF Ry.*, 764 F.3d 1019, 1026–30 (9th Cir. 2014).

## V. Conclusion

The opposition confirms that the SAC does not supply the "drastically different allegations" the Court required. Order at 12. Plaintiffs lack Article III standing; they seek relief Section 21 does not authorize; and their reading of TSCA would convert it into the accident-prevention statute Congress declined to write and codified elsewhere. Because these defects are inherent in Plaintiffs' theory, further amendment would be futile, *Sweaney v. Ada Cnty.*, 119 F.3d 1385, 1393 (9th Cir. 1997), and the Court has advised that a further successful motion would be granted without leave to amend. Order at 13. WSPA respectfully requests that the Court dismiss the SAC with prejudice.

DATED: October 28, 2026

Respectfully submitted,

*/s/ Jason S. Mills*
Jason S. Mills (SBN 225126)
jason.mills@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
350 S. Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 612 7387
Facsimile: +1 213 612 2501

*/s/ Justin A. Savage*
Justin A. Savage (*pro hac vice*)
jsavage@sidley.com
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: +1 202 736 8000
Facsimile: +1 202 736 8711

*/s/ Nima H. Mohebbi*
Nima H. Mohebbi (SBN 275453)
nima.mohebbi@sidley.com
SIDLEY AUSTIN LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: +1 310 595 9500
Facsimile: +1 310 595 9501

*/s/ Brooklyn Hildebrandt*
Brooklyn Hildebrandt (SBN 350707)
bhildebrandt@sidley.com
SIDLEY AUSTIN LLP
350 S. Grand Avenue
Los Angeles, CA 90071
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Intervenor-Defendant Western States Petroleum Association, certifies that this brief contains 4,897 words, which complies with the word limit of L.R. 11-6.1.

DATED: October 28, 2026

*/s/ Justin A. Savage*
Justin A. Savage

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 28th day of October 2026, a true and complete copy of the foregoing has been filed with the Clerk of the Court pursuant to the Court's electronic filing procedures, and served on counsel of record via the Court's electronic filing system.

*/s/ Justin A. Savage*
Justin A. Savage